**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

In re EDWARD R. MARTIN,

No. 1:26-mc-00042

A member of the Bar of the
District of Columbia Court of Appeals
Bar Number: 481866

HON. CHRISTOPHER R. COOPER

_____

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517 in support of the removal of this attorney disciplinary action instituted by the Office of Disciplinary Counsel ("ODC") of the District of Columbia Court of Appeals, and in opposition to ODC's motion to remand this case to the D.C. Court of Appeals Board on Professional Responsibility ("the Board"). *See* Mot. to Remand, ECF No. 3. While not a party here, the United States has distinct interests in this matter. First, the guarantee of a federal forum in matters where relief is sought against federal employees for actions within the scope of their employment when they have raised a colorable federal defense is important to ensure federal employees are not chilled in carrying out their official duties.

Second, the United States' interests are amplified by the unprecedented nature of ODC's action, which targets a federal officer expressly based on his status and seeks to subject him—and, by extension, the government itself—to ODC's interpretation of the First and Fifth Amendments. ODC's action circumvents Congress's longstanding refusal to authorize individual-capacity constitutional claims against federal officers by bringing such a claim in the form of an attorney

disciplinary proceeding that in effect establishes a D.C. tribunal as the sole and final arbiter of the constitutionality of the federal government's operations through its agents. Worse still, ODC commenced this action while the respondent federal officer, then-interim U.S. Attorney Edward R. Martin, Jr., was in discussions with an educational institution during an ongoing federal inquiry into whether that institution was violating federal law. This is precisely the kind of action the federal officer removal statute and the Constitution's Supremacy Clause were designed to foreclose. This Court should accept removal jurisdiction under 28 U.S.C. § 1442(a)(1) to resolve a proceeding Martin has aptly called "a frontal attack on the discretionary power of a U.S. Attorney to investigate suspected violations of law." Removal Notice, ECF No. 1, at 9.

## FACTUAL AND PROCEDURAL BACKGROUND

The following is drawn from the notice of removal, the motion to remand, and their respective attached exhibits. *See id*. Martin has been licensed to practice law in the District of Columbia since June 10, 2003. *Id*. at 60 (Specification of Charges). Starting on January 20, 2025, Martin served as the interim U.S. Attorney for the District of Columbia. *Id*. at 2. He currently serves in another position at the Department of Justice. *Id*.

On February 17, 2025, Martin, in his capacity as interim U.S. Attorney, wrote to William Treanor, the Dean of Georgetown University Law Center ("GULC"). *Id*. at 43 (Feb. 17, 2025, Letter from Martin to Treanor ("Feb. 17 Letter")). Martin wrote that "it ha[d] come to [his] attention reliably" that GULC continued to "teach and promote DEI"—a common acronym for practices

2

purportedly meant to promote diversity, equity, and inclusion but that can often entail discrimination based on protected characteristics[1]—adding that this was "unacceptable." *Id*. Noting that he had "begun an inquiry into this," Martin asked whether Treanor had "eliminated all DEI from [his] school and its curriculum," and whether, "if DEI is found in [Treanor's] courses or [Treanor's] teaching in anyway," Treanor would "swiftly . . . remove it." *Id*. Martin added that, "no applicant for our fellows program, our summer internship, or employment in our office who is a student or affiliated with a law school or university that continues to teach and utilize DEI will be considered." *Id*. Martin offered Treanor to contact or meet with him about any questions Treanor might have. *See id*.

On March 5, Treanor responded to Martin. *Id.* Treanor claimed that Georgetown University prohibited discrimination and harassment and took its legal obligations seriously. *See id*. at 46 (Mar. 5, 2025, Letter from Treanor to Martin ("Mar. 5 Letter")). Treanor characterized Martin's letter as inquiring into GULC's curriculum and teaching, and asserted that Martin had refused to hire applicants from schools where he found the curriculum to be unacceptable. *See id*. Treanor contended that GULC had a First Amendment right to determine who may teach and what may be taught, and claimed that Martin's alleged threat not to hire GULC students violated the Constitution. *See id*. Treanor stated that he "look[ed]

---

[1] *See, e.g.*, *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 791 n.10 (4th Cir. 2024) ("[E]mployers may, if they so choose, utilize D&I-type programs. What they cannot do is take adverse employment actions against employees based on their race or gender to implement such a program. And as recounted above, the evidence presented at trial in this case was more than sufficient for a reasonable jury to conclude that is precisely what Novant Health did to Duvall.").

forward to confirming that any Georgetown-affiliated candidates for employment with [Martin's] office w[ould] receive full and fair consideration." *Id*. at 47. The Associated Press published an article containing contents of the letter. *See id*. at 6 (citing Michael Kunzleman, *Georgetown law dean rebuffs DEI warning from top federal prosecutor for DC*, Associated Press (March 6, 2025, at 7:51 p.m. EDT), https://apnews.com/article/trump-dei-georgetown-ed-martin-9bff842ed5ca3e4600de52ca6967fe9d).

Five days later, Phillip Argento, a retired Superior Court Judge in California and GULC alumnus, asked ODC to investigate Martin. *See* Removal Notice, ECF No. 1, at 50 (Mar. 10, 2025, Letter from Argento to Fox). Argento posited that Martin violated D.C. Rules of Professional Conduct (DCRPC) 1.1 (requirement to provide competent representation), 3.1 (assertions must have basis in law or fact), and 4.1 (prohibition on knowingly making false statements). *Id*. at 50-54.

According to the Specification of Charges, Martin sent a letter to Treanor on March 17, 2025, repeating his prior inquiries about the status of GULC's DEI programs and observing that Georgetown University operates as a non-profit whose tax status is governed by 26 U.S.C. § 501(c)(3). *See id*. at 62 (Specification of Charges). Martin stated, "Until you answer my questions in full, as my initial letter stated, no Georgetown Law student will be considered for our fellows program, our summer internships, or employment in our office." *Id*. That day, Martin also wrote a letter to Georgetown's interim President and Chairman of the Board of Directors,

4

reporting Treanor's refusal to respond to his questions and stating that this "appear[ed]" to bear on the university's tax status and receipt of federal funds. *Id.*[2]

By this time, and unrelatedly, Martin had raised concerns with Fox about his seemingly irregular conduct and the politicization of D.C.'s attorney disciplinary process.[3] On March 28, Fox asserted in a letter to Martin that violating an attorney's oath of office and its included promise to "support the Constitution of the United States of America" constitute professional misconduct under D.C. Bar Rule XI § 2(b), and stating that he had decided to investigate Martin's conduct based on Argento's letter. *See id.* at 36 (Mar. 28, 2025, Letter from Fox to Martin).[4] Fox demanded that Martin answer several questions, including how it was "consistent" with Martin's "oath to support the Constitution" to "direct the acceptable curriculum of a private educational institution," "direct what a school affiliated with a religious institution may teach," and "deny employment to the students and graduates of an accredited law school unless you approve of that law school's

---

[2] Neither of the March 17 letters are currently part of the record. The United States recites the allegations as contained in the Specification of Charges.

[3] Ten days before his first letter to Treanor, Martin wrote to Fox discussing concerns about the politicization of ODC's attorney disciplinary process. *See id.* at 22 (Feb. 7, 2025, Letter from Martin to Fox). On March 5 and 6, 2025, Martin sent emails to Fox and D.C. Court of Appeals Chief Judge Anna Blacksburne-Rigsby noting Fox's "irregular public conduct" and complaining about Fox's apparent disclosure to the Washington Post of Martin's prior letter to Fox. *Id.* at 27 (Mar. 5, 2026, Email from Martin to Fox and Chief Judge Blacksburne-Rigsby); *id.* at 30 (Mar. 6, 2025, Email from Martin to Fox and Chief Judge Blacksburne-Rigsby).

[4] The D.C. Bar Rules differ from the DCRPC. The DCRPC define the ethical duties of attorneys admitted to practice law in the District. The D.C. Bar Rules were promulgated by the D.C. Court of Appeals to establish the bar association, govern members of the bar, and provide rules for disciplinary proceedings.

curriculum and teaching methodology." *Id.* at 37. Fox contended that a failure to respond to his questions may result in discipline. *See id.* at 36-38.

On March 31, Martin wrote several judges of the D.C. Court of Appeals and copied White House Counsel David Warrington, explaining he would not respond to Fox's questions in his March 28 letter for three reasons: (1) Martin had a complaint pending against Fox based on his "uneven conduct"; (2) Argento's letter did not warrant a response because Argento lacked personal knowledge of Martin's conduct; and (3) Martin's dealings with GULC were "*an ongoing matter in [Martin's] office*" in which GULC had "obtained outside counsel who requested a meeting" with Martin "about the concerns expressed," such that all involved should "respect confidentiality." *Id.* at 40-41 (Mar. 31, 2025, Letter from Martin to Chief Judge Blackburne-Rigsby) (emphasis added).

After further disputes over the propriety of ODC's handling of Fox's March 28 letter, Martin responded to ODC's questions about the Argento letter. *See* Mot. to Remand, Ex. 4, ECF No. 3-2, at 56-60 (May 20, 2025, Letter from Sargeant to Martin). In the meantime, Martin's efforts to challenge Fox's alleged misconduct continued. The Board eventually denied a motion by Martin to disqualify Fox from the investigation of Martin. *See id.* at 61 (Order Denying Disqualification).

On March 6, 2026, ODC filed with the Board a two-count Specification of Charges against Martin. *See* Removal Notice, ECF No. 1, at 60 (Specification of Charges). In Count I, ODC offered its characterization of Martin's February 17 letter to Treanor, Treanor's March 5 letter in response, Martin's March 17 letter in reply, and Martin's March 17 letter to the interim President and Chairman of the

Board of Directors of Georgetown University. *See id.* at 61-63. ODC asserted that "Mr. Martin knew or should have known that, as a government official, his conduct violated the First and Fifth Amendments to the Constitution of the United States" because he allegedly: (i) demanded that GULC change the content of its teaching; (ii) threatened to punish GULC for teaching and promoting DEI without defining that term; (iii) acted "in his official capacity" and spoke "on behalf of the government" to suppress GULC's DEI-related viewpoint; (iv) demanded that GULC relinquish its First Amendment rights in order to receive government employment opportunities; and (v) failed to give GULC notice of what conduct was prohibited and provide adequate procedures to avoid any penalty. *Id.* at 63-64. ODC asserted that Martin's alleged conduct "violated his oath of office as an attorney admitted to the Bar of the District of Columbia Court of Appeals, in which he swore to 'support the Constitution of the United States of America,' and therefore is grounds for discipline pursuant to Rule XI, § 2(b)." *Id.* at 64.[5]

On March 30, 2026, Martin filed an answer to the Specification of Charges. *Id.* at 69 (Answer). Martin contended that the Supremacy Clause deprived the Board of jurisdiction to adjudicate the charges against him, and raised additional jurisdictional and merits defenses. *See id.* at 70-88. Martin argued he had not

---

[5] Count II asserted that Martin's communications with judges violated DCRPC 3.5(d)'s prohibition against unauthorized *ex parte* communications and his alleged conduct before responding to ODC's questions violated DCRPC 8.4(d)'s prohibition against conduct that seriously interferes with the administration of justice. *See id.* at 64-67. Because Count I clearly supports removability of the entire action, *infra* n.7, Count II is not the basis for this Statement of Interest.

committed misconduct because he was engaged in the "lawful and proper execution of the President's Executive Orders relating to DEI and Weaponization," noting that Georgetown University was a "large federal contractor and is therefore governed by federal anti-discrimination laws in contracting" and by a "recently issued Executive Order"; that the university "annually administers hundreds of millions of dollars in federal student aid funds, including loans and grants"; and that the "administration and operations of Georgetown's educational programs are therefore subject to both Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §§ 1681–1688." *Id*. at 83-84.[6]

On April 7, Martin removed ODC's action to this Court, citing 28 U.S.C. §§ 1331, 1441, 1442, and 1446. *See id*. at 1 (Notice of Removal). With respect to § 1442, which authorizes removal of state court actions against an "officer" of the United States "for or relating to any act under color of such office," § 1442(a)(1), Martin alleged that, based on his role as interim U.S. Attorney and his subsequent federal positions, he was a federal officer at all relevant times. Removal Notice, ECF No. 1, at 2. Martin also maintained that ODC's disciplinary action was "for or relating to" his acts under color of office in investigating Fox's misconduct, *see id*. at 2-4, 7-9, and GULC's DEI practices, *see id*. at 3, 5-6. Connecting those acts to his official duties, Martin alleged that his February 17 letter to Treanor "requested information and clarification concerning Georgetown University Law School's

---

[6] In support of this defense, Martin cited case law, Georgetown University's financial disclosures on its website, and executive orders setting forth policies to combat DEI-related discrimination in employment and other areas. *See id*.

ongoing implementation and enforcement of allegedly illegal or otherwise non-compliant Diversity, Equity, and Inclusion ('DEI') policies covered by" Executive Order 14151, *id*. at 5-6, which directed the federal government to eliminate all DEI-related action plans, programs, and employee performance requirements from the government as well as its contractors and grantees. *See* Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025). Martin explained he was entitled to a federal forum in which to raise a colorable federal defense of Supremacy Clause immunity based on ODC's attempt to mount "a frontal attack on the discretionary power of a U.S. Attorney to investigate suspected violations of law" and "hobble" the "operation of the national government" with "harassing and pretextual enforcement actions by a politically hostile municipal Disciplinary Counsel." Removal Notice, ECF No. 1, at 8. Martin raised additional federal defenses. *See id*. at 9-17.

On April 17, ODC moved to remand for lack of subject matter jurisdiction. *See* Mot. to Remand, ECF No. 3, at 1. In its motion, ODC argues that 28 U.S.C. § 530B, which addresses certain applications of state laws governing attorney conduct to federal attorneys, bars removal of disciplinary proceedings. *See id*. at 6-7. ODC also asserts that Martin's letters to Treanor were not prepared under the color of his office because Martin did not characterize his inquiry as an investigation or GULC's actions as illegal. *See id*. at 8-10. ODC further contends that its attorney disciplinary proceeding against Martin is not a removable "civil action" or "criminal prosecution" under 28 U.S.C. § 1442(a)(1) because it does not involve the type of

9

injury, relief, or procedures typically available in a civil lawsuit and lacks the threat of criminal penalties. *See id.* at 2-6.

## ARGUMENT

### I.    The federal officer removal statute must be broadly construed in favor of removal.

The federal officer removal statute, 28 U.S.C. § 1442, provides that a "civil action or criminal prosecution that is commenced in a State court" may be removed to federal court when it is against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." § 1442(a)(1). The statute and its predecessors "were enacted to maintain the supremacy of the laws of the United States by safeguarding officers and others acting under federal authority against peril of punishment for violation of state law." *Colorado v. Symes*, 286 U.S. 510, 517 (1932). For well over a century, the Supreme Court has "emphasized the need to safeguard the exercise of legitimate federal authority" through removal to federal court of proceedings that implicate federal government operations. *Arizona v. Manypenny*, 451 U.S. 232, 241 n.16 (1981) (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). The Supreme Court has also repeatedly affirmed that the federal officer removal statute must "be liberally construed to give full effect to the purposes for which [it was] enacted." *Symes*, 286 U.S. at 517. Those purposes include ensuring a defendant's "*right* to assert a colorable defense of official immunity in a federal forum." *O'Bryan v. Chandler*, 356 F. Supp. 714, 719 (W.D. Okla. 1973). "[O]ne of the most important reasons for removal is to have the validity

of the defense of official immunity tried in a federal court." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

## II.   Martin properly removed this matter, which arises from investigative acts under color of office.

When viewed in light of the federal officer removal statute's broader purpose, it is clear that Martin may remove this attorney disciplinary proceeding based on Count I of the Specification of Charges, which arises from his efforts to acquire information about possible violations of federal law.[7] Three elements must be satisfied to remove under the statute: (1) the "removing defendant must be . . . a federal officer"; (2) the suit must be "for or relating to any act under color of such office"; and (3) the removing defendant must assert "a colorable federal defense." *Chevron USA Inc. v. Plaquemines Par.*, 606 U.S.__, Slip Op. at 2, 2026 U.S. LEXIS 1627 at *7-8 (April 17, 2026) (internal citations omitted). There is no dispute as to the first removal element because Martin was a federal officer. Removal Notice, ECF No. 1, at 2; *id.* 60-61 (Specification of Charges).

As to the second element, in evaluating whether the removing federal officer acted "under the color" of his or her office, the district court must "credit the [removing party's] theory of the case" and determine only whether he or she has made an "adequate threshold showing" for removal purposes. *Jefferson County v.*

---

[7] When a single count is properly removable, the district court may remove the rest of the matter as well. *See Nadler v. Mann*, 951 F.2d 301, 306 & n.9 (11th Cir. 1992); *see also Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022). Thus, regardless of whether Count II is removable, the entire proceeding should be removed along with Count I, the basis of this Statement of Interest. This Statement of Interest therefore does not address Count II.

*Acker*, 527 U.S. 423, 432 (1999); *see K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020). Even when a local government attempts to rebut the federal officer's allegations with evidence, the officer is not required to definitively "'exclude[] the possibility that the suit is based on acts or conduct not justified by his federal duty' before removal." *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017) (quoting *Osborn v. Haley*, 549 U.S. 225, 249 (2007)). Instead, it is "enough" that an officer's "acts or their presence at the place in performance of their official duty constitute the basis, though mistaken or false," of the action. *Willingham*, 395 U.S. at 409 (internal marks omitted). In that vein, the officer may satisfy the "colorable federal defense" element of removal via mere "plausible" allegations supporting a federal defense. *Kleinert*, 855 F.3d at 313.

## A. This action is "for or relating to" an inquiry into possible unlawful discrimination, which is within the scope of Martin's duties.

Martin's inquiry to Treanor about GULC's use of DEI practices at least "related to" acts under the color of his office. As the interim U.S. Attorney, Martin had the duty to "prosecute for all offenses against the United States," 28 U.S.C. § 547(1), "prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned," 28 U.S.C. § 547(3), and "secur[e] evidence therefor," 28 U.S.C. § 516. Those duties included investigating possible violations of federal civil rights laws to determine whether to commence litigation. *See* 28 C.F.R. § 50.3(c)(I)(B)(1) (discussing Department of Justice enforcement of Title VI of the Civil Rights Act of 1964); *see generally Nadler*, 951 F.2d at 305; *cf. United States v. Florida*, 938 F.3d 1221, 1244 (11th Cir. 2019)

12

("Congress knew that both Title VI and the Rehabilitation Act had been enforced through Department of Justice litigation . . . ."). The sort of preliminary fact-gathering efforts Martin undertook through his inquiry fell well within his duties as interim U.S. Attorney, enabling him to evaluate whether GULC—an educational institution receiving federal funds subject to Title VI of the Civil Rights Act and Title IX of the Education Amendments of 1972, *see* Removal Notice, ECF No. 1, at 83-84 (Answer); 20 U.S.C. § 1681; 42 U.S.C. 2000d; 42 U.S.C. 2000e(a)-(b)—engaged in any practices that might violate those laws.

Notably, depending on the circumstances, an institution like GULC might violate those laws under the banner of "DEI" by, for example: enacting discriminatory admissions policies mislabeled as efforts to combat racism; or promoting or ignoring in-classroom harassment or shaming of members of certain racial or gender groups in the guise of lessons on diversity. Thus, possible uses of what may be labeled DEI fell within Martin's investigatory duties.[8]

---

[8] *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638-54 (1999) (recognizing that school receiving federal funds and acting with deliberate indifference to pervasive student-on-student sexual harassment may be liable under Title IX); *Duvall*, 95 F.4th at 781-90 (upholding jury verdict that employer's termination of high-performing white man and promotion, in his stead, of two women following adoption of "Diversity and Inclusion Strategic Plan" constituted unlawful discrimination under Title VII); *cf. Sargent v. Sch. Dist. of Phila.*, 165 F.4th 727, 739-50 (3d Cir. 2026) (finding triable fact issue where public school admissions process created in wake of "Anti-Racism Declaration" and "Goals and Guardrails" document meant to address "systemic racism" supported inference of discriminatory intent and impact in violation of Equal Protection Clause); *see generally Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214-31 (2023).

Martin acted to perform his duty to investigate whether GULC implemented such potentially unlawful DEI practices when he sent a letter to Treanor asking for information about GULC's "promot[ion]" of "unacceptable" DEI and whether such DEI practices had been "eliminated . . . from [the] school." Removal Notice, ECF No. 1, at 43 (Feb. 17 Letter). Because an "unacceptable" promotion of DEI that needed to be "eliminated" from GULC would include the sorts of unlawful DEI practices set forth above, Martin's letter indicated he was seeking evidence corroborating or undermining "reliabl[e]" information he had received about violations of civil rights laws, *id.*, thereby pursuing his duty to enforce those laws. In his follow-up letter of March 17, Martin renewed his requests for such information, further fulfilling the same duty to investigate possible civil rights violations.

ODC insists Martin was not performing his investigative duties because he failed to explicitly declare GULC's suspected actions "illegal" in those words or label his inquiry an official "investigation." Mot. to Remand, ECF No. 3, at 9-10. But Martin's restraint in declining to announce that GULC was the target of a formal investigation or had broken the law—something Martin sought to investigate, not pre-judge—did not diminish the clear purpose of his request. Martin asked, on behalf of the United States, for information about certain actions within the U.S. Attorney's Office's purview to "beg[i]n an inquiry" and to "act on" "requests for information and clarification." Removal Notice, ECF No. 1, at 43 (Feb. 17 Letter). In other words, Martin asked about actions that were properly the subject of that office's power and duty to investigate possible violations of federal law. Thus, he

14

acted in furtherance of his federal investigatory duties, regardless of the specific terms he did or did not use.

ODC also argues that Martin was not acting under the color of his office when he sent the initial letter to Treanor because the letter allegedly indicated that the U.S. Attorney's Office would not employ GULC graduates unless the school eliminated DEI, which ODC views as a punishment without due process rather than part of an investigation. *See* Mot. to Remand, ECF No. 3, at 10. But the initial letter did not announce any particular potential or actual employment action with respect to GULC. Nor is there any evidence that the U.S. Attorney's Office denied employment to GULC graduates. Rather, without naming any particular school, Martin explained that "no applicant . . . affiliated with *a* law school or university that *continues to teach and utilize* DEI will be considered." Removal Notice, ECF No. 1, at 43 (Feb. 17 Letter) (emphases added).

In the context of the letter "inquiring" about DEI that was "unacceptable," Martin's statement was not a determination that GULC had violated the law or that anyone at GULC should not be hired. At most, it was a cautionary statement that his office would not consider employing anyone who was, in fact, found to be associated with any unlawful practice "utiliz[ing]" DEI. Even if unartfully phrased, Martin's statement that his office would not consider students or employees from a school that participated in violations of federal civil rights laws was related to his federal duty to uphold federal law. Moreover, statements regarding employment at the U.S. Attorney's Office clearly fell within the scope of Martin's federal duties as interim U.S. Attorney. Since this Court must credit Martin's theory that the letter

15

"requested information and clarification concerning Georgetown University Law School's ongoing implementation and enforcement of allegedly illegal or otherwise non-compliant Diversity, Equity Inclusion ("DEI") policies covered by" Executive Order 14151, *id.* at 5-6; *see Acker*, 527 U.S. at 432, ODC's competing interpretation of the letter as a final decision to deny someone employment cannot thwart removal.[9]

Moreover, parsing words or sentences within the same letter to determine whether each one is consistent with a federal officer's duty, as ODC attempts to do, represents an impermissibly "narrow, grudging interpretation of § 1442(a)(1)." *Willingham*, 395 U.S. at 407. A myopic focus on a single step in the relevant conduct, isolated from its context, cannot justify denying removal. Rather, whether a proceeding is "for or relating to" an act under color of office, 28 U.S.C. § 1442(a)(1), depends on whether the officer's conduct and "the 'circumstances that gave rise to the . . . liability'" had some connection to his federal duties. *K&D LLC*, 951 F.3d at 508 (quoting *Acker*, 527 U.S. at 433). In context, Martin's overall conduct was in pursuit of his federal investigative duties, rendering removal proper.

Lastly, even if this Court were to find that Martin's drafting of some portion of the letters to Treanor and Georgetown University was not an act under color of

---

[9] In his March 17 letter, Martin allegedly said he would not hire GULC students until Treanor had answered his inquiry. *See* Removal Notice, ECF No. 1, at 62 (Specification of Charges). Martin could reasonably have believed this statement was necessary to fulfill his duty to preserve the integrity of the inquiry by avoiding employing anyone at GULC, who may be a witness to or involved in suspected unlawful practices (about which GULC was silent in response to inquiries). No record evidence demonstrates the U.S. Attorney's Office declined to consider or rejected an applicant on the grounds mentioned in the letter.

office, this proceeding would still be removable as one "related to" acts under color of office. As the Supreme Court recently explained, "The phrase 'relating to' sweeps broadly. . . . It contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits 'relate to' such acts." *Plaquemines Parish*, Slip Op. at 7-12, 2026 U.S. LEXIS 1627 at *14-19 (internal quotation marks, citations, and punctuation omitted). Because Martin prepared and sent the letters to Treanor to request information about whether GULC's DEI practices amounted to unlawful discrimination, this matter arises from conduct that at least "relate[s] to" acts under color of Martin's office, even if his duties are eventually found not to encompass the writing of these letters. *See id.*

### B. Martin has raised a colorable federal defense.

One federal defense justifying removal of an action is the doctrine of Supremacy Clause immunity. *See Wyoming v. Livingston*, 443 F.3d 1211, 1224 (10th Cir. 2006); *see also Girard v. Wilson*, 152 F. Supp. 21, 26 (D.D.C. 1957) ("Since the petitioner's act was committed in the performance of official duty, under the principles announced by the Supreme Court in the case of *In re Neagle*, the petitioner is accountable only to United States Federal jurisdiction for any act or omission." (internal citation omitted)). The Supremacy Clause of the U.S. Constitution forbids states from regulating, burdening, or otherwise impeding the activities of the federal government. *See* U.S. Const. art. VI, cl. 2; *Hancock v. Train*, 426 U.S. 167, 178 (1976); *McCulloch v. Maryland*, 17 U.S. 316, 426 (1819). In *In re Neagle*, 135 U.S. 1 (1890), the Supreme Court construed the Supremacy Clause to provide immunity to a federal employee from criminal prosecution by a state for

17

acts performed in the course of that employee's federal duties. 135 U.S. at 75. This immunity extends to non-criminal matters. *See Brown v. NationsBank Corp.*, 188 F.3d 579, 589 (5th Cir. 1999). Under *Neagle* and its progeny, the Supremacy Clause requires dismissal of a state action against a federal officer if the officer: (1) was "in the performance of an act which he is authorized by federal law to do as part of his duty," and (2) did "'no more than what was necessary and proper for him to do.'" *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982) (quoting *Neagle*, 135 U.S. at 75); *see also Birsch v. Tumbleson*, 31 F.2d 811, 814 (4th Cir. 1929) (the officer must have engaged in conduct which "was necessary, or at least believed by them to be necessary, to properly discharge their duties, or for their own protection").

  i.      *Martin has plausibly alleged he acted in the scope of his duty.*

Under the first prong of the Supremacy Clause immunity test, an officer performs "an act which he is authorized by federal law to do as part of his duty" when his or her conduct is authorized by "the general scope" of the officer's duty. *Baucom*, 677 F.2d at 1350; *see also Clifton v. Cox*, 549 F.2d 722, 726 (9th Cir. 1977) ("To be within that perimeter, and therefore absolutely privileged, [i]t is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official." (internal quotation marks and citations omitted)).

For the same reasons that Martin has adequately alleged that he was a federal officer acting under the color of federal law, *see supra* Part A, he has also alleged that his conduct in sending the letters to Treanor fell within "the general

18

scope" of his duty, thereby raising a colorable claim under the first prong of the Supremacy Clause immunity test. *Baucom*, 677 F.2d at 1350.

ii.    *Martin has plausibly alleged his actions were necessary and proper.*

The second prong of the Supremacy Clause immunity analysis turns on whether the federal agent's actions were "no more than what was necessary and proper." *Neagle*, 135 U.S. at 75. Put differently, federal agents "who reasonably believed that their acts were necessary to perform their duties" are entitled to Supremacy Clause immunity. *Livingston*, 443 F.3d at 1221. The reasonableness of the officer's belief is evaluated at the time the relevant actions occurred, even if that belief turns out to have been mistaken. *See New York v. Tanella*, 374 F.3d 141, 143-44, 151 (2d Cir. 2004); *Clifton*, 549 F.2d at 727-28; *Maryland v. DeShields*, 829 F.2d 1121, 1987 WL 38619, at *6 (4th Cir. 1987).

Under this rubric, Martin has plausibly alleged he "had an honest and reasonable belief that what he did was necessary in the performance of his duty," *In re McShane's Petition*, 235 F. Supp. 262, 274 (N.D. Miss. 1964), when he sent letters to investigate possible unlawful discrimination. Martin alleged in the letters to Treanor and his removal notice that, according to information he believed to be reliable, GULC was promoting unacceptable and hence potentially illegal DEI policies. *See* Removal Notice, ECF No. 1, at 5-6; *id.* at 43 (Feb. 17 Letter) ("It has come to my attention reliably that Georgetown Law School continues to teach and promote DEI."). Because Martin's letter sought information about GULC's DEI practices, he could have reasonably believed his inquiry was a proper means of

19

executing his duty to investigate policies and practices that violate federal anti-discrimination laws.

Even if this Court were to accept GULC's subsequent assertions that its DEI practices were legal and protected by the First Amendment—which it should not at this stage, where Martin's allegations must be credited—Martin's belief that his inquiry may uncover evidence of illegality, even if mistaken, was reasonable. In forming that belief, Martin could reasonably have relied on Executive Order 14151's determination that special preferences and "equity action plans" labeled "DEI" were illegal, warranting the elimination of that type of DEI initiative by federal contractors and grant recipients. *See* Executive Order 14151 §§ 1, 2(b)(i). Additionally, courts have found that certain actions that may fall under the rubric of "DEI," such as an institution's use of racial preferences in admissions or employment, can violate federal civil rights statutes. *See supra* note 8. Thus, regardless of whether Martin's position on the legality of DEI initiatives proved correct, it was reasonable for him to believe that the sort of unacceptable DEI practices referred to in his letters were unlawful and that his inquiry fell within the scope of his duties.

Likewise, Martin could have reasonably believed that simply asking questions about whether GULC taught, promoted, or utilized impermissible DEI imposed no significant burden on speech and constituted a narrow and lawful means to further the government's compelling interest in investigating discrimination. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2009) ("[R]acial insults or sexual advances directed at particular

20

individuals in the workplace may be prohibited on the basis of their non-expressive qualities, as they do not seek to disseminate a message to the general public, but to intrude upon the targeted listener, and to do so in an especially offensive way."); *Garrett v. City Univ. of N.Y.*, No. 24-cv-9710, 2025 U.S. Dist. LEXIS 201916 at *15-53 (S.D.N.Y. Oct. 10, 2025) (instances of severe and pervasive antisemitic harassment targeted at particular individuals, as opposed to offensive comments on matters of public concern, were actionable under Title VII and enforcing prohibition against such harassment did not violate First Amendment); *see generally R.A.V. v. St. Paul*, 505 U.S. 377, 388-390 (1992). Here, Martin could have reasonably believed that DEI practices included harassment of individuals undertaken in the guise of, and facilitated by, DEI lessons, trainings, or policy, that did not fall within the protection of the First Amendment and were properly subject to investigation.

In addition, contrary to ODC's claims, because there is no recognized due process interest in a prospective government job, Martin could have reasonably believed that sending letters indicating an unwillingness to hire persons associated with unlawful DEI practices, without taking action regarding any particular applicant, did not violate the Due Process Clause. *See Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 434 (S.D.N.Y. 2017); *Kosinski v. Conn. State Dep't of Educ.*, No. 3:10-cv-0805, 2011 WL 1134236, at *5 (D. Conn. Mar. 24, 2011); *see generally Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972). In any event, this Court need not decide the point now. Even assuming *arguendo* that GULC's and ODC's constitutional arguments were relevant to the immunity issue and Martin's position was mistaken, that would bear on the merits of his immunity

21

defense, not whether his assertions establish a colorable federal defense for removal purposes. *See Kleinert*, 855 F.3d at 313 ("'Colorable' here means plausible, not 'clearly sustainable.'" (quoting *Acker*, 527 U.S. at 432)).

> iii.   *The McDade Amendment does not bind federal officers to state interpretations of the Constitution or otherwise preclude immunity.*

ODC asserts that 28 U.S.C. § 530B, the McDade Amendment, precludes immunity because it purportedly requires Department of Justice attorneys to obey local attorney licensing and ethics rules in all circumstances, including a local disciplinary body's interpretation under its rules of the U.S. Constitution. *See* Mot. to Remand, ECF No. 3, at 6-8. But the McDade Amendment does not require federal government attorneys to follow a local bar's constitutional interpretation—even when that interpretation is framed as a local ethics rule—in the course of their federal duties. Consequently, the McDade Amendment does not make a federal government attorney's actions any less necessary and proper simply because they offend ODC's views on the Constitution.

Under the McDade Amendment, "An attorney for the Government shall be subject to State laws and rules . . . governing attorneys in each State where such attorney engages in that attorney's duties, to the *same extent* and in the *same manner* as other attorneys in that State." 28 U.S.C. § 530B(a) (emphases added). The Amendment thus does not sanction a local disciplinary counsel to bring an action against a federal government attorney—based on the government attorney's federal role—that seeks to enforce constitutional provisions, which apply solely to

government attorneys. Doing so applies "State law and rules" to that attorney to a different "extent" and in a different "manner" than local private attorneys.

In addition, nothing in the legislative history of the McDade Amendment suggests Congress intended to require federal government attorneys to obey substantive rules of conduct beyond typical professional ethics rules. Rather, Congress passed the McDade Amendment to address an open question as to the application of state ethics rules to government attorneys and to respond to traditional attorney ethics concerns in the wake of congressional debates over federal prosecutors' contact with represented persons, pursuit of investigations for allegedly partisan political reasons, and conflicts of interest. *See* 142 Cong. Rec. H7229-30 (Statements of Representatives Murtha and Conyers); *United States v. Brown*, 595 F.3d 498, 516 (3d Cir. 2010).

Thus, because Congress did not "clearly and unambiguously" consent to state rules that purport to mandate government attorneys' compliance with the state bar's interpretation of the Constitution or substantive legal principles, government attorneys need not comply with such rules. *See United States v. Washington*, 596 U.S. 832, 839-40 (2022) (for a court to "find that Congress has authorized regulation that would otherwise violate the Federal Government's intergovernmental immunity" from state regulation, "Congress must provide clear and unambiguous authorization for this kind of state regulation" (internal quotation marks, punctuation, and citation omitted)); *Stern v. U.S. Dist. Ct.*, 214 F.3d 4, 19 (1st Cir. 2000) ("[I]t simply cannot be said that Congress, by enacting section 530B, meant to empower states . . . to regulate government attorneys in a manner inconsistent with

23

federal law. . . . [the Attorney General's] regulations dispel the notion that section 530B grants states and lower federal courts the power, in the guise of regulating ethics, to impose strictures that are inconsistent with federal law."); *see also* 28 C.F.R. § 77.1(b) ("Section 530B requires Department attorneys to comply with state . . . rules of professional responsibility, but should not be construed in any way to alter federal substantive, procedural, or evidentiary law . . . .").[10] As a result, a federal government attorney acts in a manner necessary and proper to his federal duties even when he contravenes a local bar's rules that, like the alleged violations here, attempt to impose a substantive legal obligation beyond the traditional purview of attorney ethics.

Count I is exactly the sort of targeted and unusual application of a local government's substantive rules to federal officials that the McDade Amendment does not allow and which the Supremacy Clause prohibits. On its face, Count I seeks to discipline Martin because, in ODC's view, he "knew or should have known that, *as a government official*, his conduct violated the First and Fifth Amendments to the Constitution of the United States" when, *"[a]cting in his official capacity* and speaking *on behalf of the government*," he "used coercion to punish or suppress a

---

[10] For this reason, courts have found that McDade does not apply when a state rule of professional conduct interferes with federal grand jury practice or other federal substantive and procedural rules; rather it allows only the application of traditional state ethics rules to federal attorneys. *See Stern*, 214 F.3d at 19-21 (McDade does not apply to state ethics rule requiring judicial approval before subpoenaing lawyer in grand jury proceeding); *cf. United States v. Colo. Sup. Ct.*, 189 F.3d 1281, 1284-89 (10th Cir. 1999) (McDade applies only to state rules of ethics, not to substantive rules or rules of procedure that conflict with federal laws).

24

disfavored viewpoint, the teaching and promotion of 'DEI.'" Removal Notice, ECF No. 1, at 63 (Specification of Charges) (emphases added).

This count expressly singles out Martin based on his government role and applies ODC's interpretation of the First and Fifth Amendments, which, as the charge itself recognizes, is only applicable to those who act "as a government official." And while Count I purports to charge Martin with violating his oath for admission to the bar, the sole alleged violation is his supposed failure to "support the Constitution of the United States of America." *Id.* at 64. Thus, instead of applying local disciplinary rules "to the same extent" and "in the same manner" as it does to attorneys in general, ODC seeks to discipline a federal government attorney based on his government role and on ODC's interpretation of constitutional provisions that apply only to government actors. Accordingly, the McDade Amendment did not require Martin to follow ODC's interpretation of the Constitution, and his alleged failure to do so cannot establish that he acted outside the scope of his duties or lacks a colorable federal defense.[11]

---

[11] ODC's reliance on *United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993), is misplaced. The *Ferrara* court dismissed the case for lack of personal jurisdiction, *id.* 967-68, 970, so any discussion of the scope of Supremacy Clause immunity is dicta. *Ferrara* also predates the McDade Amendment and more recent decisions clarifying that the government's consent to the neutral application of traditional state ethics rules does not subject federal government attorneys to substantive state regulation. *See Stern*, 214 F.3d at 19-21; *Colo. Sup. Ct.*, 189 F.3d at 1284-89.

C. **The disciplinary action functions as a "civil action" or "criminal prosecution" within the meaning and intent of the federal officer removal statute.**

The disciplinary action against Martin is the type of action subject to removal under § 1442(a)(1). In *Kolibash v. Comm. on Legal Ethics of the W. Va. Bar*, 872 F.2d 571 (4th Cir. 1989), the Fourth Circuit held that a state bar disciplinary proceeding against the U.S. Attorney for alleged negligent supervision was removable. *See id.* at 575-76. In doing so, the court applied a functional test. First, the court defined the disciplinary proceeding as "quasi-civil." *Id.* at 576. Second, the court noted that § 1442(a) should be "broadly construed." *Id.* (internal citation omitted). And third, the court focused on the central concern of the removal statute—the state's power to subject federal officers to state processes—as well as the adversarial nature of the bar proceedings and stated that form should not be elevated over substance. *Id.* Thus, the court held, the bar proceedings satisfied the requirements of § 1442. *Id.* Here, too, the disciplinary action against Martin functions as an adversarial proceeding that seeks to subject him to local government process for acting contrary to ODC's interpretation of the Constitution in the course of his federal duties. As in *Kolibash*, the core purpose of the removal statute—the litigation of his federal defense in a federal forum—would be served by hearing the case in federal court.

As ODC points out, another decision in this district, *In re Clark*, 678 F. Supp. 3d 112 (D.D.C. 2023), denied removal of a disciplinary proceeding against another government official on the theory that such a proceeding is not a "civil action" or "criminal prosecution" within the meaning of § 1442(a)(1). *See id.* at 125-133. But

the removability of bar proceedings remains an open question in the D.C. Circuit, which has not ruled on the issue and declined to do so on appeal in *Clark*. *See In re Clark*, No. 23-7073, 2024 U.S. App. LEXIS 17160 at *3, *13-16 (D.C. Cir. July 12, 2024).

Furthermore, *Clark* is unpersuasive. The decision proceeds from the premise that a government attorney cannot remove state disciplinary proceedings to federal court because they do not seek damages, equitable relief, or criminal punishment of the kind available in traditional civil suits or criminal prosecutions, and thus are not "civil actions" or "criminal prosecutions." *See Clark*, 678 F. Supp. 3d at 122-25. This narrow reading of the statute is contrary to its purpose, which mandates a broad interpretation of its terms in favor of removal. *See Watson v. Philip Morris Cos.* 551 U.S. 142, 147 (2007); *Wisconsin v. Schaffer*, 565 F.2d 961, 963 (7th Cir. 1977) (noting that the language "civil action or criminal proceeding" should be "broadly construed in the light of the purpose" of § 1442(a)(1)). As the Fourth Circuit explained, an attorney disciplinary proceeding uses adjudicatory procedures and can result in orders limiting or stripping an attorney of his or her ability to practice law, *see Kolibash*, 872 F.2d at 576, resulting in practical effects similar to injunctive and declaratory relief. Hence, under the proper functional approach, a quasi-civil attorney disciplinary proceeding is functionally a civil action subject to removal. *Cf. In re Lusk*, No. CV 16-0930, 2016 U.S. Dist. LEXIS 100583 at *7-12 (C.D. Cal. July 30, 2016) (following functional approach to removal statute in case involving threatened seizure of government attorney's law practice).

Moreover, even the district court in *Clark* acknowledged that a disciplinary proceeding could in certain circumstances function as a criminal prosecution by another name, warranting removal. *See Clark*, 678 F. Supp. 3d at 123-25. In that vein, a disciplinary proceeding involving unique circumstances may resemble a civil action as a functional matter, permitting removal. This is such a case.

Unlike the typical bar proceeding, Count I resembles a constitutional tort claim which, if available at all, can only be brought as a civil suit under federal law in federal court. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). ODC brings a claim that, while not sounding in tort, nonetheless seeks to penalize a federal officer in his individual capacity for violating the Constitution. Count I is thus functionally akin to a civil action. Moreover, Congress has never authorized constitutional tort claims against federal officers in their individual capacity. *See Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). Through the Westfall Act, Congress has immunized federal officers from state law claims involving allegations of unconstitutional conduct. *See* 28 U.S.C. §§ 2679(b)(1); 2679(d)(1); *United States v. Smith*, 499 U.S. 160, 166-67 (1991). ODC's action thus raises a local-federal conflict, which the Supremacy Clause and the removal statute are meant to resolve.

Additionally, according to Martin's allegations, accepted as true for removal purposes, ODC is pursuing him and other federal officials based on its disagreement with the current federal administration's policies and priorities. *See* Removal Notice, ECF No. 1, at 8, 16-17, 22. Count I thereby presents the kind of federal-local conflict that Congress intended federal courts to resolve through § 1442(a)(1). *See*

*Watson*, 551 U.S. at 150; *Tennessee*, 100 U.S. at 262-63, 265-66; *see also Manypenny*, 451 U.S. at 241-42. In sum, this proceeding is highly unusual and involves multiple federal-local conflicts that justify removal.

**D. The McDade Amendment does not limit § 1442's application here.**

In a final bid to litigate its constitutional claim before a local government tribunal, ODC asserts that the McDade Amendment precludes removal because it applies local ethics rules to federal government attorneys "in the same manner" as other attorneys and thus requires government attorneys to defend against disciplinary charges in the same local forum as private attorneys. *See* Mot. to Remand, ECF No. 3, at 7. But the McDade Amendment simply establishes that federal attorneys are subject to local ethics rules. It is silent about the availability of removal when the requirements of § 1442 are met based on the unusual nature of a specific proceeding. Nothing in the text or the legislative history of the McDade Amendment suggests it precludes removal under § 1442 when a local disciplinary body attempts to impose its own interpretation of the U.S. Constitution on a federal attorney through the guise of a local ethics violation—here, the alleged violation of the attorney's oath to "support the Constitution of the United States." *Cf. Stern*, 214 F.3d at 19 ("[I]t simply cannot be said that Congress, by enacting section 530B, meant to empower states . . . to regulate government attorneys in a manner inconsistent with federal law.").

To hold otherwise would provide a pathway for most if not all state and local disciplinary bodies to bring proceedings against federal attorneys whenever those attorneys act in a manner the local body deems contrary to its understanding of the

U.S. Constitution. *See, e.g.*, N.Y. Jud. Law § 466; N.Y. Const. art. XIII, § 1 (attorney oath of office includes "to support the constitution of the United States"); 705 Ill. Comp. Stat. 205/4 (same); Cal. Bus. & Prof. Code § 6067 ("Every person on his admission shall take an oath to support the Constitution of the United States . . . ."). Such an extraordinary expansion of state and local authority to both interpret the U.S. Constitution and discipline federal attorneys based on that interpretation— while at the same time precluding the ability of federal attorneys to remove such unique proceedings to a federal forum—clearly is not what Congress intended with the McDade Amendment. *See Stern*, 214 F.3d at 19 (Department of Justice regulations "dispel the notion that section 530B grants states . . . the power, in the guise of regulating ethics, to impose strictures that are inconsistent with federal law"). Thus, the McDade Amendment does not eliminate the removal jurisdiction that Martin has established under § 1442.[12]

---

[12] ODC claims that removal of its proceedings to federal court would be unworkable because a federal court cannot order disciplinary relief and does not follow the same procedures as a disciplinary body. See Mot. to Remand, ECF No. 3, at 6. But federal courts routinely apply federal procedural rules in removed cases even when they conflict with applicable state court rules. *See generally Manypenny*, 451 U.S. at 241-42. And the ODC's concern about relief, even assuming it has any validity, did not prevent the *Kolibash* court from finding bar disciplinary proceedings removable.

## CONCLUSION

For the foregoing reasons, ODC's remand motion should be denied.


Dated: May 8, 2026                    Respectfully submitted,

                                      STANLEY E. WOODWARD, Jr.
                                      Associate Attorney General

                                      BRETT A. SHUMATE
                                      Assistant Attorney General
                                      Civil Division

                                      JONATHAN D. GUYNN
                                      Deputy Assistant Attorney General
                                      Civil Division

                                      PAUL E. WERNER
                                      Assistant Director
                                      Torts Branch, Civil Division

                                      */s/ John B. F. Martin*
                                      JOHN B. F. MARTIN
                                      Trial Attorney, Constitutional Torts Staff
                                      Torts Branch, Civil Division
                                      U.S. Department of Justice
                                      Ben Franklin Station, P.O. Box 7146
                                      Washington, D.C. 20044
                                      T: (202) 616-4492; F: (202) 616-4314
                                      John.B.Martin@usdoj.gov