**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In the Matter of** | |
| **EDWARD R. MARTIN,** | **CASE NO.** |
| **Respondent, A Member of the Bar of the District of Columbia Court of Appeals** | **1:26-mc-0042-CRC** |
| **Bar No. 481866** | |

**RESPONSE TO MOTION TO REMAND**

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 5

Standard of Review ..................................................................................................... 7

Argument and Citation of Authority ........................................................................... 7

I.    Any Proceeding … in which a judicial order … is sought" against a federal officer is removable Under the Plain Text of §1442. ............................................................ 7

II.   The McDade Amendment, 28 U.S.C. §530B, is a Choice of Law Rule only: It is not a Forum Selection Rule. .......................................................................................... 9

   1.    The McDade Amendment provides the rule of decision, while the Federal Officer Removal Statute Creates Jurisdiction in the District Court to Hear and Resolve Controversies Involving Federal Claims and Defenses. ................................... 9

   2.    The McDade Amendment neither creates (nor can it create) State court jurisdiction over disciplinary cases, nor does it abrogate the choice of forum option Congress provided in the federal removal statute, 28 U.S.C. §1442(a) ............. 11

III.  ODC's Argument that Bar Disciplinary Proceedings are "Categorically" Non-Removable is Against the Weight of Federal Authority and is Contrary to the Plain Meaning of the Federal Officer Removal Statute, 28 U.S.C. §1442(a), the McDade Amendment, 28 U.S.C. §530B, and the Regulations Adopted by the Department of Justice under the McDade Amendment, 28 C.F.R. §§77.1 through 77.5. ........................... 13

   1.    The Reported Federal Case Law Rejects the Proposition that State Disciplinary Authorities Have Exclusive Jurisdiction to Hear and Decide the Merits of a Federal Officer's Federal Claims and Defenses. ........................................ 13

   2.    The Reported Case Law from the Circuit Courts of Appeal Supports that Proposition that Disciplinary Proceedings are (or should be) Removable. .................. 17

IV.   Amendments to the Federal Officer Removal Statute after the Effective Date of the McDade Amendment Support Removal. ............................................................... 19

   1.    There was No Repeal by Implication ........................................................... 20

   2.    The Statutes Creating the D.C. Courts Create no Exceptions to Federal Officer Removal. ................................................................................................ 21

V.    Mr. Martin has Stated a Basis for Federal Officer Removal. ............................. 22

VI.   The Claim of Factual Misrepresentations is Unfounded. ................................... 23

Conclusion ............................................................................................................... 26

## Table of Authorities

### Cases

A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp., 62 F.3d 1454, 1458, 1463 (D.C. Cir. 1995) .................................................................................................................................. 11

Branch v. Smith, 538 U.S. 254, 273 (2003) ...................................................................... 21

Charges of Unprofessional Conduct Against 99-37 v. Stuart, 249 F.3d 821 (8th Cir. 2001) .................................................................................................................................. 18

Chevron USA Inc. v. Plaquemines Par., Louisiana, 146 S. Ct. 1052, 1057-1058 (2026)... 6, 15, 19

Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236 (1976).......................................................................................................................... 22

Conklin v. Kane, 634 F. App'x 69, 75 (3d Cir. 2015).......................................................... 17

Gurda Farms, Inc. v. Monroe Cnty. Legal Assistance Corp., 358 F. Supp. 841, 847 (S.D.N.Y. 1973) ................................................................................................................. 19

Huang v. D'Albora, 644 A.2d 1, 3 (D.C. 1994)................................................................... 11

In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia, 790 F.3d 457, 468 (3d Cir. 2015), as amended (June 16, 2015) ...................... 17

Jefferson County, Ala. v. Acker, 527 U.S. 423, 431 (1999)................................................. 18

K&D LLC v. Trump Old Post Office LLC, 951 F.3d 503, 506 (D.C. Cir. 2020) ........................... 7

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020 (1941) ............................ 11

Kolibash v. Comm. on Legal Ethics of W. Virginia Bar, 872 F.2d 571, 576 (4th Cir. 1989)................................................................................................................................... 18

Lamie v. United States Tr., 540 U.S. 526 (2004)................................................................. 21

Maine v. 3M Co., Inc., 159 F.4th 129 (1st Cir. 2025)......................................................... 18

Mata v. Lynch, 576 U.S. 143, 150, 135 S. Ct. 2150, 2156 (2015)....................................... 22

Matter of Doe, 801 F. Supp. 478, 482 (D.N.M. 1992)............................................... 14, 15, 16

Matter of Gorence, 810 F. Supp. 1234, 1236 (D.N.M. 1992).................................................. 14, 15

Ohio ex rel. Yost v. Ascent Health Servs., LLC, 165 F.4th 999, 1010 (6th Cir. 2026) ................ 18

Parker v. K & L Gates, LLP, 76 A.3d 859, 869 (D.C. 2013) .................................................. 11

Petit v. Dep't of Educ., 675 F.3d 769 (D.C. Cir. 2012)......................................................... 22

Potter v. United States, 155 U.S. 438 (1894)...................................................................... 22

Ratley v. U.S. Postal Serv., 953 F.Supp.2d 270 (D.D.C. 2013) ........................................... 22

Re Clark, 2025 WL 3385251 at *4 (D.C. Cir. 2024), aff'g on timeliness grounds 678 F. Supp. 3d 112 (D.D.C. 2023) ........................................................................................... 13

Stern v. U.S. Dist. Ct. for Dist. of Mass., 214 F.3d 4 (1st Cir. 2000).................................... 14

Stirling v. Minasian, 955 F.3d 795 (9th Cir. 2020) ............................................................ 18

United States v. Colorado Supreme Court, 189 F.3d 1281, 1283 (10th Cir. 1999)...................... 16

United States v. Ferrara, 54 F.3d 825 (D.C. Cir. 1995)...................................................... 16

United States v. Ferrara, 847 F.Supp. 964, 969 (D.D.C. 1993)............................................. 16

United States v. Supreme Ct. of New Mexico, 839 F.3d 888, 901 (10th Cir. 2016), cert. denied 583 U.S. 905 (2017)................................................................................................. 17

United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001).................................................... 19

Whitehouse v. U.S. Dist. Ct. for Dist. of Rhode Island, 53 F.3d 1349 (1st Cir. 1995)................ 14

**Statutes**

28 U.S.C. §1450................................................................................................................ 8

28 USC § 515-517 ........................................................................................................... 15

84 Stat. 473 (1970)......................................................................................................... 29

D.C. Code §11-101(2)...................................................................................................... 16

D.C. Code §11-2501(a)................................................................................................... 16

Pub. L. 112-239, 126 Stat. 1969, §1087 (Jan. 2, 2013) ............................................... 27

Pub. L. 112-51, 136 Stat. 2114 (Nov. 9, 2011) ............................................................ 27

Pub. L. No. 91-358, §101............................................................................................... 29

Removal Clarification Act of 2011 ..................................................................... 16, 17, 21, 27

**Other Authorities**

Congressional Research Service, "McDade-Murtha Amendment: Ethical Standards for
    Justice Department Attorneys", updated December 18, 2001, at 1, available at
    https://www.everycrsreport.com/reports/RL30060.html ....................................... 12

House Report: No. 112–17, pt. 1 ..................................................................................... 27

**Rules**

28 C.F.R. § 77.2(j)(2)...................................................................................................... 13

28 C.F.R. §77 ............................................................................................................ 11, 14

28 C.F.R. §77.4. ............................................................................................................. 12

D.C. Bar Rule XI, § 1(a)................................................................................................... 9

D.C. Bar Rule XI, § 4(e)(4) ............................................................................................. 9

**Constitutional Provisions**

Seat of Government Clause, U.S. Const. art. I §8, cl. 17.................................................. 15

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In the Matter of** | |
| **EDWARD R. MARTIN,** | **CASE NO.** |
| **Respondent, A Member of the Bar of the District of Columbia Court of Appeals** | **1:26-mc-0042-CRC** |
| **Bar No. 481866** | |

**RESPONSE TO MOTION TO REMAND**

Comes now Edward R. Martin, Esq., Respondent in the above-entitled matter, and responds to the Motion for Remand filed by the D.C. Bar Office of Disciplinary Counsel as follows:

**Introduction**

The Office of Disciplinary Counsel (ODC) moves to remand on three grounds. First, that bar disciplinary proceedings are neither "civil actions" nor "criminal prosecutions" within the meaning of those terms as used in the federal officer removal statute, 28 U.S.C. §1442(a); second that the McDade Amendment, 28 U.S.C. §530B, forecloses removal of bar disciplinary proceedings against federal officers, and third that Mr. Martin has failed to state any ground for removal.

These arguments fly in the face of the text, history, and policy of the federal officer removal statute. From the date it was adopted in 1815 to the "Removal Clarification Act" adopted in 2011, Congress and the Supreme Court have made it clear – repeatedly – that the federal officer removal statute, 28 U.S.C. §1442, has a single purpose: to create a federal forum in which federal officers and persons acting under the authority of the federal government, can litigate their federal claims and defenses against politically hostile State and local authorities. *Chevron USA Inc. v.*

5

*Plaquemines Par., Louisiana*, 146 S. Ct. 1052, 1057-1058 (2026) (majority opinion); Id., 146 S.Ct. at 1065 (2026) (Jackson, J., concurring in the judgment) (The legislative history of the Removal Clarification Act "makes crystal clear that … §1442 would apply "anytime a legal demand is made on a Federal officer for any act done under their official capacity.")

First, ODC's complaint against Mr. Martin is, on its face, a frontal, First Amendment-based attack on the investigative discretion of the U.S. Attorney for the District of Columbia. It seeks not only an order imposing discipline, but also orders compelling the production of a myriad of official documents and compelled testimony that ODC hopes will, somehow, bolster its allegation that Mr. Martin has violated his oath of office. As such, Respondent is entitled under §1442(d)(1) to remove "any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued." *Id*. As shown below, ODC's contention that bar disciplinary proceedings are outside the scope of this all-encompassing definition is without merit and should be rejected.

Second, ODC misreads the McDade Amendment. The McDade Amendment is a choice of law rule; it says nothing about forum selection. The federal officer removal statute is the forum selection rule for this case. Third, it is indisputable that this disciplinary action arises from Mr. Martin's performance of his duties as a federal officer, and that he has raised a host of federal defenses. He is therefore entitled by the federal officer removal statute to have those defenses adjudicated in federal court; not in the labyrinthine, constitutionally defective processes established by the D.C. Court of Appeals. [DCCA]

Finally, as will be shown, ODC's complaint about omitted or misrepresented facts is groundless. In removed cases, the District Court may consider issues *de novo*. It is not bound by the decisions in the forum of origin. 28 U.S.C. §1450. Further, ODC is in no position to complain

about the omission or misrepresentations. Disciplinary Counsel's charges omit material facts showing that he has a conflict of interest and should be disqualified. The motion to remand should be denied.

## STANDARD OF REVIEW

The test of whether a federal officer is entitled to removal is as follows:

> We apply a two-step test in officer-removal cases. First, the officer must "raise a colorable federal defense." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). Second, the officer must show that the suit is one "for or relating to any act under color of [his] office." 28 U.S.C. §1442(a)(1). **[1] *We must construe the statute liberally in favor of removal***, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007), **_and_ [2] *"we credit the [officer's] theory of the case for purposes of both elements of" the removal inquiry***, *Acker*, 527 U.S. at 432.

*K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) (emphasis/numbering added). Apply this test, and the motion for remand should be denied.

## ARGUMENT AND CITATION OF AUTHORITY

ODC's first argument is that discipline cases are neither civil nor criminal and therefore are exempt from removal. In this view, discipline or other administrative actions regulating professionals generally inhabit a netherworld in which a federal officer's federal claims and defenses need not be litigated *at all*. This argument is clearly precluded by the plain language of the federal officer removal statute, 28 U.S.C. §1442.

    I.    **Any Proceeding … in which a judicial order … is sought" against a federal officer is removable Under the Plain Text of §1442.**

§1442(a)(1) provides as follows:

> (a) [1] A civil action or criminal prosecution that is [2] commenced in a State court and that is [3] against or directed to any of the following [4] may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof [5] or any officer (or any person acting under that officer) of the United States or of any agency thereof, [6] in an official or individual capacity, [7] for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

The Charges against Mr. Martin clearly satisfy every element of the statute.

**[1]** ODC's premise that bar discipline cases are neither a "civil action" nor a "criminal prosecution" is an evasion of the plain text of the statute, which in subsection (d)(1) defines "civil action" and "criminal prosecution" to "include ***any proceeding*** (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued."

**[2]** For purposes of §1442, this case was "commenced in a State Court," because §1442(d)(5) defines the "District of Columbia" as a "State," 42 U.S.C. §1442(d)(5), and the orders that ODC is seeking in this action rest on the disciplinary jurisdiction of the District of Columbia Court of Appeals.[1]

**[3]** The Charges here are obviously "against" Mr. Martin within the meaning of §1442(a).

**[4]** Mr. Martin removed the case to "the district court of the United States for the district" where the Charges were pending, namely, the U.S. District Court for the District of Columbia.

**[5]** The charged conduct was carried out while Mr. Martin was indisputably an "officer . . . of the United States or of any agency thereof," namely the Acting U.S. Attorney for the District of Columbia.

---

[1] The Board on Professional Responsibility is appointed and supervised by the DCCA. *See* D.C. Bar Rule XI, § 1(a) (referring to "the disciplinary jurisdiction of this Court and its Board on Professional Responsibility"); D.C. Bar Rule XI, § 4(e)(4) (the Board appoints Hearing Committee members, such as the members of Hearing Committee #12 assigned to Mr. Martin's case).

**[6]** The Charges were brought against Mr. Martin "for or relating to any act under color of such office."

## II. The McDade Amendment, 28 U.S.C. §530B, is a Choice of Law Rule only: It is not a Forum Selection Rule.

The case law is unequivocal. Federal officers are entitled to officers are entitled to remove their cases from a State to a federal forum whenever the federal officer plausibly asserts a "colorable federal defense" to the claims or charges made in the state proceeding. *Mesa v. California*, 489 U.S. 121, 129 (1989).

The removal analysis presumes that State or District law governs the merits of the disciplinary proceeding, but acknowledges, as it must, that that federal defenses arise under the Constitution and laws of the United State. Congress has *repeatedly* confirmed that federal officers are entitled to a federal forum in which to litigate Supremacy Clause, Separation of Powers, and Federalism defenses.

Bar disciplinary proceedings are no exception to this rule.

### 1. The McDade Amendment provides the rule of decision, while the Federal Officer Removal Statute Creates Jurisdiction in the District Court to Hear and Resolve Controversies Involving Federal Claims and Defenses.

ODC next argument is that the McDade Amendment conclusively denies "government attorneys" any right to remove of disciplinary proceedings. This is the functional equivalent of an "exclusive jurisdiction" argument and is without merit on multiple grounds.

On its face, the McDade Amendment, 28 U.S.C. §530B(a), is a choice of law rule:

> An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

9

That the McDade Amendment *operates* as a choice of law rule is confirmed by the implementing regulations adopted by the Department of Justice [DOJ] under 28 U.S.C. §530B(2). Those regulations, codified at 28 C.F.R. §77.1 through §77.5, provide "Guidance" for government attorneys in litigation and non-litigation settings where the ethical standards and court rules of the forum or locale – the *lex loci* in which the federal attorney serves – might conflict with those of an attorney's state of licensure. 28 C.F.R. §77.4.

By enacting the McDade Amendment, Congress resolved a long-simmering controversy over *which* law – State or federal – defines the ethical obligations of "government attorneys" in the particularly contentious context of federal prosecutors seeking or having contacts with persons represented by counsel. *See* Congressional Research Service, "McDade-Murtha Amendment: Ethical Standards for Justice Department Attorneys", updated December 18, 2001, at 1, available at https://www.everycrsreport.com/reports/RL30060.html (accessed May 6, 2026) ("The McDade-Murtha Amendment, 28 U.S.C. 530B, requires federal prosecutors to follow state and federal rules of professional responsibility in effect in the states where they conduct their activities. It also continues in place the sixty year old directive that federal prosecutors follow the ethics rules promulgated by the states in which they are licensed to practice.")

After McDade, the *substantive* law of legal ethics applicable "in each State where such attorney engages in that attorney's duties," is applicable (subject to constitutional limitations), but only "to the same extent and in the same manner as other attorneys in that State."[2] The *procedural*

---

[2] In cases arising under 28 U.S.C. §530B, disciplinary authorities must show *both* that the charged attorney *violated* the applicable Rules of Professional Responsibility, *and* that both ODC and the DCCA *apply* those rules "to the same extent and in the same manner as other attorneys in that State." Where, as here, Mr. Martin is prepared to show that ODC does *not* apply its Rules of Professional Responsibility to "government attorneys" admitted to the Bar in the District of Columbia "to the same extent and in the same manner as other attorneys" admitted in D.C., the alleged discrepancy constitutes a distinct federal defense. *See* 28 C.F.R. § 77.2(j)(2) which explains

rules governing removed disciplinary cases are defined, as in all other cases removed from State courts, by the Federal Rules of Civil Procedure. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020 (1941); *Parker v. K & L Gates, LLP*, 76 A.3d 859, 869 (D.C. 2013), quoting *Huang v. D'Albora*, 644 A.2d 1, 3 (D.C. 1994) ("Under customary choice of law principles, the laws of the forum ... apply to matters of procedure...."); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458, 1463 (D.C. Cir. 1995) (applying the D.C. statute of limitations).

**2. The McDade Amendment neither creates (nor can it create) State court jurisdiction over disciplinary cases, nor does it abrogate the choice of forum option Congress provided in the federal removal statute, 28 U.S.C. §1442(a).**

The McDade Amendment says nothing about the forum in which Bar cases must be tried. Nor does it address the State procedures that govern investigations, discovery, or adversary proceedings that can occur when formal charges are filed against federal government attorneys in State court. These are questions arising under State law. The McDade Amendment is thus silent on both questions. McDade cannot, by any stretch of the imagination, be construed, as ODC argues, as a statute allocating exclusive jurisdiction to any court.[3]

---

that DOJ will not acquiesce to efforts in "any jurisdiction that would not ***ordinarily apply*** its rules of ethical conduct to ***particular conduct or activity*** by the attorney." (emphasis added) It is exceedingly unlikely that the ODC has *ever* sought to pursue discipline against *any* lawyer – government or private – for the conduct charged in this case.

[3] To the contrary, federal law has, since at least 1938, assumed that State law prescribes the substantive duties of attorneys who are "duly licensed and authorized to practice", since licensure is possible only if the attorney agrees to adhere to the ethical standards required of members of the bar. Federal courts have long understood this requirement to mean that Justice Department attorneys must follow the ethical standards prescribed by the States in which they are admitted to practice, *United States v. Ferrara*, 847 F.Supp. 964, 969 (D.D.C. 1993), *aff'd on other grounds*, 54 F.3d 825 (D.C. Cir. 1995). When the McDade Amendment was adopted, Justice Department ("DOJ") attorneys were required by statute to be members of the bar of one or more of the fifty states and/or territories. These attorneys were empowered, by statute, to represent the United States in federal district courts nationwide in performing their official duties, provided they were in good standing in at least one state bar. *See* 28 USC § 515-517.

The DOJ regulations adopted when the McDade Amendment became effective confirm this reading of the statute. 28 C.F.R. §77.2(h)(1), provides that:

> The phrase *state laws and rules and local federal court rules…* does not include:
> (1) Any statute, rule, or regulation *which does not govern ethical conduct*, such as rules of procedure, evidence, or substantive law, whether or not such rule is included in a code of professional responsibility for attorneys[.] (emphasis added)

In the case at bar, Mr. Martin does not question the disciplinary *authority* of the DCCA. Congress conferred the DCCA's Article I jurisdiction pursuant to the Seat of Government Clause, U.S. Const. art. I §8, cl. 17, and codified its authority to discipline lawyers in the District of Columbia Court Reform and Criminal Procedure Act of 1970, Public Law 91-358, (the "Reorganization Act"), *codified as revised in* D.C. Code, Chapter 11, as amended. *See* D.C. Code §11-101(2); D.C. Code §11-2501(a) (confirming the DCCA's the responsibility to ensure that D.C. lawyers comply with their professional obligations.)

The statutes that *do* address forum selection are the federal removal statutes, 28 U.S.C. §§1442 and 1447. The legislative history of the Removal Clarification Act of 2011, which amended both 28 U.S.C. §§1442 and 1447, *after* the McDade Amendment was adopted, confirms their plain meaning. The Committee Report makes it clear that

> H.R. 368 amends a Federal officer removal statute (28 U.S.C. §1442) and a related remand statute (28 U.S.C. §1447) to ensure that any individual drawn into a State legal proceeding based on that individual's status as a Federal officer has the right to remove the proceeding to a U.S. district court for adjudication.

Committee on the Judiciary, Report on the Removal Clarification Act of 2011 (H.R. 368), Rept. 112-17 (Part I), 112th Congress, 1st Sess. (2011) at pp. 1-2.

In sum: The McDade-Murtha Amendment did not address, nor does it provide any authority to support ODC's assertion that Congress intended to 1) confer *additional or exclusive* disciplinary authority upon State officials to supervise the official conduct of DOJ attorneys acting

12

in their official capacities, 2) negate Article III jurisdiction over questions arising under the Constitution and laws of the United States that are interposed as defenses in disciplinary matters initiated by State officials in State courts; or 3) provide any restriction on the right of a federal officer to invoke the removal jurisdiction of the District Court created by 28 USC §1442. To the contrary, Congress carefully tailored the legislation specifically to ensure that DOJ's Office of Professional Responsibility (OPR) applies *State* rules of professional conduct (but not procedure) as it advises DOJ attorneys who express concerns about potential conflict of laws issues arising when the rules of professional conduct in their state(s) of admission differ from those of the forum in which their official duties require them to  practice.

**III.    ODC's Argument that Bar Disciplinary Proceedings are "Categorically" Non-Removable is Against the Weight of Federal Authority and is Contrary to the Plain Meaning of the Federal Officer Removal Statute, 28 U.S.C. §1442(a), the McDade Amendment, 28 U.S.C. §530B, and the Regulations Adopted by the Department of Justice under the McDade Amendment, 28 C.F.R. §§77.1 through 77.5.**

The D.C. Circuit has not addressed whether disciplinary proceedings are "categorically" non-removable. In *Re Clark*, 2025 WL 3385251 at *4 (D.C. Cir. 2024), *aff'g on timeliness grounds* 678 F. Supp. 3d 112 (D.D.C. 2023), the Court of Appeals affirmed Judge Contreras' holding that Mr. Clark's removal notice was untimely, but it did not address the Judge's claim that disciplinary proceedings are categorically non-removable. Because the attempted removal in *Re Clark* was untimely, the Court held that it had "no power to decide whether either [subpoena] is removable under the federal-officer or general removal statutes." Mr. Martin respectfully submits that this proceeding is removable.

**1.    The Reported Federal Case Law Rejects the Proposition that State Disciplinary Authorities Have Exclusive Jurisdiction to Hear and Decide the Merits of a**

**Federal Officer's Federal Claims and Defenses.**

An exhaustive review of the case law and the literature reveals that only two District Courts, both in New Mexico, have held that disciplinary proceedings are "categorically" non-removable. *Matter of Doe*, 801 F. Supp. 478, 482 (D.N.M. 1992); *Matter of Gorence*, 810 F. Supp. 1234, 1236 (D.N.M. 1992).

As even a cursory review of these cases reveals, both cases were decided *before* the adoption of the McDade Amendment; both were decided before Congress *expanded* the scope of the federal removal statutes in 2011; and both cases involved behavior by federal prosecutors that resulted in an explosion of litigation in the federal courts as both prosecutors and the Department of Justice sought clarification of the Supremacy Clause boundary between State ethics rules, State procedural rules in disciplinary cases, and the defenses arising under the Constitution and laws of the United States. *See, e.g., Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4 (1st Cir. 2000) (declaratory judgment action by U.S. Attorney challenging local court rule); *Whitehouse v. U.S. Dist. Ct. for Dist. of Rhode Island*, 53 F.3d 1349 (1st Cir. 1995) (declaratory judgment action by U.S. Attorney and assistants challenging Rhode Island rules of court);

In light of this history, and of the ongoing efforts of both the States and the federal government to mark the boundaries between federal and State enforcement authorities with respect to federal attorneys, *Matter of Doe,* supra, and the cases and legislation it spawned (including the McDade Amendment and the 2011 expansion of federal officer removal) illustrate just how constitutionally problematic the "categorically non-removable" approach is – in both theory and practice.

As a general matter, the *only* relevant questions in professional discipline cases are 1) whether State or local authorities are seeking to impose "direct regulation" on federally protected activity; 2) whether the Constitution or other federal laws provide "colorable" defenses to that

14

regulation, *see Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 413 (D.C. Cir. 1995); and 3) whether the professional can have his or her federal claims and defenses heard and decided in a neutral federal forum. *Mesa v. California,* 489 U.S. 121 (1989); Tennessee v. Davis, 100 U.S. 257, 263 (1889). *Compare, e.g., United States v. California*, -- F.4th --, 2026 WL 1088674 (9th Cir., April 22, 2026) (invalidating under the Supremacy Clause a California law imposing "direct regulation" on the inherently governmental powers of ICE agents operating within the scope of their delegated authority), *with Chiles v. Salazar*, 607 U.S. --, 146 S. Ct. 110, 1018 (2026) (invalidating, under the First Amendment, Colorado's law prohibiting licensed counselors from making "any 'effor[t] to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex[], while "explicitly allow[ing] counselors to engage in 'practices' that provide '[a]cceptance, support, and understanding for the facilitation of an individual's ... identity exploration and development.'").

By remanding the case to New Mexico disciplinary authorities in both *Matter of Doe* and *Matter of Gorence*, *supra,* rather than simply accepting the jurisdiction that Congress had conferred in 28 U.S.C. §1442(a), the New Mexico District Court inadvertently set off a race to the courthouse that Congress sought to eliminate when it adopted the McDade Amendment in 1998[4]; and that Congress sought (again) to eliminate in the Removal Clarification Act of 2011. *See Chevron USA Inc. v. Plaquemines Par., Louisiana,* 608 U.S. --, 146 S. Ct. 1052, 1065 (2026) (Jackson, J., concurring) (recounting the history of the Act).

The District of New Mexico's cramped reading of 28 U.S.C. §1442(a) in *Matter of Doe*, supra,  created significant problems for the Department of Justice here in the District of Columbia.

---

[4] Pub. L. 105-277, div. A, §101(b) [title VIII, § 801(a)], Oct. 21, 1998, 112 Stat. 2681-50, 2681-118.

In *United States v. Ferrara*, 847 F.Supp. 964, 969 (D.D.C. 1993), the Department of Justice filed a lawsuit against Virginia Ferrara, the Chief Disciplinary Counsel of the Disciplinary Board of the Supreme Court of New Mexico. Its goal was to protect the federal defenses and other interests implicated in the New Mexico proceedings remanded in *Matter of Doe*. This Court dismissed on both substantive and jurisdictional grounds, but the D.C. Circuit affirmed only on jurisdictional grounds*, United States. v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) because the D.C. courts had no personal jurisdiction over the Chief Disciplinary Counsel of the Disciplinary Board of the Supreme Court of New Mexico for actions taken in her official capacity. Not only was the "government lawyer" charged in the New Mexico proceeding deprived of the federal forum created by 28 U.S.C. §1442(a); so too was the federal government.

The case law in the Tenth Circuit in the aftermath of *Matter of Doe* is particularly revealing. In *United States v. Colorado Supreme Court*, 189 F.3d 1281, 1283 (10th Cir. 1999), the Department of Justice sought a declaratory judgment against the Colorado Supreme Court, challenging its authority to restrict "the prosecutorial practice of subpoenaing an attorney to compel evidence about a past or present client in criminal proceedings." The significance of the case lies, not in its holding, but in its analysis.

In one of the first cases decided after the adoption of the McDade Amendment, the Tenth Circuit elaborated, at length, the difference between an "ethics rule" and a rule of procedure. As the court put it: "the question whether Rule 3.8 violates the Supremacy Clause now turns on whether the rule is a rule of professional ethics clearly covered by the McDade Amendment, or a substantive or procedural rule that is inconsistent with federal law." *Id*., 189 F.3d at 1284-288. Because the court "easily conclude[d that] the rule is an ethical one" rather than a rule of procedure, *id.*, 189 F.3d at 1288, it then *conducted* the preemption analysis required in *every* removal case,

and concluded that, because the Colorado Supreme Court had modified its rules to accommodate federal interests, there was no conflict between Colorado's ethics rule and federal law. Id., 189 F.3d at 1289.

The New Mexico Supreme Court, however, did not make the requested accommodations and insisted that it had the authority impose direct regulation on the practice of federal prosecutors before grand juries. The Tenth Circuit, after reviewing evidence that the rule did, in fact, "work to the detriment of federal prosecutors," held that the United States had suffered an "injury in fact" because "[w]e do not require "a plaintiff [to] risk actual prosecution before challenging an allegedly unconstitutional ... statute." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016), *cert. denied* 583 U.S. 905 (2017).

The same rule should apply to Respondent. Article III courts "do not require "a plaintiff [to] risk actual prosecution before challenging an allegedly unconstitutional ... statute." *United States v. Supreme Ct. of New Mexico*, supra, 839 F.3d at 901. There is absolutely no support for ODC's proposition that local disciplinary authorities or courts have exclusive jurisdiction to hear and decide the merits of the "colorable" federal claims and defenses asserted by a federal officer.

> **2.   The Reported Case Law from the Circuit Courts of Appeal Supports that Proposition that Disciplinary Proceedings are (or should be) Removable.**

The reported case law in the Third, Fourth, Eighth, and Ninth Circuits supports the proposition that disciplinary proceedings are (or should be) removable. The Third Circuit has held that "attorney disciplinary proceedings are not categorically exempt from removal under §1442. *See In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 468 (3d Cir. 2015), *as amended* (June 16, 2015); *Conklin v. Kane*, 634 F. App'x 69, 75 (3d Cir. 2015) (removal authorized when the state proceeding "was the functional equivalent of an order requiring" the federal official's testimony).

17

The Fourth Circuit affirmed removal in *Kolibash v. Comm. on Legal Ethics of W. Virginia Bar*, 872 F.2d 571, 576 (4th Cir. 1989), a case in which the State Bar alleged that the U.S. Attorney failed adequately to supervise a subordinate AUSA.

The Eighth Circuit affirmed removal in *Charges of Unprofessional Conduct Against 99-37 v. Stuart*, 249 F.3d 821 (8th Cir. 2001), a Bar discipline case in which a federal witness refused to attend a deposition and faced a contempt citation.

The Ninth Circuit affirmed removal in *Stirling v. Minasian*, 955 F.3d 795 (9th Cir. 2020), a case alleging that a JAG officer assigned as regional defense counsel to the California Army National Guard was engaged in the unauthorized practice of law.

The First, Second, Fifth, Sixth, Circuits do not appear to have addressed the precise issue raised by this removal notice, but the First Circuit was the locus of two cases in which U.S. Attorneys filed declaratory judgment actions against the Supreme Courts of Massachusetts and Rhode Island in an effort to get an unbiased forum in which to litigate their constitutional claims and defenses. *See Stern v. U.S. Dist. Ct. for Dist. of Mass.*, supra, and *Whitehouse v. U.S. Dist. Ct. for Dist. of Rhode Island*, supra.

The Sixth Circuit has recently held that the purpose of "even … the older and narrower versions of the officer removal statute … gives the federal officer a chance to prove in federal court that it lawfully carried out its federal duties." *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1010 (6th Cir. 2026), citing *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431 (1999) (rejecting a "narrow, grudging interpretation" of the statute, [and] recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."). *Accord Maine v. 3M Co., Inc.*, 159 F.4th 129 (1st Cir. 2025); *Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) (removal by private physician practicing in a federal

18

hospital); *Gurda Farms, Inc. v. Monroe Cnty. Legal Assistance Corp.*, 358 F. Supp. 841, 847 (S.D.N.Y. 1973) (permitting federally funded legal services attorneys to remove a civil case for damages to business alleged to have arisen because of the legal services provided); *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001) (removal of alleged conflict between the duties imposed by federal and State FOIAs).

If there were any doubt about the removability of ODC's attack on Respondent for having had the temerity to conduct discretionary investigations in his capacity as Acting U.S. Attorney for the District of Columbia, it was resolved by a unanimous Supreme Court[5] in *Chevron USA Inc. v. Plaquemines Par., Louisiana*, 146 S. Ct. 1052, 1061 (2026). In *Plaquemines Parish*, the Court squarely rejected Louisiana efforts to deprive Chevron of its right under 28 U.S.C. §1442 to select a federal forum in which to litigate its federal defenses.

> Chevron's case fits comfortably within the ordinary meaning of a suit "relating to" the performance of federal duties. Chevron has plausibly alleged a close relationship between its challenged conduct and the performance of its federal duties—not a tenuous, remote, or peripheral one. Cf. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89, 135 S.Ct. 547, 190 L.Ed.2d 495 (2014) (explaining that, when reviewing a remand to state court, we credit plausible factual allegations by the removing party).

In the case at bar, there is no dispute: ODC seeks to discipline the former Acting U.S. Attorney for the District of Columbia *because* he initiated federal investigations of conduct that Disciplinary Counsel *personally* thought should be left *un*-investigated. Removal is proper.

### IV.    Amendments to the Federal Officer Removal Statute after the Effective Date of the McDade Amendment Support Removal.

ODC's reliance on the McDade Amendment as a bar to removal is further refuted by the fact that the federal officer removal statute was amended *after* Section 530B was adopted in 1998

---

[5] Justice Alito did not participate. Justice Jackson concurred in the result.

in ways that are irreconcilable with ODC's position. The Removal Clarification Act of 2011 made multiple changes to the statute that were designed to broaden – not limit – the scope of the removal option. None of these changes carve out state or local bar disciplinary authority as a non-removable proceeding. *See* Pub. L. 112-51, 136 Stat. 2114 (Nov. 9, 2011). To the contrary, the 2011 amendment clarified that the removal statute covered "any proceeding" and was to be interpreted broadly. *See* House Report: No. 112–17, pt. 1 at 3 (describing purposes of federal removal to protect operations of federal government from "local interests or prejudice").

A later amendment to §1442 in 2013 replaced subsection (c) and moved its language to a new subsection (d) with several other new provisions. Pub. L. 112-239, 126 Stat. 1969, §1087 (Jan. 2, 2013). This amendment added the language now found in §1442(d)(5) defining "State" for purposes of the code section to include the District of Columbia.

It is indisputable from this amendment that Congress specifically intended to make §1442 removal available to federal officers with respect to actions commenced in the courts of the District of Columbia. The inclusion of the District of Columbia in §1442(d)(5) is sufficient, on its face, to refute ODC's argument that it has exclusive jurisdiction to hear and resolve disputes arising under the Constitution and laws of the United States

### 1. There was No Repeal by Implication

This court should reject any argument that Section 530B implicitly repealed §1442 for bar discipline matters. If ODC's argument were not entirely refuted by the 2011 and 2013 amendments to §1442, it should fail because repeals by implication are not favored:

> We have repeatedly stated, however, that absent "a clearly expressed congressional intention," … "repeals by implication are not favored," …. An implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute."

*Branch v. Smith*, 538 U.S. 254, 273 (2003) (emphasis added) (cleaned up). There is no basis for repeal by implication here. There is no irreconcilable conflict because removal only changes the forum, not the substantive law. Equally obviously, there is no whole-subject substitution because Section 530B does not and could not purport to overturn the constitutional doctrine of federal supremacy on which federal-officer removal rests.

Republicans from time to time hold the White House and occupy senior positions in federal agencies. The national government cannot be brought to its knees by lawfare emanating from a politically hostile one-party jurisdiction like the District of Columbia.

### 2.    The Statutes Creating the D.C. Courts Create no Exceptions to Federal Officer Removal.

ODC also argues that Congress granted the DCCA authority to regulate federal lawyers and that this operates to preclude removal. The Superior Court of the District of Columbia and the DCCA were created as Article I Courts in the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 473, 475 (1970). Section §11-503 of that Public Law provides that civil actions or criminal prosecutions were removable to federal District Court. Conversely, it contains nothing contrary to the plain-text point that §1442 permits removal of a D.C. Bar ethics proceeding to federal court.

§1442(a) and (d)(1) specifically permit removal of "any proceeding." To require additional specificity from Congress—to demand that Congress must specifically list attorney discipline cases as "removable"—is thus entirely unnecessary and would render superfluous §1442(d)(1)'s authorization for removal of "any proceeding." "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 533–34 (2004).

Courts cannot interpret a statute so as to render any words within that statute as "mere surplusage." "As we have often explained, judges should hesitate to treat words in a regulation or statute as mere surplusage—words of no consequence." *Petit v. Dep't of Educ.*, 675 F.3d 769, 793 (D.C. Cir. 2012). *See also Potter v. United States*, 155 U.S. 438, 446 (1894) (language 'cannot be regarded as mere surplusage; it means something')." In sum, the phrase "any proceeding" means what it says.

In *Ratley v. U.S. Postal Serv.*, 953 F. Supp. 2d 270 (D.D.C. 2013), then-Judge, now Justice, KETANJI Brown Jackson allowed the Post Office to remove a case involving only $341.99 from the Small Claims and Conciliation Branch of the District of Columbia Superior Court pursuant to §1442(d)(1). She expressed distaste for the "Post Service decid[ing] to make a federal case out of this," especially as it had ***already won*** the case in Small Claims Branch ***before*** it removed, but she faithfully applied the statute and allowed removal. *See id.* at 272.

*Ratley* stands for an unexceptionable rule: When Congress creates jurisdiction, and an eligible party timely invokes it, the courts have a "virtually unflagging obligation to ... exercise' that authority." *Mata v. Lynch*, 576 U.S. 143, 150, 135 S. Ct. 2150, 2156 (2015), *quoting Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236 (1976).

## V.   Mr. Martin has Stated a Basis for Federal Officer Removal.

ODC's third principal argument is that Mr. Martin has failed to state a basis for removal. This section of ODC's motion lightly rehashes the argument that bar disciplinary proceedings are a *sui generis,* third category of non-removable proceedings that are neither civil actions nor criminal prosecutions. See Motion to Remand, p. 8. Otherwise, ODC cites no facts that support its contention that the Notice of Removal fails to state a basis for removal. To the contrary, the Notice of Removal states that Mr. Martin is a currently serving federal officer; that the Charges arise from

and relate to conduct in his official capacity as a federal officer, namely Acting U.S. Attorney for the District of Columbia and Director of the Weaponization Working Group; that the conduct for which he was charged was in the course of his execution of the policies of the elected President of the United States as set forth in Executive Orders; and that he has federal defenses to the charges. *See* Notice of Removal, Dkt-1, ¶s 1-4, pp. 2-3.

The federal constitutional and statutory defenses are set out at considerable length at pp. 8-17 of the Notice of Removal, and include federal supremacy, intergovernmental immunity, qualified immunity, separation of powers, violation of the Appointments Clause, the Oath Clause, noncompliance with federal conflict of interest statutes for adjudicatory officers, and viewpoint discrimination. The contention that Notice of Removal fails to state a basis for federal removal is utterly without merit.

## VI.    The Claim of Factual Misrepresentations is Unfounded.

The main thrust of section C of the Motion to Remand is for Disciplinary Counsel to complain about counsel for Mr. Martin. None of these complaints bear on whether this case is removable, but we will briefly address them. The first offense allegedly committed by Mr. Martin's counsel is that two of the undersigned, Mr. MacDougald, and Mr. Destro, also represent Jeffrey Clark, and did not disclose that fact in the Notice of Removal. 28 U.S.C. §1446(a) contemplates for a "short and plain statement of the grounds for removal." It does not contain any requirement for such a disclosure, and ODC does not identify any such requirement.

ODC next complains that the Notice of Removal asserted that during the investigative stage of the case against Mr. Martin, counsel sought his disqualification for conflicts of interest. The Board on Professional Responsibility denied that request, but Respondent will renew the motion to disqualify in this Court because we believe it is well-founded. Because the decisions from the

forum of origin can be dissolved by the District Court pursuant to 28 U.S.C. §1450, counsel will make such motions as necessary to protect Mr. Martin's interests.

Specifically, we allege facts in the Notice of Removal showing that when Disciplinary Counsel launched his investigation of the Argento complaint, he was well-aware that Mr. Martin was looking into *Mr. Fox's* conduct with respect to weaponization of the disciplinary process against conservative lawyers identified with President Trump. The Board on Professional Responsibility held that Mr. Fox being under investigation by Mr. Martin for weaponizing bar discipline against conservative lawyers identified with President Trump did not create a conflict of interest that would require Mr. Fox to recuse when he opened an investigation of Mr. Martin, a conservative lawyer in the Trump Administration. The Board found no disqualifying personal interest on the part of Mr. Fox because there was no indication the bar investigation would aid in his defense of Mr. Martin's investigation, as if that were the only basis for a conflict of interest.[6]

The Board also concluded there was no basis for finding a retaliatory motive because Mr. Fox did not know he was under investigation when he opened the investigation of Mr. Martin. To the contrary, we alleged in the Notice of Removal that Mr. Fox received letters or copies of letters from Mr. Martin inquiring into or complaining about his conduct on February 7, 2025, March 5, 2025, March 6, 2025 – all *before* Mr. Fox opened the Argento investigation on March 28, 2025. Notice of Removal, pp. 4-5.

Suffice it to say there is ample basis for this Court to consider afresh whether Disciplinary Counsel should be disqualified. Without rehashing all of those arguments here, and for the sake of completing the record, we attach hereto the motion to disqualify, ODC's response, the reply in

---

[6] *See* D.C. Rules of Professional Conduct, Rules 1.7-1.10 (setting out the District's standards for conflict of interest). *Cf.* D.C. Rules of Professional Conduct, Rule 3.8, Comment [1]. (Special Responsibilities of a Prosecutor.)

support of the motion, and the Order of the Board on Professional Responsibility denying the motion to disqualify as Exhibits 1, 2, 3 and 4 respectively.

## CONCLUSION

Mr. Martin is entitled to remove this case to this Court under the federal officer removal statute. The motion to remand should be denied.

Respectfully submitted this 8th day of May, 2026.

*Christoper A. Byrne*

Christopher A. Byrne, Esq.
DC Bar No. 928424
Byrne Law PLLC
1050-30th St Northwest
Washington, DC 20007
(202) 487-6800

cabesq@protonmail.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400 Atlanta,
Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com
*Application for admission Pro Hac Vice
Forthcoming*

*Robert A. Destro*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, 520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com
*Application for admission Pro Hac Vice
Forthcoming*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I have served counsel for the opposing party with a copy

of this ***Response to Motion to Remand*** by email addressed to:

Hamilton P. Fox
Theodore (Jack) Metzler
D.C. Bar Office of Disciplinary Counsel
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org
metzlerj@dcodc.org

John B. Martin, Esq.
Department of Justice
Washington, DC
john.b.martin@usdoj.gov

This 8th day of May, 2026.

/s/ *Christopher A. Byrne*

Christopher A. Byrne, Esq.
DC Bar No. 928424

Byrne Law PLLC
1050-30th St Northwest
Washington, DC 20007
(202) 487-6800
cabesq@protonmail.com

# EXHIBIT 1

RECEIVED

Jun 10, 2025 6:42 PM

Board on Professional Responsibility

<u>**UNDER SEAL**</u>

**DISTRICT OF COLUMBIA COURT OF APPEALS**

**BOARD ON PROFESSIONAL RESPONSIBILITY**

| | |
|---|---|
| In the Matter of | |
| **Edward R. Martin** | **Disciplinary Docket No.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2025-D047** |
| **Bar No. 481866** | |
| **Date of Admission: June 9, 2003** | |

## MOTION TO DISQUALIFY DISCIPLINARY COUNSEL AND THE OFFICE OF DISCIPLINARY COUNSEL

Comes now Edward R. Martin, Respondent in the above-entitled matter, and submits this motion to disqualify Disciplinary Counsel Hamilton P. Fox, III and the Office of Disciplinary Counsel from investigating this matter based on a conflict of interest.

It is well-settled that Bar disciplinary proceedings are "quasi-criminal" in nature, and thus constitutional protections attach to the conduct of any investigation by Disciplinary Counsel. *In re Ruffalo*, 390 U.S. 544, 551 (1968) ("These [disciplinary proceedings] are adversary proceedings of a quasi-criminal

nature."); *In re Williams*, 464 A.2d 115, 118-19 (1983) (following *In re Ruffalo* as to D.C. lawyer regulation); *In Re: Artis*, 883 A.2d 85, 98-99 (D.C. 2005).

Respondent is entitled to an unconflicted prosecutor. In *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808 n. 19 (1987) the Supreme Court cited with approval the holding of *Brotherhood of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969), that the appointment of an interested prosecutor was a due process violation.

Prosecutors such as Disciplinary Counsel are barred by RPC 1.7(b)(4) from having a personal interest that conflicts with their professional responsibilities:

> "[T]he standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers.... [, and they] may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of \*64 interest exists." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810–11, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). In particular, given prosecutors' duties, they "are necessarily permitted to be zealous in their enforcement of the law." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Of course, this does not waive prosecutors' ethical obligations, as they "too must serve the public interest," and their behavior is not "immunize[d] from judicial scrutiny in cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." *Id*. at 249, 100 S.Ct. 1610.

*Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 63–64 (D.D.C. 2022).

While there is a presumption of regularity in the conduct of prosecutors, the presumption may be overcome by clear evidence. *United States v. Armstrong*, 517

U.S. 456, 464 (1996) (*quoting United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)).

Thus, prosecutorial discretion is limited by constitutional protections:

> [A] prosecutor's discretion is "subject to constitutional constraints." *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2204–2205, 60 L.Ed.2d 755 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 694–695, 98 L.Ed. 884 (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

*United States v. Armstrong*, 517 U.S. 456, 464 (1996).

"[C]ourts have an independent interest in ensuring that criminal trials are conducted **within the ethical standards of the profession** and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

RPC 1.7(b)(4) in relevant part prohibits conflicts of interest where "[t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party **or the lawyer's own** financial, business, property, or **personal interests**.' (Emphasis added). Comment 11 to Rule 1.7 provides in pertinent part that:

> The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious

3

question, it may be ***difficult or impossible*** for the lawyer to give a
client detached advice.

(Emphasis added).

Where, as here, the prosecutor's own conduct is in question, their self-interest in defending themselves is necessarily in conflict with their professional responsibilities.

The timeline of Mr. Martin's inquiries as to political bias and motivation by Disciplinary Counsel, combined with the decision to open an investigation based on a patently insufficient complaint lodged by Mr. Argento, and the posing of knowingly unlawful questions to Mr. Martin, together strongly suggest that Disciplinary Counsel is acting from a retaliatory motive:

- February 7, 2025: Mr. Martin's first letter to Disciplinary Counsel inquiring into political motivations in the conduct of investigations and prosecutions of conservative lawyers, including Jeffrey Clark.

- March 10, 2025: Mr. Argento sent his complaint letter to Disciplinary Counsel. Disciplinary Counsel took no action on that letter for 18 calendar days, during which there was considerable activity within the leadership of the Board of Professional Responsibility regarding Mr. Martin's investigation of, and complaint regarding, Disciplinary Counsel's conduct.

- March 13, 2028: Board Chair Bernadette Sargeant, on behalf of the Board of Professional Responsibility, responded at length to Mr. Martin's letter of February 7, 2025.

- March 28, 2025: Mr. Martin responded to Ms. Sargeant's letter by writing to the Chief Judge of the D.C. Court of Appeals, Anna Blackburne-Rigsby, expanding his complaint regarding political bias in Disciplinary Counsel's conduct, including additional information regarding his conduct towards Jeffrey Clark.

4

- March 28, 2025: Disciplinary Counsel opened the investigation of Mr. Martin.

- March 31, 2028: Mr. Martin wrote to Chief Judge Blackburne-Rigsby noting the retaliatory nature of Disciplinary Counsel opening an investigation against him during his inquiries regarding Disciplinary Counsel.

- April 1, 2025: Board Chair Sargeant responds to Mr. Martin's letter of March 31, 2025.

The Bar's disciplinary process must not only be fair, it must appear to be fair.

There is compelling evidence that Disciplinary Counsel has a disqualifying conflict of interest because his own interests are under scrutiny by Mr. Martin acting in his official capacity. While Disciplinary Counsel was under investigation and complaint by Mr. Martin, Disciplinary Counsel opened an investigation on a patently frivolous complaint and posed a series of additional questions that he knows full well are unlawful. These circumstances provide clear evidence that Disciplinary Counsel's investigation of Mr. Martin is retaliatory. Disciplinary Counsel's conflict is imputed to the entire Office of Disciplinary Counsel because their authority flows through him and because they are all subordinate to him in their authority, compensation, promotion, etc. Disciplinary Counsel and his entire office should be disqualified from this investigation.

Respectfully submitted this 10 day of June, 2025.

*/s/ Harry W. MacDougald*
Harry W. MacDougald
Georgia Bar No. 453076

Robert A. Destro
Ohio Bar #0024315
4532 Langston Blvd, #520

5

Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

6

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of *this Motion to Disqualify Disciplinary Counsel and the Office of*

*Disciplinary Counsel* by email addressed to:

Hamilton P. Fox
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 10 day of June, 2025.

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

7

# EXHIBIT 2

<u>**UNDER SEAL**</u>

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**

|  |  |  |
|---|---|---|
| | : | |
| **In the Matter of** | : | **Board Docket No. 25-PD-011** |
| | : | |
| **Edward R. Martin, Jr. Esquire,** | : | **Disciplinary Docket No. 2025-D047** |
| **Respondent** | : | |
| | : | |
| **A Member of the Bar of the District** | : | |
| **of Columbia Court of Appeals** | : | |
| **Date of Admission: June 9, 2003** | : | |
| **Bar Number: 481866** | : | |
| | : | |

**DISCIPLINARY COUNSEL'S REPLY TO RESPONDENT'S OPPOSITION**
**TO MOTION TO COMPEL AND RESPONSE TO RESPONDENT'S**
**MOTION FOR PROTECTIVE ORDER AND MOTION TO DISQUALIFY**

Disciplinary Counsel hereby replies to Respondent Edward R. Martin's

Response to the Motion to Compel and responds to his Motion for Protective Order

and Motion to Disqualify Disciplinary Counsel and the Office of Disciplinary

Counsel.

**A. The Motion to Compel**

The pleadings that Mr. Martin filed on June 10, 2025, along with the

accompanying letter of his lawyer to Disciplinary Counsel, satisfy Mr. Martin's

obligation under Section 8(a) of Rule XI to respond to Disciplinary Counsel's written

inquiries. On June 12, 2025, counsel for Mr. Martin produced the *ex parte* letter that

he had sent to the Chief Judge and the senior judges of the Court of Appeals and

either produced or identified other communications with the Court. This satisfied the request set forth in Disciplinary Counsel's letter of April 21, 2025, Attachment G to the Motion to Compel. Accordingly, Disciplinary Counsel's Motion to Compel is now moot and hereby withdrawn.

## B. Mr. Martin's Motion for a Protective Order

Despite providing answers to Disciplinary Counsel's questions, Mr. Martin seeks a protective order, claiming those same questions amount to "an obviously unconstitutional demand that Mr. Martin answer to a religious test," and that they are "unlawful interrogatories." Martin Resp. & Mot. 3, 6. He suggests further that Disciplinary Counsel has no basis to conduct an investigation. *Id.* at 4, 6. Because the motion raises issues that may arise again in this investigation, Disciplinary Counsel addresses Mr. Martin's arguments below.

    1. Mr. Martin's potential violation of his oath to support the Constitution warrants investigation.

Under Section 2(b) of Rule XI, "misconduct" includes "[a]cts or omissions by an attorney . . . which may violate the attorney's oath of office . . . ." The oath to which D.C. Bar members must adhere includes a promise to "support the Constitution of the United States of America." And under Section 6(a)(2) of Rule XI, Disciplinary Counsel has "the power and duty" to investigate "all matters involving alleged misconduct by an attorney subject to the disciplinary jurisdiction of this Court which may come to the attention of Disciplinary Counsel . . . from any

source whatsoever, where the apparent facts, if true, may warrant discipline." Here the complaint raises factual allegations which, if true, may warrant discipline because Mr. Martin appears to have violated the Fifth Amendment due process and First Amendment free speech and free exercise rights of Georgetown University Law Center. Accordingly, it is Disciplinary Counsel's duty to investigate those allegations.

Specifically, Mr. Martin, when he was Interim United States Attorney for the District of Columbia, engaged in unconstitutional viewpoint discrimination and an attempt to chill free speech by sanctioning the Law Center for unspecified "DEI" policies and practices. In his February 17, 2025 letter (attached to the Motion to Compel), Mr. Martin informed Georgetown Dean William Treanor that "no applicant for our fellows program, our summer internship, or employment in our office who is a student or affiliated with a law school or university that continues to teach and utilize DEI will be considered." This statement followed an assertion that Mr. Martin had reliable information that "Georgetown Law School continues to teach and promote DEI," asserting further, "This is unacceptable." In short, Mr. Martin appears to have imposed sanctions on Georgetown University Law Center and its students and graduates—a hiring ban—with absolutely no due process.

Mr. Marin did not even define "DEI," much less explain what teaching and utilization of "DEI" was the subject of his ire. (His responses to the Motion to

3

Compel identify policies that he alleges are somehow improper, Response to Motion to Compel at 7-8, but these were identified four months after he sanctioned the law school.) Assuming *arguendo* that he could ever sanction an educational institution for what appears to be its exercise of academic and religious freedom, Mr. Martin conducted no evidentiary procedure, granted no hearing, made no findings of fact, and gave Georgetown no notice and opportunity to defend itself.

An academic institution has a First Amendment right to teach and promote whatever policies it may choose. *See Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) (Academic freedom is a special concern of the First Amendment and receives heightened protection). *Students for Fair Admissions, Inc v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), does not prohibit a law school from encouraging minority applicants to apply—consistent with policies of diversity, equity, and inclusion—even if it cannot give them admission preference. For example, Georgetown and other universities might encourage students at historically Black colleges and universities to consider their law schools. Indeed, Georgetown professors are free to teach that *Students for Fair Admissions* was wrongly decided and argue that the goals of diversity, equity, and inclusion be promoted by means other than preferential admission. Mr. Martin's announcement that his office would not hire Georgetown candidates so long as it taught "DEI"

4

therefore appears to violate the school's rights under First Amendment and therefore Mr. Martin's oath as an attorney.

Moreover, Mr. Martin may have violated the school's First Amendment right to free exercise as a religiously-affiliated institution. Dean Treanor's response to Mr. Martin (also attached to the Motion to Compel) points out that, as a Catholic and Jesuit institution, it was founded on "the principle that serious and sustained discourse among people of different faiths, cultures, and beliefs promotes intellectual, ethical, and spiritual understanding." What Mr. Martin apparently means by DEI may thus be part of the University's mission as a Jesuit and Catholic institution. Discriminating against the law school and its students and graduates for teaching and promoting religious beliefs and principles is an apparent violation of the right to free exercise of religion, which would violate Mr. Martin's oath of office, and therefore warrants investigation by Disciplinary Counsel.

Judge Argento's letter of complaint (attached to the Motion to Compel,) makes a similar point: "I view Mr. Martin's letter is [sic] an attack on religious freedom." It was in this context that Judge Argento cited the *Catechism of the Catholic Church*. Mr. Martin claims that the catechism reference makes answering the complaint "an obviously unconstitutional demand that Mr. Martin answer a religious test." Martin Resp. & Mot. 3. What is "obvious" is that this argument is frivolous. Asking him to

answer questions about his own conduct does not remotely impose on Mr. Martin any religious test as a condition of holding office.

Mr. Martin also claims that responding to Judge Argento's complaint is a violation of the First Amendment's Establishment Clause, an argument that he does not explain. An inquiry as to why Mr. Martin's conduct did not interfere with the free exercise of the religious beliefs of Georgetown and its constituents cannot be thought to establish Roman Catholicism as an official religion or even a government-favored religion. If that were so, any challenge to the government's interference with the free exercise of a particular religion establishes that religion as a state religion. This leads to the logical conclusion that upholding the right of school children not to salute the flag established Jehovah's Witnesses as the state religion of the United States. *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943).

2. A complainant need only bring facts to Disciplinary Counsel's attention and is not required to specify the relevant violations of the Rules of Professional Conduct before Disciplinary Counsel may docket a case for investigation.

Mr. Martin spends considerable effort attempting to refute the specific disciplinary rule violations Judge Argento discussed in his letter of complaint. He argues that his conduct does not fit any of these violations and therefore Disciplinary Counsel had no basis to investigate him. Under Mr. Martin's theory, unless a complainant spelled out precisely how a respondent's conduct violated a specific rule, Disciplinary Counsel has no basis to open an investigation. This is, of course,

6

ridiculous. Section 6(a)(2) of D.C. Bar Rule XI, which Mr. Martin quotes in his Response to the Motion to Compel at 4, provides that the threshold for docketing a case for investigation are the "apparent facts" not whether the complainant identifies a particular rule violation. Were Mr. Martin's position the law, a client who alleges conduct that might constitute misappropriation, would not justify an investigation unless she specified that it violated Rule 1.15. Such a reading of the rule would be completely inconsistent with Disciplinary Counsel's obligation to initiate an investigation "from any source whatsoever." Even if Judge Argento, a retired California judge, failed to identify the District of Columbia rule violation, he identified apparent facts that, if true, would warrant discipline for violating Mr. Martin's oath as a member of the D.C. Bar. Judge Argento's failure to cite the D.C. attorneys' oath is of no moment. Disciplinary Counsel sought to make clear to Mr. Martin in its initial letter of March 28, 2025 that a specific concern was the attorney's oath to support the Constitution by directing Mr. Martin's attention to the conduct that appeared to violate that oath.

3. Nothing forbids Disciplinary Counsel from asking a respondent questions about his conduct and how that conduct is consistent either with the Rules of Professional Conduct or his oath of office.

Equally unavailing is Mr. Martin's argument that asking a respondent to address specific issues constitutes "unlawful interrogatories," which "Disciplinary Counsel is prohibited by clearly established law from posing." Martin Resp. & Mot.

6 (citing *In re Artis,* 883 A.2d 85, 98-99 (D.C. 2005)).  Martin's counsel's letter to Disciplinary Counsel goes even further, stating: "To borrow your phrasing, how, consistent with you own oath of office to uphold the Constitution, can you engage in conduct toward Mr. Martin that you know full well is unlawful."  Letter from Harry W. MacDougald to Hamilton P. Fox, III at 4 (June 10, 2025) (attached to Martin's Response).  That reading of the Court of Appeals' decision in *Artis* is wildly inaccurate and approaches a misrepresentation.

Under Board Rule 2.7, when docketing a case for investigation, Disciplinary Counsel must inform the respondent of the basis for the complaint. Board Rule 2.9 likewise authorizes Disciplinary Counsel "to request . . . respondent . . . to provide information concerning the matters under investigation."  And Section 8(a) of Rule XI provides that "[a]n attorney under investigation has an obligation to respond to Disciplinary Counsel's written inquires in the conduct of an investigation, subject to constitutional limitations."  Thus, Disciplinary Counsel's inquiries were authorized by the pertinent rules—and Mr. Martin's responses were required by those rules. Indeed, it benefits respondents when Disciplinary Counsel's letter of inquiry explains the issues that are of concern in an investigation.  That provides the respondent the opportunity to address those issues.  It is passing strange for a respondent to cry foul because in its initial inquiry, Disciplinary Counsel has been

too specific as to the issues that it wants the respondent to address in an effort to ward off a specification of charges. Is the respondent better off simply guessing?

*Artis* concerned the conditions of reinstatement for a respondent whom the Board had recommended be suspended; it did not concern Disciplinary Counsel's initial inquiry or the conduct of an investigation before the filing of charges. 883 A.2d at 88. The Board and the Court determined that a fitness requirement was not appropriate as part of the sanction, but Disciplinary Counsel sought to condition reinstatement on Artis's responding to six sets of questions. *Id.* at 91. The Board rejected this recommendation for several reasons, one of which was that there was no provision in its rules for discovery by way of interrogatories. *Id.* at 98. The Court agreed that interrogatories should not be incorporated into the reinstatement process without the promulgation of rules authorizing their use but emphasized that respondents are required to respond to written inquires. *Id.* at 101. It determined that the Board did not abuse its discretion in determining that responses to the proposed questions should not be a condition of reinstatement. *Id.* 101-102.

In reaching that determination, the Court cited other reasons why the answer to the proposed questions was unnecessary as well as potential self-incrimination issues. *Id.* at 102. Nothing in *Artis* suggests any limitation on requests for information from Disciplinary Counsel at the outset of or during the investigation; to the contrary, it emphasizes a respondent's obligation to respond to such requests

9

absent a constitutional privilege. *Id.* at 99. Nor does anything in the opinion support Mr. Martin's claim that "clearly established law" prohibits Disciplinary Counsel from posing interrogatories. *Artis* merely holds that the Board did not abuse its discretion in the case under submission by not requiring a respondent to answer interrogatories as a condition of readmission when there was no fitness requirement. *Id.* at 102. (When there is a fitness requirement, the Board has propounded a detailed set of questions that respondents must answer before they may be readmitted. Bd. R. 9.1(b).) Even if there were no procedural mechanism to compel the answer to interrogatories—*but see* Board Rule 2.9(a) and *In re Doman*, 314 A.3d 1219, 1228 (D.C. 2024), superceding the relevant part of *Artis*, 883 A.2d at 101—there is no law, much less "clearly established law" that prohibits Disciplinary Counsel from asking a respondent questions about potential misconduct, even if the questions were deemed to be interrogatories.  Mr. Martin has just made that up.

    4. Mr. Martin persists in ignoring his obligation to comply with Rule XI and the Board's rules and orders.

Finally, with respect to the Motion for Protective Order, Disciplinary Counsel notes that Mr. Martin made no effort to comply with the procedural requirements of Board Rule 2.9.  He made no effort to confer with Disciplinary Counsel to resolve the matter before filing his motion.  He did not file his motion within 30 days of the request for information from Disciplinary Counsel, nor seek an extension of the time

limit for good cause.  His motion did not certify that he and Disciplinary Counsel had attempted to resolve the matter.

This is of a pattern with his conduct in this investigation.  Despite his obligation to reply to Disciplinary Counsel's letter of March 28, 2025, Mr. Martin simply ignored it, other than to send an improper, *ex parte* letter to the Chief Judge. When Disciplinary Counsel followed up with a second letter on April 15, Mr. Martin once again refused to answer the inquiry, stating only that he had corresponded *ex parte* with the Chief Judge about the matter.  The Chief Judge, who was cc'd on this email response, promptly reminded Mr. Martin, as she had previously informed him, that the procedures did not permit such direct communications to the Court.  Mr. Martin still did not respond to the complaint but instead made a spurious claim that the manner in which Disciplinary Counsel has served its second letter of inquiry disclosed the fact of the inquiry to the staff of the U.S. Attorney's office—a claim which the Board found to be without merit.  Disciplinary Counsel was forced to file a Motion to Compel.  After Mr. Martin sought and obtained permission for an extension of time for four weeks or until June 6 to respond to the motion, he still did not do so in timely fashion, waiting until after business hours on June 10, and, as set forth above, ignoring the procedural prerequisites to a Motion for Protective Order.

Should this matter proceed further, the Board should affirmatively require Mr. Martin to comply with the requirements of the rules and the orders of the Board.

11

### C. The Motion to Disqualify.

Mr. Martin seeks to disqualify the Disciplinary Counsel and every other member of the Office of Disciplinary Counsel from investigating this matter. His argument is a mashup of Rule 1.7(b)(4), which is designed to protect a client in circumstances where the client's interests might be adversely affected by her lawyer's personal interests, and case law prohibiting a prosecutor from basing the decision to prosecute on an unjustifiable standard such as race, religion, or other arbitrary classification. In essence, Mr. Martin argues that Disciplinary Counsel's investigation was launched in retaliation for a letter Mr. Martin sent in his former capacity as Interim United States Attorney for the District of Columbia and for his subsequent complaint about Disciplinary Counsel to the Court of Appeals. He claims that Disciplinary Counsel has a conflict that disqualifies him and his entire office from investigating Mr. Martin.

Mr. Martin sent Mr. Fox a letter dated February 7, 2025. *See* letter as Attachment A hereto. (Because Mr. Martin sent his letter by U.S. Mail, and to the wrong address, it was not received by the Office of Disciplinary Counsel until February 24.) Far from announcing any investigation, the letter simply asked (1) whether Disciplinary Counsel had written policies on how to limit investigations

12

from targeting individuals with whom Disciplinary Counsel might disagree and (2) how Disciplinary Counsel handles politically motivated complaints. Mr. Martin did not say that Mr. Fox was under investigation nor what any potential violation might be. To the contrary, he described his communication as a "letter of inquiry." The Board responded to Mr. Martin's questions in detail on March 13.

On the same day as the Board's response, Mr. Martin filed a "Complaint" with the Chief Judge, alleging, bizarrely, that Mr. Fox had "failed to rein in" a United States Senator who had "attack[ed] me and my office." He did not copy Mr. Fox on this "complaint." He followed this up with a "supplement" to his complaint dated March 28, this time copying Mr. Fox. This letter complained about a statement Mr. Fox had allegedly made during the Jeffrey Clark case and about "his uneven public positioning." Neither letter informed Mr. Fox that he was under investigation. The Board responded to these letters on April 1. The response focused entirely on practice and procedures of the Office of Disciplinary Counsel. The Board did not interpret Mr. Martin's letters as indicating that the United States Attorney was investigating Mr. Fox. It seems unlikely that the Board would have responded to complaints relating to Disciplinary Counsel's procedures had it interpreted Mr. Martin's communications to mean the U.S. Attorney was investigating Mr. Fox.

On March 28, Disciplinary Counsel docketed the instant complaint. Mr. Martin claims this was done in retaliation for his having opened his own

13

investigation. As discussed above, there was no such investigation. He points to a lag between March 10, when Judge Argento sent his letter and March 28, when the matter was docketed. This proves nothing. After it is received, a complaint is processed administratively by Disciplinary Counsel's staff, which takes several days, and then it is reviewed by intake attorneys before it ever comes to the attention of Mr. Fox.  (Many complaints are disposed of by the intake section and never come to Mr. Fox's attention.)  Disciplinary Counsel sometimes will conduct a preliminary investigation before making the final docketing decision, which occurred here; Mr. Fox spoke to a potential witness on March 17 before docketing the complaint.

Mr. Martin's second argument to support his claim of retaliation is that the complaint was "patently insufficient" and that Disciplinary Counsel posed "knowingly unlawful questions."  Those issues are addressed above in response to the motion for a protective order, although the logic of posing questions, lawful or not, as constituting evidence of retaliation seems a non sequitur.

Mr. Martin's argument that his supposed investigation of Mr. Fox and his complaint against Mr. Fox create a conflict of interest—which should be imputed to all the other attorneys in the Office of Disciplinary Counsel—is frivolous.  Mr. Martin never announced any investigation of Mr. Fox. Even if the U.S. Attorney for the District of Columbia is nevertheless conducting such an investigation, that cannot create a conflict because Mr. Fox has never been informed of it. Indeed, an

14

investigation could not create a *present* conflict with Disciplinary Counsel's investigation of Mr. Martin because he is no longer employed by that office.

Mr. Martin cites cases relating to criminal prosecutors and suggests that these standards should be applied to Disciplinary Counsel. Assuming that analogy is apt, no case supports the disqualification of Mr. Fox, much less the entire Office of Disciplinary Counsel. *Cf.* D.C. Rule 1.10 cmt. 1 (imputed disqualification rule does not apply in government offices); *United States v. Hubbard,* 493 F. Supp. 206, 208 (D.D.C. 1979). Because of his unique role, a prosecutor exercises "considerable discretion" in a variety of matters, including which persons should be investigated or charged, the methods of investigation, and the prosecution of a charged offense. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987). Prosecutors are not required to be disinterested in the same way that judges are. "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law[.]" *Marshall v. Jerrico, Inc.* 446 U.S. 238, 248 (1980). Judges are supposed to be neutral. Prosecutors are the adversaries of those against whom they bring cases. Only in the most extreme situations, *e.g.,* prosecutors who engage in invidious discrimination or who have a financial interest that would be affected by the outcome of a case, should a prosecutor be disqualified.

The District of Columbia has not enunciated a broad standard to govern when a personal interest conflict of a prosecutor requires his disqualification. Other jurisdictions have enunciated standards similar to New Mexico's standard:

> A prosecutor may be removed from a case for a conflict of interest where the prosecutor has a prior or current relationship with the defendant that either made the prosecutor privy to relevant, confidential information, . . . or where their relationship has created an interfering personal interest or bias. . . .

*State v. Robinson*, 179 P.3d 1254, 1259 (N.M. 2008) (internal citations omitted). *See also U.S. v. Heldt*, 668 F.2d 1238,1276 n.80 (D.C. Cir. 1981) ("The potential conflict of interest that might result from a personal civil suit filed against an … [AUSA] by a defendant in a criminal case for acts undertaken by the AUSA in his official capacity in the criminal matter would have to be very strong before disqualification would be justified. It could not be justified by mere inference from the filing of the suit but would require proof, by clear and convincing evidence, of a prima facie case of misconduct on the part of the AUSA."); *People v. Pomar*, 95 Cal. App. 5th 504, 515 (Cal. Ct. App. 2023) (analyzing under state recusal statute whether elected head prosecutor and her entire office should be recused from two prosecutions because she was related to victim of charged crime or similar crime, requiring evidence showing a conflict exists that is so severe that it  would render it unlikely that the defendant would receive a fair trial; requiring showing of actual likelihood of unfair treatment, mere speculation would be insufficient).

16

Nor does Mr. Martin's complaint against Mr. Fox to the Court create a conflict that requires disqualification. There is no authority for Mr. Martin's position that any respondent who has complained about the policies and practices of Disciplinary Counsel cannot be investigated by Disciplinary Counsel. Even in situations where respondents bring civil actions against lawyers in the Office of Disciplinary Counsel, that has not been grounds for disqualification. *See* Order of the Board on Professional Responsibility, *In re Klayman*, Bd/ Dkt. No. 24-BD-043 (BPR Dec. 26, 2024) (Attachment B hereto). To hold otherwise would cripple the disciplinary system. Every respondent could simply file a complaint with the Board or Court or file a lawsuit against Disciplinary Counsel to avoid investigation.

Mr. Martin's conduct with respect to the Georgetown University Law Center was at a minimum conduct that "if true, may warrant discipline." Rule XI, § 6(a)(2). The claim that these facts were "patently insufficient" or "patently frivolous" is simply false; they were more than sufficient to raise whether Mr. Martin violated his oath to support the Constitution, and his conduct since the investigation was docketed—refusing to respond to Disciplinary Counsel's inquiries, refusing to adhere to deadlines, and making an *ex parte* approach to the Court, raise serious issues as to other violations. *See* Rules 3.5(b) & 8.4(d).

## Conclusion

Disciplinary Counsel withdraws its motion to compel. The Board should deny Mr. Martin's motions for a protective order and to disqualify Disciplinary Counsel.

s/ *Hamilton P. Fox, III*
HAMILTON P. FOX, III
 *Disciplinary Counsel*

THEODORE (JACK) METZLER
 *Senior Assistant Disciplinary Counsel*

JERRI U. DUNSTON
 *Assistant Disciplinary Counsel*

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Bldg. A., Suite 117
Washington, D.C. 20001
(202) 638-1501

18

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June 2025, Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Response to Respondent's, to be sent by email to the Board on Professional Responsibility, Historic Courthouse, 430 E Street, NW, Suite 138, Washington, D.C. 20001, at CaseManager@dcbpr.org and to Respondent via email to: Edward.martinjr@usdoj.gov, Edward.Martin2@usdoj.gov, and edmartin1791@gmail.com.

s/ *Hamilton P. Fox, III*
HAMILTON P. FOX, III
 *Disciplinary Counsel*

19

OₜFICE of DISCIPLINARY COUNSEL

FEB 2 4 2025

RECEIVED



U.S. Department of Justice

Edward R. Martin, Jr.
United States Attorney

*District of Columbia*

*Patrick Henry Building*
*601 D Street, N.W.*
*Washington, D.C. 20530*

February 7, 2025

Mr. Hamilton P. Fox, III
DC Bar
901 4th Street, NW,
Washington, DC 20001

Dear Sir,

As United States Attorney for the District of Columbia, I receive requests for information and clarification. I take these requests seriously and act on them with letters like this one you are receiving.

At this time, I have received a specific request about how the DC bar operates with regard to disciplinary investigation and actions. In particular, I have been asked about how you target individuals based not on personal knowledge for a basis of a complaint but instead based on a policy or political disagreement. Please see the two attached documents that seem to indicate some sort of policy.

However, public reports of your conduct compared with these two documents is inconsistent. For example, in some instances you have clearly not abided by the "personal knowledge" requirement and instead fallen into political motive: see, for example, your use of the Senator Dick Durbin complaint to open complaints against DC Bar members.

At this time, I inquire about two topics specifically:

First, do you have a written policy that you can share which indicates how you are even-handed in your policies? This would include something that explains how you limit the targeting of individuals who you may disagree.

Second, will you describe for me exactly how you handle the clearly politically motivated attacks that come from certain "public interest" groups? What has become clear in their own literature and public announcements is that these groups are simply political hit squads looking to damage the Bar. I assume that you have addressed this because it is a serious problem that is damaging our Bar as well as others across the country

I look forward to your cooperation with my letter of inquiry after requests. Thank you in advance for your assistance with this. Please respond by February 21, 2025. Should you have further questions regarding this matter, please do not hesitate to call my office or schedule a time to meet in person.

Thank you and

All the best.

Edward R. Martin, Jr.

Attachments



ISSUED

Dec 26 2024 9:44am

Board on Professional
Responsibility

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:                          :
                                           :
    LARRY E. KLAYMAN,                      :
                                           :    Board Docket No. 24-BD-043
Petitioner.                                :    Disc. Docket No. 2024-D142
                                           :
A Suspended Member of the Bar of the       :
District of Columbia Court of Appeals      :
(Bar Registration No. 334581)              :

## ORDER OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

This matter is before the Board on Professional Responsibility (the "Board") pursuant to Board Rule 9.4 on Disciplinary Counsel's Motion to Dismiss Petition for Reinstatement. Disciplinary Counsel argues that Petitioner Larry E. Klayman's Petition for Reinstatement (the "Petition" or "Reinstatement Petition") should be denied because he has failed to provide "full and complete" responses to questions on the Reinstatement Questionnaire, as required by Board Rule 9.1(b), and because he is not eligible for reinstatement while another disciplinary matter (*In re Klayman* (D.C. App. No 24-BG-689) ("*Klayman III*"), is pending against him in the Court of Appeals. For the reasons set forth below, Disciplinary Counsel's Motion to Dismiss the Petition is granted.

### I.    Background

On September 15, 2022, the Court of Appeals suspended Petitioner for eighteen months, with reinstatement conditioned on Petitioner demonstrating his fitness to practice law. *In re Klayman*, 282 A.3d 584, 598 (D.C. 2022) ("*Klayman II*"). Petitioner filed his Petitioner for Reinstatement and accompanying

Reinstatement Questionnaire on August 6, 2024.  On October 4, 2024, Disciplinary Counsel filed a Motion to Dismiss the Petition for Reinstatement.  On November 6, 2024, after seeking and receiving an extension of time to respond to Disciplinary Counsel's motion, Petitioner filed his Opposition, which included a Motion to Disqualify Deputy [Disciplinary] Counsel Julia Porter and [Disciplinary] Counsel Hamilton Fox III from Administering to Reinstatement.  On November 26, 2024, Disciplinary Counsel filed its Reply in support of its motion, which included argument in opposition to Petitioner's motion to disqualify.

**II.    Analysis**

**A.    Petitioner's Motion to Disqualify**

Petitioner argues that Ms. Porter and Mr. Fox must be disqualified from representing the Office of Disciplinary Counsel in this matter because they have a conflict of interest due to civil suits he filed against them:  "their personal interests in defending the litigation against them are averse to the interest of their client, ODC . . . because their actions which give rise to the litigation against them are contrary to their official duties as deputy [disciplinary] counsel and [disciplinary] counsel at ODC, respectively."  Opp. at 10.  We reject Petitioner's contention that he can sue attorneys in the Office of Disciplinary Counsel and then exploit the pendency of that lawsuit to disqualify those attorneys from Petitioner's reinstatement proceeding.  Petitioner's Motion to Disqualify is denied.

2

**B.    Disciplinary Counsel's Motion to Dismiss**

Disciplinary Counsel moves to dismiss the Petition on the grounds that Petitioner has failed to file full and complete responses to the Reinstatement Questionnaire.  Board Rule 9.1(b) provides that a reinstatement petition "shall be accompanied by a full and complete response to the Reinstatement Questionnaire available from the Office of the Executive Attorney."  Disciplinary Counsel also moves to dismiss on grounds that Petitioner is ineligible for reinstatement during the pendency of *Klayman III*.  Petitioner argues that he has provided full and complete responses.

**1.  The Reinstatement Questionnaire.**

Disciplinary Counsel argues that Petitioner failed to provide full and complete responses to Questions 11, 12 and 15 in his Reinstatement Questionnaire.

*Question 11*.  Question 11 asks, in relevant part:

> Have there been or are there now any charges, complaints, or grievances pending concerning your conduct as an attorney in any bar of which you are a member or have ever been a member other than the District of Columbia Bar.

Petitioner answered "No."

Disciplinary Counsel argues that Petitioner's response is false because a reciprocal discipline matter is pending against Petitioner in Florida arising out of the Court of Appeals opinions in *In re Klayman*, 228 A.3d 713 (D.C. 2020) ("*Klayman I*").  Petitioner argues that his response is complete because the Florida disciplinary matter is a reciprocal proceeding, not a new disciplinary matter, and it is not final.  However, Question 11 is not limited to final disciplinary decisions, and it does

3

not exclude foreign reciprocal matters that follow discipline here.  Thus, Petitioner's

negative response to Question 11 is not full and complete.

*Question 12.*  Question 12 requires a petitioner to

> List any discipline for misconduct of petitioner other than that which forms the basis for the suspension or disbarment involved in this petition, in any jurisdiction where petitioner has been admitted to practice law. A certified copy of any official action to that effect in any jurisdiction shall be attached to this questionnaire and petitioner shall also provide a description of the misconduct and the specific disciplinary action(s).

Petitioner answered "No."

Disciplinary Counsel argues that this answer is false because Petitioner has

prior discipline in D.C. (*Klayman I*) and in Florida (a 2011 public

reprimand).  Petitioner argues that Question 12 "clearly refers to this instant

disciplinary proceeding," and that it does not seek disclosure of prior discipline.

Opp. at 12.  We disagree.  The plain language of Question 12 requires the disclosure

of "discipline for misconduct of petitioner *other than that which forms the basis for*

*the suspension or disbarment involved in this petition*, in any jurisdiction where

petitioner has been admitted to practice law." (emphasis added).  The emphasized

language makes clear that Question 12 seeks information about discipline for

misconduct "other than" the misconduct in *Klayman II*.  Thus, Petitioner's negative

response to Question 12 is not full and complete.

*Question 15.*  Question 15 requires a petitioner to

> Provide a statement showing the dates, general nature and final disposition of every civil action, in any jurisdiction, during the period of disbarment or suspension wherein the petitioner was either a party

plaintiff or defendant or in which he had or claimed an interest, together with dates of filing of complaints, titles of courts and the names and addresses of attorneys for said parties and of the trial judge or judges, and the names and addresses of all witnesses who testified in such actions.

Petitioner answered "No civil cases with final disposition during period of suspension where Larry Klayman was a party."  Disciplinary Counsel argues that this answer is incomplete because Petitioner has sued Disciplinary Counsel and others during the designated period.

Petitioner argues that Question 15 requires disclosure of only "final dispositions," relying on a tortured interpretation of Question 15's request that he provide "the dates, general nature and final disposition of every civil action" at issue.  Petitioner concedes, however, that he has not disclosed responsive information and argues that he should not be required to provide it in his Petition because Disciplinary Counsel

simply cannot be permitted access to information pertaining to all of Mr. Klayman's civil cases, as they will surely abuse that information and attempt to harm Mr. Klayman in every single jurisdiction court where he currently litigates. Mr. Klayman will provide this information once Porter, Fox and ODC are disqualified and this matter is reassigned to a non-partisan and non-biased independent body, with appropriate safeguards.

Opp. at 12.

In its reply, Disciplinary Counsel argues that Question 15 is not limited to civil actions that were "finally disposed," and attaches a list of undisclosed

5

concluded civil suits in which Petitioner was a party during his suspension, showing that even closed cases were not disclosed by Petitioner.   ODC Reply at 3.

We disagree with Petitioner's reading of Question 15.   It requires the disclosure of certain information regarding for "*every civil action*, in any jurisdiction, during the period of disbarment or suspension wherein the petitioner was either a party plaintiff or defendant or in which he had or claimed an interest." Question 15 also requires disclosure of the "final disposition" of civil cases, just as it requires disclosure of the dates, general nature of the action, the titles of courts, the names and addresses of attorneys and trial judge or judges, and the names and addresses of all testifying witnesses.   The requirement to disclose "final dispositions" does not limit the disclosure obligation to only those suits that have been finally disposed.  Nor does the Questionnaire seek anything confidential about responsive civil suits that are on the public record, so it is nonsensical to argue that disclosure to Disciplinary Counsel may somehow harm Petitioner.

### 2.  The Pendency of *Klayman III.*

On August 13, 2024, the Court ordered Petitioner to show cause why he should not remain suspended pending final action on the Board's *Klayman III* recommendation that he be suspended with fitness. *See* D.C. Bar R. XI, § 9(g)(1) (where the Board recommends a suspension with fitness, "the Court shall order the attorney to show cause within thirty days why the Court should not enter an order of suspension pending final action on the Board's recommendation.").  Petitioner filed his response on September 23, 2024 (updated on September 27, 2024).  On October 23, 2024, the Court issued an order addressing various matters, but did not resolve

6

the temporary suspension issue while observing that, "[t]he existing sanction in [*Klayman II*] remains in effect." On December 5, 2024, the Court issued another order in that matter on various issues, again noting that the show cause order and interim suspension issue "shall continue to be held in abeyance pending further order of the court. Respondent's existing suspension in [*Klayman II*] remains in effect."

In its October 4 Motion, filed before either of the above-referenced orders in *Klayman III*, Disciplinary Counsel argued that Petitioner's reinstatement petition is premature because the Court of Appeals had not decided whether Petitioner should remain suspended pending final action in *Klayman III*. Petitioner did not respond to this argument in his Opposition to Disciplinary Counsel's Motion. In its Reply, Disciplinary Counsel cited the portion of the Court's October 23, 2024 order that "[t]he existing sanction in [*Klayman II*] remains in effect."

Both the October 23 and December 5 orders make clear that Petitioner remains suspended following *Klayman II*, but neither order addressed Disciplinary Counsel's argument here that Petitioner is therefore ineligible to seek reinstatement even though he has served the eighteen-month suspension imposed in *Klayman II* and he would otherwise be eligible to seek reinstatement. Disciplinary Counsel cites no precedent for its argument that a petitioner facing a current suspension and fitness recommendation from the Board is ineligible to seek reinstatement from a prior suspension with fitness. The Board need not resolve this apparently novel issue because Petitioner's failure to provide complete responses in the reinstatement questionnaire suffices as grounds for dismissing his reinstatement petition. If Petitioner files a compliant reinstatement questionnaire in the future, and

7

Disciplinary Counsel believes that the pendency of *Klayman III* prevents Petitioner from seeking reinstatement from the *Klayman II* suspension with fitness requirement, any future motion to dismiss may assert that argument for consideration.

### III.    Conclusion

Upon consideration of the foregoing, and for the reasons set forth above, Petitioner's Motion to Disqualify Deputy [Disciplinary] Counsel Julia Porter and [Disciplinary] Counsel Hamilton Fox III from Administering to Reinstatement is denied, and Disciplinary Counsel's Motion to Dismiss Petition for Reinstatement is granted.

BOARD ON PROFESSIONAL RESPONSIBILITY


By:    *Bernadette C. Sargeant*
_____
        Bernadette C. Sargeant
        Chair

All members of the Board concur in this Order except Dr. Hindle, who did not participate.  This Order was prepared by Mr. Gilbertsen.


cc:

Larry E Klayman, Esquire
leklayman@gmail.com

Julia L Porter, Esquire
Deputy Disciplinary Counsel
porterj@dcodc.org

# EXHIBIT 3



RECEIVED

Jun 30 2025 4:58pm

Board on Professional Responsibility

## UNDER SEAL

### DISTRICT OF COLUMBIA COURT OF APPEALS

### BOARD ON PROFESSIONAL RESPONSIBILITY

| | |
|---|---|
| In the Matter of | |
| **Edward R. Martin** | **Disciplinary Docket No.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2025-D047** |
| **Bar No. 481866** | |
| **Date of Admission: June 9, 2003** | |

## REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND MOTION TO DISQUALIFY

Harry W. MacDougald
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

Robert A. Destro
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**TABLE OF CONTENTS**

Introduction ........................................................................................ 1

I.    The Motions to Compel and for Protective Order are Moot.................2

II.    Disciplinary Counsel and his Office Should be Disqualified for their Manifest Conflict of Interest.........................................................2

III.    Disciplinary Counsel Seeks an Unconstitutional Advisory Opinion on the Legitimacy of His Politically Motivated Investigation of Mr. Martin. .................................................................11

IV.    Disciplinary Counsel has No Authority to Question Either Mr. Martin's Public Statements Interpreting Federal Law or His Discretion to Investigate Possible Violations of Federal Law. ...........12

    1.    Federal Law – including the D.C. Human Rights Act – Prohibits Discrimination in Employment and Admissions on the Basis of Race, Color, National Origin, and Other Prohibited Grounds. ...................................................................13

    2.    Two Executive Orders Authorize Federal Investigations into both Illegal and Unconstitutional Violations of Well-Settled Federal Anti-Discrimination Laws. .............................15

    3.    The Executive Orders .............................................................15

    4.    Georgetown Falls within the Scope of the U.S. Attorney's Investigatory Discretion.........................................20

V.    Disciplinary Counsel's Arguments are Politically Motivated and Legally Specious .......................................................................23

    1.    This is a Political Case Brought by a Disciplinary Counsel with a Conflict of Interest and Long-standing Connections to Political Superiors in the Senate......................23

    2.    Rule XI does not Empower Disciplinary Counsel to Interfere in an Ongoing Federal Civil Rights Investigation.........................................................................24

iii

3.    Disciplinary Counsel's "Oath of Office" Theory is Inconsistent with Rule XI and is Unconstitutionally Vague...................................................................................27

4.    Rule XI Does Not Authorize Disciplinary Counsel to Litigate Contested Civil Rights Issues Pending Before Article III Courts.....................................................................30

Conclusion....................................................................................... 34

**iii**

**<u>UNDER SEAL</u>**

**DISTRICT OF COLUMBIA COURT OF APPEALS**

**BOARD ON PROFESSIONAL RESPONSIBILITY**

| | |
|---|---|
| In the Matter of | |
| **Edward R. Martin** | **Disciplinary Docket No.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2025-D047** |
| **Bar No. 481866** | |
| **Date of Admission: June 9, 2003** | |

**REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND MOTION TO DISQUALIFY**

Comes now Edward R. Martin, Respondent in the above-entitled matter, and submits this reply in support of his motion for protective Order.

**INTRODUCTION**

Disciplinary Counsel's reply with respect to his motion to compel, and response to Mr. Martin's motion for protective order and motion to disqualify confirm that he and his office should be disqualified from this matter based on a manifest conflict of interest and that this groundless and improper investigation should be dismissed.

1

## I.    THE MOTIONS TO COMPEL AND FOR PROTECTIVE ORDER ARE MOOT

Disciplinary Counsel begins by acknowledging that Mr. Martin has met his obligations to respond to Disciplinary Counsel's questions and that the motion to compel is therefore moot.

That being so, the motion for protective order is also necessarily moot. There are no pending discovery requests nor any disputed requests for information. Should ODC file further improper requests for information, Mr. Martin will seek appropriately tailored protection at that time. At this stage of the investigation, however, there is nothing to either compel or protect, and nothing for the Board to decide on either the motion to compel or for protective Order. Below we first reply in support of the motion to disqualify, and then address the gratuitous arguments offered by Disciplinary Counsel on the now moot motions.

## II.    DISCIPLINARY COUNSEL AND HIS OFFICE SHOULD BE DISQUALIFIED FOR THEIR MANIFEST CONFLICT OF INTEREST.

Disciplinary Counsel has a clear conflict of interest in this case because his own conduct was under investigation by Mr. Martin when he opened his groundless investigation of Mr. Martin. Disciplinary Counsel attempts to negate the conflict by contending Mr. Martin's letters to him and his superiors in the D.C. Bar system were not an "investigation." Disciplinary Counsel relies on form over substance—the substance is that the Interim U.S. Attorney sent Disciplinary Counsel a letter asking

2

questions about whether Disciplinary Counsel was acting wrongfully in Bar discipline investigations and prosecutions. This was followed by a number of other letters from Mr. Martin posing similar questions and pointing out Disciplinary Counsel's thuggish behavior in the case of Jeffrey Clark. Investigations are conducted by asking questions, and Mr. Martin's letter, and subsequent complaints to the Chief Judge of the D.C. Court of Appeals and the Chair of the Board of Professional Responsibility clearly put the conduct of Disciplinary Counsel in question.

It is painfully disingenuous to suggest that Disciplinary Counsel's conduct was not under scrutiny by Mr. Martin while he was Interim U.S. Attorney, or that it is not now under scrutiny by Mr. Martin as the Director the Weaponization Working Group at DOJ. Disciplinary Counsel cannot pretend otherwise to insulate himself from the prima facie case of retaliation presented by the circumstances of this case.

Disciplinary Counsel next contends that the timing of his office's processing Mr. Argento's complaint rebuts the inference of retaliation. But the timeline he offers only compresses the interval between Disciplinary Counsel becoming aware of Mr. Martin's inquiries and Disciplinary Counsel's opening his investigation of Mr. Martin, which strengthens rather than weakens the inference of retaliatory motive.

Disciplinary Counsel continues the argument that none of Mr. Martin's follow-up letters constituted an investigation, claiming that Chief Judge Rigsby-

**3**

Blackburn and Chair Sargeant did not interpret Mr. Martin's correspondence as an "investigation." Here Disciplinary Counsel speaks for people who are not his clients and relies on quibbling semantics, purporting to distinguish a "letter of inquiry" from an "investigation. In both BPR Rules 2.1 and 2.7 and the dictionary the terms "inquiry" and "investigation" are synonyms. *See* Merriam-Webster online dictionary. https://www.merriam-webster.com/dictionary/investigation and https://www.merriam-webster.com/dictionary/inquiry (last visited Jun. 30, 2025).

That the letters from the Chief Judge and the Board Chair did not address the specific allegations of misconduct made by Mr. Martin is a shortcoming in the oversight of Disciplinary Counsel and not an exoneration of Disciplinary Counsel. They do nothing to negate or extinguish the patent conflict of interest under which he is presently operating. If anything, these letters—and Disciplinary Counsel's reliance on them to rebut the motion to disqualify—illustrate only that Disciplinary Counsel is allowed to continue weaponizing the bar disciplinary process against the Trump Administration.

Disciplinary Counsel then contends that there can be no conflict of interest because he did not know about Mr. Martin's inquiries until after he opened the investigation. The timeline belies this contention—Disciplinary Counsel admits receiving Mr. Martin's first letter on February 24, 2025, ODC Brief, p. 12, and it is undisputed that he opened the investigation formally on March 28, 2025. A great

4

deal of other activity in response to Mr. Martin's inquiries transpired between those two dates, and so it is preposterous for Disciplinary Counsel to pretend that he did not know he was under scrutiny when he relied on Mr. Argento's patently insufficient letter to open this investigation. In any event, Disciplinary Counsel certainly knows of it *now* and therefore is *now* knowingly operating under a conflict. He just recently sent an investigative subpoena for documents to GULC and so continues his work on this investigation despite knowing of the conflict. *See* Exh. 1 attached hereto.

Disciplinary Counsel also contends there can be no *present* conflict because Mr. Martin has left the position of U.S. Attorney for the District of Columbia. This is without merit because one of Mr. Martin's current duties is Director of the DOJ Weaponization Working Group, formed to investigate precisely the sort of weaponization of law enforcement in which Disciplinary Counsel is engaged in this and other cases. If anything, the conflict is even more acute because Mr. Martin has greater authority to investigate such matters now than he did as Interim U.S. Attorney, as he currently has nationwide jurisdiction to inquire into whether Disciplinary Counsel collaborated with such personages as the District Attorney for Fulton County, Georgia, Fani Willis, who was herself disqualified by the Georgia Court of Appeals. *Roman v. State*, 910 S.E.2d 609 (2024).

**5**

Disciplinary Counsel also contends that the asserted conflict and its imputation to his office are frivolous arguments. He assumes that the rule against conflicts of interest has no application to him as Disciplinary Counsel. But it is elementary that he is subject to the RPC, including the conflict rules. Our motion to disqualify cited the legal authorities entitling Mr. Martin to an unconflicted prosecutor and Disciplinary Counsel offers no persuasive argument to the contrary.

Disciplinary Counsel does not have a client whose choice of counsel is implicated. His client is justice and he therefore has special duties as memorialized in the RPC rules on conflicts and on the special duties of prosecutors. The appearance of impropriety in a prosecutor is a weighty consideration. Where "there is at least the appearance of impropriety [by a prosecutor], [a defendant is] denied fundamental fairness in the state's prosecution of the charges against [him or] her." *Davenport v. State*, 157 Ga. App. 704, 705 (1981). To ensure that "the image of disinterested justice is not impoverished or tainted" "sometimes … attorney[s] [in the criminal sphere], guiltless in any actual sense, nevertheless [are] required to stand aside for the sake of public confidence in the probity of the administration of justice." *Love v. State*, 202 Ga. App. 889, 891 (1992). Thus, disqualifying a prosecutor—who is subject to a higher standard of public trust—requires a different outcome than disqualifying a private attorney in the civil context. *See Matter of Redding*, 269 Ga. 537, 537 (1998) (per curiam); *v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807

**6**

(1987), (recognizing fundamental right to "a disinterested prosecutor"). "[C]ourts of this country as well as of England[]" have long held that prosecutors must be (i) "unpaid except by the state," (ii) "unprejudiced by any motives of private gain," and (iii) divorced of all "private interest in [any] prosecution." *Biemel v. State*, 37 N.W. 244, 247 (Wis. 1888) (collecting authorities).

Prosecutors are "required to stand aside for the sake of public confidence in the probity of the administration of justice[,]" in circumstances in which private lawyers in the civil sphere are not. *Compare Love*, 202 Ga. App. at 891, with *Blumenfeld v. Borenstein*, 247 Ga. 406, 409 (1981). As such, when a prosecutor's participation could even "cast doubt on the fairness of the trial," disqualification "might be appropriate." *See Neuman v. State*, 856 S.E.2d 289, 296 (Ga. 2021).

In Georgia "[i]f the assigned prosecutor has acquired a personal interest or stake in the conviction, the trial court abuses its discretion in denying a motion to disqualify him, and the defendant is entitled to a new trial, even without a showing of prejudice." *Amusement Sales, Inc. v. State*, 316 Ga.App. 727, 735 (2012) (pecuniary interest); *McLaughlin v. Payne*, 295 Ga. 609, 613 (2014) ("for a prosecutor to have a conflict in such a [criminal] case is contrary to public policy, and can warrant a new trial.") (District Attorney was a necessary witness and his daughter was a close friend of the victim).

7

Disciplinary Counsel's conflict is imputed to the rest of his office because they are subordinate to him and their authority to represent his office in any matter flows from and through him. As his subordinates, they are obliged to heed his direction and preferences. In *McLaughlin* the entire District Attorney's office was disqualified because

In a Georgia criminal prosecution,

> the whole proceeding, from the time the case is laid before the [district attorney] until the rendition of the verdict, is under the direction, supervision, and control of that officer, subject to such restriction as the law imposes. Counsel employed to assist in the prosecution of criminal cases can perform no duties as such except those agreeable to and under the direction of the [district attorney].

*McLaughlin v. Payne*, 295 Ga. 609, 613 (2014) *citing Jackson v. State*, 156 Ga. 842, 850(3) (1923). While the assistants to the Disciplinary Counsel serve at the pleasure of the Board, this distinction is insufficient to preclude imputation of the conflict in light of the assistants' inherently subordinate relationship to the Disciplinary Counsel and the extent of the authority vested by the Bar Rules in him and which then flows to them. *See* Rule XI § 4(c)(2).

Disciplinary Counsel mischaracterizes our argument by saying we contend that Mr. Martin has immunity because of Disciplinary Counsel's conflict of interest. We make no such argument. Instead, Disciplinary Counsel and his office are disqualified by his personal interests in the "inquiries" being conducted by Mr.

**8**

Martin into his conduct. The Board should disqualify Disciplinary Counsel and appoint a different unconflicted Special Disciplinary Counsel to take over this case.

The Georgia law cited herein is persuasive authority. The legitimacy of ODC investigations and prosecutions of conservative lawyers has created an appearance of impropriety and subjected the Office of Disciplinary Counsel, Disciplinary Counsel himself, the Board and the D.C. Court of Appeals to public criticism and loss of confidence—the very points made by Mr. Martin in his correspondence to Disciplinary Counsel, Chief Judge Rigsby-Blackburn and Chair Sargeant. The Board should be especially jealous of its reputation for probity and fairness and take such persuasive authority under careful consideration.

Such considerations lead the Georgia Court of Appeals to disqualify Fulton County, District Attorney Fani Willis and her entire office from the case of *State v. Trump*, et al. *Roman v. State*, 373 Ga.App. 863 (2024). As the Georgia Court of Appeals explained:

> Here, we must address the remedy in the context of a significant appearance of impropriety caused by the conduct of a public prosecutor.
>
> > In our criminal justice system, the district attorney represents the people of the state in prosecuting individuals who have been charged with violating our state's criminal laws. The responsibility of a public prosecutor differs from that of the usual advocate; [her] duty is to seek justice, not merely to convict. This special duty exists because the prosecutor represents the sovereign and should exercise restraint in the discretionary exercise of governmental powers. Therefore, the district attorney is more than an advocate for one party and has additional professional responsibilities as a public

**9**

> prosecutor to make decisions in the public's interest. In the district attorney's role as an administrator of justice, he or she has broad discretion in making decisions prior to trial about who to prosecute, what charges to bring, and which sentence to seek.

(Citation and punctuation omitted.) *State v. Wooten*, 273 Ga. 529, 531 (2) (543 S.E.2d 721) (2001). These considerations take this case out of the continuum of cases involving an appearance of impropriety in connection with the conduct of private counsel and a client's interest in counsel of choice balanced against a more nebulous public interest.

*Roman*, 373 Ga.App. at 872-873.

Rule 1.7 is *crystal* clear that *any* personal interest that impairs a lawyers' independent professional judgment is grounds for disqualification. The personal interest here—being the subject of federal "inquiry" by the person into whom Disciplinary Counsel then opened a groundless investigation—is certainly within that broad scope. The circumstances clearly indicate impaired professional judgment: Disciplinary Counsel has opened an investigation that should never have been opened, posed interrogatories that he knows full well are improper, argued moot motions at length to obtain an advisory opinion, and relied on sophomoric semantic games to deflect the obvious conflict of interest under which he is laboring. He is distracted from the proper discharge of his professional responsibilities by a desire to protect himself, and by his personal political animus towards the policies of the Trump Administration.

Finally, Disciplinary Counsel's complaints about ex parte contacts with the Chief Judge of the D.C. Court of Appeals are also without merit. The U.S. Attorney

**10**

for the District of Columbia has regular business with the judiciary in the District, including D.C. Court of Appeals, relating to the administration of Justice in the District. Mr. Martin had previously inquired about and complained about Disciplinary Counsel's weaponization of his authority against conservative lawyers directly to Disciplinary Counsel and his superiors and followed up as circumstances indicated. That Disciplinary Counsel opened an investigation of Mr. Martin does not strip Mr. Martin of his other duties, responsibilities and authorities, or his ability to raise relevant and important issues with the Board or the D.C. Court of Appeals.

## III.   DISCIPLINARY COUNSEL SEEKS AN UNCONSTITUTIONAL ADVISORY OPINION ON THE LEGITIMACY OF HIS POLITICALLY MOTIVATED INVESTIGATION OF MR. MARTIN.

Disciplinary Counsel offered arguments on the motion for protective order even though it is moot on the grounds that the issues might come up again.

Neither the Court of Appeals, nor the Board of Professional Responsibility created by Rule XI, has the power to issue advisory opinions. D.C. Code §2503(b). The Board has the authority to "consider and investigate" alleged misconduct, Rule XI(4)(e)(1) and to "decide cases" developed in accordance with the procedures established the Court of Appeals, Rule XI(4)(d). Neither body has the power to give advance or advisory rulings in case an issue may come up later – but that is what Disciplinary Counsel is seeking from the Board.

11

Disciplinary Counsel claims authority to intervene in a fully warranted federal investigation to protect a local private university that may have violated well-settled federal laws prohibiting discrimination on the basis of prohibited categories. This grandiosity is untethered to the remit of the Office of Disciplinary Counsel. After all, Rule 9.1 of the D.C. Rules of Professional Conduct explicitly provides that

> A lawyer shall not discriminate against any individual in conditions of employment because of the individual's race, color, religion, national origin, sex, age, marital status, sexual orientation, family responsibility, or physical handicap.

Georgetown Law School trains lawyers. It is run by lawyers; its Dean and incoming Interim Dean are lawyers; and the University's employment policies *and practices* for faculty, staff, and students are governed by federal law, including the D.C. Human Rights Act, on which Rule 9.1 is explicitly based.

The logical implication of Disciplinary Counsel's arguments is that he can use the Bar disciplinary process to block or impede enforcement of federal anti-discrimination laws. He has no such authority.

**IV.   DISCIPLINARY COUNSEL HAS NO AUTHORITY TO QUESTION EITHER MR. MARTIN'S PUBLIC STATEMENTS INTERPRETING FEDERAL LAW OR HIS DISCRETION TO INVESTIGATE POSSIBLE VIOLATIONS OF FEDERAL LAW.**

At the time of Mr. Martin's letter to Georgetown University Law Center ("GULC"), Mr. Martin was the Interim United States Attorney for the District of Columbia. As such, he was authorized to investigate and prosecute "all offenses

against the United States" and to investigate, prosecute and defend "all civil actions, suits, or proceedings in which the United States is concerned." 28 U.S.C. §547(1,2).

### 1. Federal Law – including the D.C. Human Rights Act – Prohibits Discrimination in Employment and Admissions on the Basis of Race, Color, National Origin, and Other Prohibited Grounds.

Whether or not programs styled as Diversity, Equity, and Inclusion (DEI) efforts are consistent with the Constitution and laws of the United States, including Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(d) (Title VI); 42 U.S.C. §§2000e–2000e-17 (Title VII); and the D.C. Human Rights Act, D.C. Code §§ 2-1401-2-1404, is a question of law that falls squarely within the investigatory powers of a U.S. Attorney. Whether or not DEI programs, as designed and administered in educational programs, violate the Constitution and laws of the United States is a mixed question of law and fact in each particular case.

Reported case law resolving constitutional and statutory claims against DEI programs is sparse but growing. On the last day of the October 2024 Term, the Supreme Court addressed the constitutionality of a Montgomery County, Maryland educational DEI program[1] that was "designed to 'disrupt' children's thinking about sexuality and gender" by introducing "'LGBTQ+-inclusive' storybooks into the

---

[1] *See* Montgomery County Board of Education, Diverse and Inclusive Instructional Materials & Resources at
https://www.montgomeryschoolsmd.org/curriculum/office/inclusive-resources/
(accessed June 29, 2025).

elementary school curriculum." *Mahmoud v. Taylor*, -- U.S. --, 2025 WL 1773627 at *5 (June 27, 2025). The Court held that objecting parents were entitled to a preliminary injunction because the First Amendment's Free Exercise Clause raises a significant bar to the compelled indoctrination of their children. Significantly, for present purposes, the United States appeared, as *amicus curiae,* in support of the parents.

In *Henderson v. Springfield R-12 School District,* 2024 WL 4899801 (November 12, 2024), the Eighth Circuit vacated a panel decision affirming the dismissal of a First Amendment and employment discrimination complaint against the Springfield (SPS) public school system that

> … requires that as a condition of their employment, all staff attend and participate in "equity training" to "learn about oppression, white supremacy, and systemic racism . . . engage in identity development and understanding . . . [and] become Anti-Racist educators."

Complaint, ¶6, *Henderson v. Springfield R-12 School District*, supra. The case was argued before the Eighth Circuit *en banc* on January 15, 2025. *See also Mais v. Albemarle Cnty. Sch. Bd.*, 657 F. Supp. 3d 813 (W.D. Va. 2023) (Title VII: hostile environment created by DEI "anti-racism" training program; case settled and dismissed).

**14**

### 2. Two Executive Orders Authorize Federal Investigations into both Illegal and Unconstitutional Violations of Well-Settled Federal Anti-Discrimination Laws.

President Trump campaigned against DEI and won a resounding victory. Immediately upon taking office as the duly elected President of the entire United States, he took decisive action to terminate DEI programs to the maximum extent possible consistent with law. His Executive Orders signed January 20 and 21, 2025, reviewed below, declare the policy and direct its implementation by the agencies of the federal government, including the Department of Justice.

These Orders are directly relevant to this case for two reasons:

- On behalf of the President, the Attorney General appointed Mr. Martin to carry out the Administration's duties under the Take Care Clause. The President in his official capacity as Chief Executive was therefore Mr. Martin's client. RPC 1.2(a) requires that "A lawyer shall abide by a client's decisions concerning the objectives of representation, … and shall consult with the client as to the means by which they are to be pursued."

- The legality of the President's executive orders on DEI is contested, and their validity is being challenged in lawsuits across the country that will in due course be resolved one way or the other. Disciplinary Counsel, ever the partisan, could not remain on the sidelines, and launched his own attack on the President's efforts to ensure that the civil rights laws are "faithfully executed" by launching an investigation of Mr. Martin that seeks to make the constitutionality of those Executive Orders the central issue in a disciplinary proceeding. This is not a matter of professional discipline, it is an attack on the President's policies.

### 3. The Executive Orders

On January 20, 2025, President Trump signed Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, available at

15

https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing (last visited Jun. 30, 2025). This order is directly relevant to the matter that Disciplinary Counsel has elected to investigate because it fully authorizes Mr. Martin's action as an exercise of his prosecutorial discretion. Section 1 of this Order provides as follows:

> **Section 1.** *Purpose and Policy*. The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."
>
> Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

Section 2 relates to implementation:

> **Sec. 2.** Implementation. (a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing *Federal employment practices*, union contracts, and training policies or programs to comply with this order.

> ***Federal employment practices, including Federal employee performance reviews, shall reward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements***.

(Emphasis added).

The President's Executive Order 14173, signed January 21, 2025, entitled "*Ending illegal discrimination and restoring merit-based opportunity*," provides additional important context for this case:

> **Section 1.** *Purpose.* Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin. These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans. As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.

> Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) that can violate the civil-rights laws of this Nation.

> Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.

**17**

These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities. Yet in case after tragic case, the American people have witnessed first-hand the disastrous consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.

The Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

**Sec. 2** *Policy*. It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

Available at https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegal-discrimination-and-restoring-merit-based-opportunity (last visited Jun. 30, 2025).

Section 3 of the Executive Order, captioned "*Terminating Illegal Discrimination in the Federal Government,*" terminates unconstitutional race- based preferences in federal contracting **and employment**, terminates prior executive orders requiring such preferences, and specifically terminates "The Presidential Memorandum of October 5, 2016 (Promoting Diversity and Inclusion in the National Security Workforce)." Section 3(b)(iii) provides that "Federal contractors and

subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws." ***Georgetown University is such a contractor.*** Section 3(b)(iv)(B) requires that all federal contracts include *"*A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Subsections 3(c)(ii) and (iii) require all federal agencies to:

> (ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and

> (iii) Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

> Section 4 of the Executive Order, captioned "*Encouraging the Private Sector to End Illegal DEI Discrimination and Preferences*," directs in subsection (b)(3) that

agencies identify offending DEI programs for appropriate enforcement action:

> (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and ***institutions of higher education with endowments over 1 billion dollars***;

*Id*. (Emphasis added).

### 4. Georgetown Falls within the Scope of the U.S. Attorney's Investigatory Discretion.

Georgetown annually administers hundreds of millions of dollars in federal student aid funds, including loans and grants. *See* Title IV Program Volume Reports, at https://studentaid.gov/data-center/student/title-iv (providing data on student loans, by school) (last visited June 30, 2025). The administration and operations of Georgetown's educational programs are therefore subject to both Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, codified at 20 U.S.C.§§ 1681–1688. Georgetown also exceeds the investigatory threshold established by Executive Order 14173, with investments of $3.6 Billion. *See* Georgetown University, Consolidated Financial Statements, June 30, 2024 and 2023, https://georgetown.app.box.com/s/p4dykc6kw954km39vlx59z5ht1ddrlf3, p. 3 (last visited Jun. 30, 2025). Its DEI programs are therefore subject to compliance review.

Federal investigation and law enforcement actions against unlawful discrimination by institutions of higher learning are underway. On June 26, 2025, the Assistant Attorney General for the Civil Rights Division of the Justice Department, Harmeet K. Dhillon, wrote a letter to the University System of California announcing the opening of an investigation into whether their hiring practices violated Title VII. See https://www.justice.gov/opa/pr/justice-department-

opens-investigation-university-california-system-race-and-sex-based (last visited Jun. 30, 2025).

On June 30, 2025, the Federal Joint Task Force to Combat Anti-Semitism wrote a letter to Harvard University announcing the results of an investigation under Title VI: "After a thorough investigation, HHS OCR finds that Harvard University is in violent violation of Title VI of the Civil Rights Act, which prohibits discrimination on the basis of race, color, and national origin." *See* https://www.hhs.gov/press-room/joint-task-force-harvard-letter-notice-of-violation.html (last visited June 30, 2025). The letter further states "Failure to institute adequate changes immediately will result in the loss of all federal financial resources and continue to affect Harvard's relationship with the federal government."

**21**

Similar well-publicized enforcement or investigatory actions are underway with respect to the University of Virginia,[2] and Columbia University[3] among others.

GULC's full-throated public commitment to DEI provides more than sufficient predication for Mr. Martin's letter, just as these other universities DEI commitments warranted the investigatory and enforcement actions taken against them. The notion that the D.C. Bar's Disciplinary Counsel has the authority to intervene to protect a private institution and block the exercise of federal investigatory discretion through the pretext of a groundless Bar investigation is outrageous and must be definitively and emphatically rejected.

---

[2] AAG Dhillon wrote a letter to the University of Virginia similar to that at issue in this case. Kate Andrews, *DOJ demands University of Virginia prove it's dismantling DEI,* , VIRGINIA BUSINESS, April 30, 2025, https://virginiabusiness.com/uva-justice-department-dei-letter/. The President of the University of Virginia announced his resignation in the face of the Civil Rights Division's investigation of the University's compliance with the President's DEI Executive Order. Ashleigh Fields, *University of Virginia president resigns facing DOJ pressure: Report* , THE HILL, June 27, 2025, https://thehill.com/homenews/education/5373706-uva-president-resigns-dei-probe/

[3] Jake Offenhartz, *Under threat from Trump, Columbia University agrees to policy changes*, AP, March 21, 2025, https://apnews.com/article/columbia-university-funding-trump-fa70143c715df8fd4ef337c0e1ccf872.

## V.    DISCIPLINARY COUNSEL'S ARGUMENTS ARE POLITICALLY MOTIVATED AND LEGALLY SPECIOUS

### 1.    This is a Political Case Brought by a Disciplinary Counsel with a Conflict of Interest and Long-standing Connections to Political Superiors in the Senate

President Trump and his policies are *extremely* unpopular in the District of Columbia. D.C. has the most one-sided partisan voting split of any jurisdiction in the United States. The votes for the Democrat presidential candidates were 90.86% in 2016, 92.15% in 2020, and 90.28% in 2024. The last Republican to break 10% in the District was George H.W. Bush with 14.8% in 1988, 36 years ago. The last to break 20% was Richard Nixon in 1972, with 21.56%, which was 53 years ago. It would be a miracle if that the membership of the D.C. Bar, and of the Bar's disciplinary organs such as the Board and its Hearing Committees, deviates so far from this multi-generational, one-sided pattern as to be equally balanced in partisan terms.

Disciplinary Counsel takes cues from leaders of the Democratic Party, beginning the investigation of Jeffrey B. Clark in response to a letter from Democrat U.S. Senator Richard Durbin. He also has a history of selectively persecuting conservative and Republican lawyers over flimsy, contrived and politically motivated cases, while at the same time going easy on Democrat and liberal lawyers such as Kevin Klinesmith and Hunter Biden. Such behavior violates RPC 3.8(a) ("In exercising discretion to investigate or to prosecute, improperly favor or invidiously

23

discriminate against any person.") In Mr. Martin's case, the power of the Board has been overtly weaponized against President Trump and his policies without any legitimate predication.

Weaponization of law enforcement against conservatives was a signature issue on which President Trump campaigned and won a decisive victory. It is the focus of the DOJ Weaponization Working Group that Mr. Martin directs by Presidential appointment. Disciplinary Counsel's weaponization of his authority against conservative lawyers is what prompted Mr. Martin's inquiries and complaints concerning Mr. Fox, and for which Mr. Fox now appears to be retaliating with this baseless investigation.

### 2. Rule XI does not Empower Disciplinary Counsel to Interfere in an Ongoing Federal Civil Rights Investigation.

In his anxiety to defend his own conduct, Disciplinary Counsel offers a series of gratuitous and groundless arguments on a motion he concedes is moot.

Disciplinary Counsel first contends that his investigation is warranted because the facts if true "appear to show a violation of the "Fifth Amendment due process and First Amendment free speech and free exercise rights of Georgetown University Law Center." ODC Brief, p. 3. This contention is without merit.

Disciplinary Counsel faults Mr. Martin for not identifying any facts about Georgetown University Law Center's (GULC) DEI policies until his response to the motion to compel. This is absurd because a U.S. Attorney is not required by the Rules

of Professional Conduct or any other rule to disclose the evidence assembled in a law enforcement investigation when sending a letter like the one Mr. Martin sent to GULC. Mr. Martin was not required to seek a warrant from a judge before sending the letter, and even if he were, there would be no obligation to disclose the support for the warrant to the subject of the warrant because evidence acquired in an ongoing investigation is protected by the law enforcement privilege. Mr. Martin asserted law enforcement privilege in response to Disciplinary Counsel's inquiry and motion to compel. That privilege has not been overcome and remains intact since Disciplinary Counsel withdrew his motion to compel as moot.

Another false premise is Disciplinary Counsel's assumption that GULC has a due process right that is implicated by Mr. Martin's letter. The Due Process Clause of the Fifth Amendment most certainly gives GULC the right to notice and an opportunity to be heard in any enforcement proceedings relating to its DEI programs, but GULC has no constitutional rights that exempt it from compliance with federal laws prohibiting discrimination in the workplace, Title VII; in programs receiving federal financial assistance, Title VI, and the D.C. Human Rights Act. Nor does GULC have immunity from investigations of whether it is violating these laws. GULC's public-facing declarations of its whole-of-school commitment to DEI, and its track record of Red Guard-style struggle session discipline of professors for

**25**

private "wrongthink" on DEI provides ample grounds for Mr. Martin's inquiry.[4] Race-based admissions preferences are unconstitutional. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023). The Trump Administration's policy is to eradicate DEI policies that unlawfully discriminate, including and especially in academia.

Disciplinary Counsel contends at page 4 of his brief that "An academic institution has a First Amendment right to teach and promote whatever policies it may choose." This is clearly a false statement of law. Whatever First Amendment rights academic institutions have "to teach" – which is not an issue in this investigation, both *Students for Fair Admissions* and *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) expressly reject the argument that the First Amendment allows colleges or universities to "promote whatever policies it may choose" when those policies discriminate based on race. Bob Jones University faced the loss of its tax exemption because it had a "policy" banning interracial dating, and Harvard lost *Students for Fair Admissions* because it was "far from evident …how assigning students to … racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue." *Students for*

---

[4] *See* Greg Piper, *Georgetown Law won't share facts about black student performance after firing professor for saying it's 'lower'*, The College Fix, March 12, 2021, https://www.thecollegefix.com/georgetown-law-wont-share-facts-about-black-student-performance-after-firing-professor-for-saying-its-lower/.

*Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 216 (2023). *Students for Fair Admissions* placed the burden of defending academic DEI programs on the institutions implementing them.

> Because "[r]acial discrimination [is] invidious in all contexts," … *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), we have required that universities operate their race-based admissions programs in a manner that is "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny, *Fisher v. University of Tex. at Austin*, 579 U.S. 365, 381, 136 S.Ct. 2198, 195 L.Ed.2d 511 (2016) (*Fisher II*). "Classifying and assigning" students based on their race "requires more than ... an amorphous end to justify it." *Parents Involved*, 551 U.S. at 735, 127 S.Ct. 2738.

*Students for Fair Admissions, Inc.*, *supra*, 600 U.S. at 214.

### 3. Disciplinary Counsel's "Oath of Office" Theory is Inconsistent with Rule XI and is Unconstitutionally Vague.

This investigation is predicated on arm-waving claims about an attorney's oath of office and by now fully repudiated interpretations of constitutional law. Mr. Argento, GULC and Disciplinary Counsel are on the wrong side of the law on these issues. It is well-settled that violating the Equal Protection Clause and the civil rights laws that implement them in the name of DEI in admissions, employment and contracting is unconstitutional.

Disciplinary Counsel next attempts to shield unconstitutional discrimination under the skirts of viewpoint discrimination. Race, sex, and religion-based DEI as practiced in admissions, hiring and promotion is unconstitutional and illegal under the civil rights laws. Under clear and controlling Supreme Court precedents such

**27**

practices enjoy no protection under the First Amendment or any other provision of the Constitution.

The oath of an attorney imposes no obligation to genuflect to invidious and unconstitutional discrimination, and to the contrary imposes on federal law enforcement officials an obligation to enforce the law against such practices. Here, Disciplinary Counsel is investigating an attorney who appropriately made inquiries of GULC consistent with his obligations as a U.S. Attorney to uphold the Constitution and laws of the United States and with the President's Executive Orders regarding such practices. Disciplinary Counsel is abusing his authority in effort to block a law enforcement priority of a democratically elected branch of government with which he appears to disagree.

There is a serious problem with Disciplinary Counsel framing the investigation around a potential violation of the oath of office given its inherent breadth and vagueness. The relevant language of the oath is "I will demean myself uprightly and according to law; and that I will support the Constitution of the United States of America." The sweep of these obligations embraces the whole of the law and an unspecified code of moral "uprightness." This surpassing breadth imparts vagueness of equal scope and encourages Disciplinary Counsel to arbitrary enforcement according to his well-established political predilections.

28

Under Disciplinary Counsel's understanding of the oath of office, any petty offense against the vast array of local, state and federal codes, laws, and regulations in our society, and any conduct that could be deemed less than "upright" would be a violation of the attorney's oath of office, whether it be thinking impure thoughts, speeding, loitering, failing to wear seat belts, having open containers, using incandescent bulbs, taking high-flow showers, or driving with broken tail lights.

Disciplinary Counsel exploits the vagueness and breadth of the oath to sally forth against his political enemies. He might as well ask "How is it consistent with your oath of office to drive 70 miles per hour in a 55 mile per zone?" "How is it consistent with your oath of office to not wear your seat belt?" This breadth and vagueness is a playground for unconstitutionally arbitrary enforcement of the sort underway in this case. The Constitution does not allow such unrestrained discretion on the part of prosecutorial authorities. "We conclude § 647(e) is unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." *Kolender v. Lawson*, 461 U.S. 352, 361 (1983).

29

### 4. Rule XI Does Not Authorize Disciplinary Counsel to Litigate Contested Civil Rights Issues Pending Before Article III Courts

As noted above, the legality of the President's Executive Orders on DEI and equal opportunity is being challenged in multiple lawsuits around the country.[5] The government's lawyers are defending those policies and have won some lower court victories in the District of Columbia. *See* May 2, 2025 Order in *National Urban League v. Trump*, 1:25-cv-00471, (D.D.C.) denying plaintiffs' motion for preliminary injunction and rejecting the same First Amendment and Due Process theories articulated by Disciplinary Counsel in his gratuitous filing. https://www.courtlistener.com/docket/69651274/57/national-urban-league-v-trump/ (last visited Jun. 30, 2025).

BPR Rule 4.1 provides that Disciplinary Counsel may seek a deferral whenever there "is a substantial likelihood that the resolution of … related investigation or litigation will help to resolve material issues involved in the pending disciplinary matter." In this case, by contrast, Disciplinary Counsel wants the BPR

---

[5] This post on the Seyfarth Shaw law firm's website reports on the status of these challenges as of May 6, 2025. Annette Tyman, Rachel V. See, *Federal Court Declines to Block DEI Executive Orders, Rejecting Due Process and First Amendment Arguments*, SEYFARTH, May 6, 2025. https://www.seyfarth.com/news-insights/federal-court-declines-to-block-dei-executive-orders-rejecting-due-process-and-first-amendment-arguments.html (last visited Jun. 30, 2025).

to authorize the use its investigatory authority to preempt these decisions. It is telling that, while he has that discretion, he chooses not to exercise it here.

Is Disciplinary Counsel going to open investigations of the lawyers defending these policies for violating their oaths of office, or against U.S. District Court Judge Timothy J. Kelly for denying preliminary injunctive relief? Assistant Attorney General Harmeet K. Dhillon is not a member of the D.C. Bar and so is beyond Disciplinary Counsel's reach, but what of her subordinates who are members? The legality of the President's DEI policies should be litigated in the pending litigation or resolved through the political process, and not through a constitutional inquisition framed as a bar "investigation." If Disciplinary Counsel wants to join the plaintiffs' teams in the cases challenging these policies, he is free to resign his post and take up the cause. But he may not abuse his disciplinary authority to join their fight. Doing so would create *another* conflict of interest.

Disciplinary Counsel next argues that the failure of Mr. Argento's complaint to identify a violation of the RPC is no obstacle to his initiating an investigation. Here, Disciplinary Counsel is at cross purposes with his own letter. He directed Mr. Martin to respond substantively to allegations in Mr. Argento's letter that Mr. Martin had violated Rules of Professional Conduct 1.1, 3.1(a), and 4.1. Those specific allegations mattered then but apparently do not matter now that they have been shown to be specious nonsense. The shifting grounds of Disciplinary Counsel's

**31**

arguments are further evidence of the pretextual and politicized nature of the investigation.

Disciplinary Counsel also contends nothing prevents him from exercising his prosecutorial discretion to ask questions of Mr. Martin about whether his conduct is compliant with the RPC and his oath of office. He further contends that the argument that the rhetorical questions posed in his letter to Mr. Martin are unlawful interrogatories is frivolous if not an outright misrepresentation of *In Re: Artis*, 883 A.2d 85 (D.C. 2005). ODC Brief, p. 8. *Artis* holds at p. 101 that "Given the nature of the proceeding and the competing interests, we agree that interrogatories, as provided for under civil court rules, should not be incorporated into the disciplinary process without promulgation of rules governing their use." In *In Re: Clark*, 311 A.3d 882 (2024) the testimonial nature of the information called for by a subpoena issued by Disciplinary Counsel led the D.C. Court of Appeals to sustain Jeffrey Clark's invocation of the Fifth Amendment act of production privilege.[6] Direct interrogatories, such as the rhetorical and argumentative questions posed by Disciplinary Counsel, are all the more clearly prohibited.

---

[6] We argued that Disciplinary Counsel was well-familiar with the prohibition on compelling testimony from the subjects of his investigations through interrogatories—or subpoenas with testimonial aspects because they resemble interrogatories—because he was on the losing side of that decision and the undersigned were on the winning side.

Disciplinary Counsel defends his intemperate, rhetorical and unconstitutional interrogatories by contending he is entitled to request information. Disciplinary Counsel is not merely asking for information. At issue here are the improper methods and questions he is pursuing.

**The point is that Disciplinary Counsel's authority to conduct investigations is limited by the rules and by the Constitution,** and that some techniques and questions are permitted while others are not. There are a host of constitutional, rule-based, and prudential constraints on his investigative authority. The questions posed to Mr. Martin are clearly on the wrong side of this line. Disciplinary Counsel is not allowed to launch groundless investigations to gratify his partisan grudges. He is not allowed to abuse his discretion in an arbitrary and capricious manner for any purpose, much less a political purpose. He is not allowed to launch investigations to retaliate against those who are investigating him. He is not allowed to launch investigations to persecute those with whom he disagrees politically or ideologically. He is not allowed to interfere in federal law enforcement investigations. He is not allowed to pose unconstitutional interrogatories in a quasi-criminal proceeding to compel the respondent to testify against themselves. And he is not allowed to ask a lawyer to explain or otherwise expound on religious doctrine. Disciplinary Counsel has ignored all of these constraints and is indignant that Mr. Martin asserts these constraints in his motion for protective order.

33

Disciplinary Counsel next contends that Mr. Martin did not comply with the Board's rules for filing the motion for protective order. Given that Disciplinary Counsel has withdrawn his motion to compel, this issue is moot as well. Before filing this reply, counsel conferred with Disciplinary Counsel via email as to whether the motion for protective order was also moot, and he replied that it was not—a position that makes no sense.

In general terms, Disciplinary Counsel invokes his prosecutorial discretion to defend the opening of his investigation and the way in which he is carrying it out. At the same time, however, his very premise is that Mr. Martin did not have any prosecutorial discretion as the Interim U.S. Attorney for the District of Columbia. Disciplinary Counsel's position is as untenable as it is hypocritical.

## CONCLUSION

Disciplinary Counsel has a clear and distinct record of weaponizing his investigative and prosecutorial authority to persecute conservative lawyers with whom he disagrees politically. He has yet to be held accountable and thus feels no restraint about launching new and baseless investigations even where the retaliatory and political motivations are clearly apparent. Disciplinary Counsel cannot be allowed to use a groundless investigation to thwart the law enforcement policies and investigations of the Executive Branch of the United States Government on behalf

**34**

**35**

of a private institution. The Board and the D.C. Court of Appeals must step in before the legitimacy of the Bar's disciplinary process is tarnished beyond repair.

Respectfully submitted this 30 day of June, 2025.

*/s/ Harry W. MacDougald*
Harry W. MacDougald
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

Robert A. Destro
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this ***Reply in Support of Motion for Protective Order and Motion to***

***Disqualify*** by email addressed to:

Hamilton P. Fox
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 30 day of June, 2025.

          */s/ Harry W. MacDougald*
          Harry W. MacDougald
          Georgia Bar No. 453076

Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

    **I.**

**36**

# EXHIBIT 4



ISSUED

Jul 31 2025 2:40pm

Board on Professional
Responsibility

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

|  |  |  |
|---|---|---|
| In the Matter of: | : | **UNDER SEAL**[1] |
|  | : |  |
| CONFIDENTIAL (E.R.M.), | : |  |
|  | : | Board Docket No. 25-PD-011 |
| Respondent. | : | Disciplinary Docket No. 2025-D047 |
|  | : |  |
| A Member of the Bar of the District | : |  |
| of Columbia Court of Appeals | : |  |

## ORDER

The following are pending before the Board:  Disciplinary Counsel's Motion to Compel Response to Written Inquiries, Respondent's Response thereto and Motion for Protective Order, Respondent's Motion to Disqualify Disciplinary Counsel and the Office of Disciplinary Counsel ("Motion"), Disciplinary Counsel's Reply to Respondent's Opposition and Response to Respondent's Motion for Protective Order and to Disqualify ("ODC's Reply"), and Respondent's Reply in Support of Motion for Protective Order and Motion to Disqualify ("Respondent's Reply").

*Disciplinary Counsel's Motion to Compel* – Disciplinary Counsel has withdrawn its motion to compel as moot due to information Respondent provided to Disciplinary Counsel after the motion was filed.  ODC's Reply at 2.

---

[1] This Order is filed under seal pursuant to D.C. Bar R. XI, § 17(a), which provides in relevant part that "all proceedings involving allegations of misconduct by an attorney shall be kept confidential until either a petition has been filed under section 8 (c) or an informal admonition has been issued."

*Respondent's Motion for a Protective Order* – Respondent asserts that his motion for a protective order is moot because "[t]here are no pending discovery requests nor any disputed requests for information." Respondent's Reply at 2.

*Respondent's Motion to Disqualify* – Respondent argues that Disciplinary Counsel (Hamilton P. Fox, III) should be disqualified from investigating this matter because Respondent is investigating Mr. Fox's conduct, and Mr. Fox opened an investigation in retaliation. Motion at 2-5.

Disciplinary Counsel argues that Respondent never previously asserted that he was "investigating" Mr. Fox, and nothing in Respondent's correspondence with Mr. Fox informed him that he was under investigation. ODC's Reply at 12-14.

For the reasons discussed below, Respondent's Motion to Disqualify is denied.

## Discussion

For purposes of this discussion, the Board reads Respondent's Motion to Disqualify and Reply as asserting that Respondent investigated Mr. Fox while he was Interim United States Attorney for the District of Columbia and is scrutinizing or intends to scrutinize Mr. Fox in his current role as the Director of the Weaponization Working Group at the Department of Justice.

Respondent grounds his motion on D.C. Rule of Professional Conduct 1.7(b)(4) which provides that

> a lawyer shall not represent a client with respect to a matter if: . . . The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities

to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

*See* Motion at 3.  The parties do not cite any Court of Appeals decisions that address a prosecutor's conflict of interest.   Other jurisdictions have recognized that the issue of prosecutor conflicts "generally arises in at least two situations:"

> [t]he first is where the prosecutor has had some attorney-client relationship with the parties involved whereby he obtained privileged information that may be adverse to the defendant's interest in regard to the pending criminal charges. . . . A second [situation] is where the prosecutor has some direct personal interest arising from animosity, a financial interest, kinship, or close friendship such that his objectivity and impartiality are called into question.

*Lux v. Commonwealth*, 484 S.E.2d 145, 149 (Va. Ct. App. 1997) (quoting *Nicholas v. Sammons*, 363 S.E.2d 516, 518-19 (W. Va. 1987)); *accord State v. Robinson*, 179 P.3d 1254, 1259 (N.M. Ct. App. 2008).  This case does not present the first *Lux* scenario, and thus we consider whether Mr. Fox has a direct personal interest such that his objectivity and impartiality are called into question.   As Respondent recognizes (*see* Motion at 2-3), a "'presumption of regularity supports' . . . prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)).   Thus, we must determine whether Respondent has presented clear evidence of a direct personal interest that calls into question Mr. Fox's objectivity and impartiality.

3

*Respondent's Investigation of Mr. Fox's Conduct* – Respondent argues that Mr. Fox's self-interest in defending himself from Respondent's inquiry "is necessarily in conflict" with his professional prosecutorial responsibilities. Motion at 4. He quotes the following from Comment 11 to Rule 1.7:

> The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.

Motion at 3-4. Respondent does not explain how Mr. Fox's self-interest in defending himself in connection with Respondent's inquiries conflicts with his professional obligation as the Disciplinary Counsel. *Cf. In re Elgin*, 918 A.2d 362 (D.C. 2007) (where the respondent used the client's credit card, he had a conflict of interest in representing the client in a suit brought against the client to collect the credit card debt). Nothing in the parties' papers suggests that Disciplinary Counsel's investigation of Respondent will provide Mr. Fox with an opportunity to defend himself against Respondent's concerns about Mr. Fox's prosecutorial decisions. Thus, there is no evidence of the type of conflict identified in Comment 11.

*Retaliation* – Respondent argues that Mr. Fox opened an investigation to retaliate against Respondent's investigation of Mr. Fox's decision-making. Motion at 4-5. Disciplinary Counsel asserts that Mr. Fox did not know he was under investigation, and thus, his investigation of Respondent is not retaliatory. ODC's Reply at 12-14. In his Reply, Respondent argues that

> It is painfully disingenuous to suggest that Disciplinary Counsel's conduct was not under scrutiny by [Respondent] while he

4

was Interim U.S. Attorney, or that it is not now under scrutiny by [Respondent] as the Director [of] the Weaponization Working Group at DOJ. Disciplinary Counsel cannot pretend otherwise to insulate himself from the prima facie case of retaliation presented by the circumstances of this case.

Respondent's Reply at 3.

In considering Respondent's retaliation claim, we need not determine whether Respondent was investigating Mr. Fox in his official capacity when the complaint was opened, or whether he is investigating Mr. Fox now. Instead, we must determine whether there is clear evidence that Mr. Fox understood that he was under investigation, because such an understanding is an essential component of Respondent's retaliation argument.

In considering this matter, we look at Respondent's February 7 letter to Disciplinary Counsel and March 28 letter to Chief Judge Blackburne-Rigsby. These letters are the only evidence in the record bearing on Mr. Fox's knowledge of Respondent's inquiries regarding the Office of Disciplinary Counsel. In the February 7 letter (attached to ODC's Reply), Respondent represented that as the D.C. U.S. Attorney, he "receive[s] requests for information and clarification," and that he had "received a specific request about how the D.C. Bar operates with regard to disciplinary investigation and actions." Respondent made two specific requests for information from Mr. Fox:

> First, do you have a written policy that you can share which indicates how you are even-handed in your policies? This would include something that explains how you limit the targeting of individuals who you may disagree [sic].

5

> Second, will you describe for me exactly how you handle the clearly politically motivated attacks that come from certain "public interest" groups? What has become clear in their own literature and public announcements is that these groups are simply political hit squads looking to damage the Bar. I assume that you have addressed this because it is a serious problem that is damaging our Bar as well as others across the country.

The February 7 letter did not assert that Mr. Fox was "under investigation."

In the March 28 letter to Chief Judge Blackburne-Rigsby (attached to Disciplinary Counsel's Motion to Compel at Ex. F), Respondent supplemented an earlier complaint about Mr. Fox that he had sent to Chief Judge Blackburne-Rigsby (Respondent had not sent the earlier complaint to Mr. Fox). According to the March 28 letter, the earlier complaint alleged that Mr. Fox "is regularly confusing members of the legal community with his uneven public positioning of his office and his public conduct." Respondent described Mr. Fox's conduct as "confusing and counterproductive." Respondent closed the March 28 letter as follows:

> To be candid, Judge, you have a crisis on your hands because of [Mr. Fox]. In a time where we have so much need for collaboration between all parties with regard to the issues facing our community and your court, he is dividing us.

> I look forward to hearing from you on this important matter. (I am cc'ing Mr. Fox on this for transparency since the Complaint Against Mr. Fox [sic] relates to him.)

The March 28 letter specifically asked the Court to investigate Mr. Fox, but it did not assert that Respondent was investigating Mr. Fox.

6

From our review of these two letters, we do not see a clear basis for a reader to conclude that Respondent was conducting an official investigation into Mr. Fox's conduct. Absent such evidence, we cannot conclude that Mr. Fox opened the investigation to retaliate against Respondent for his investigation of Mr. Fox.

While Mr. Fox was clearly aware that Respondent had complained to Chief Judge Blackburne-Rigsby, that complaint is not sufficient to require Mr. Fox's disqualification. Courts routinely hold that a defendant may not create a disqualifying conflict by complaining about a prosecutor. Otherwise, any respondent could manufacture a conflict by complaining about any of the attorneys or investigators in the Office of Disciplinary Counsel. *See, e.g.*, *Robinson*, 179 P.3d at 1260 ("[A] defendant does not create a disqualifying interest and cannot choose his or her prosecutor for an underlying offense by the use of threats."); *State v. Iowa Dist. Ct. for Dubuque Cnty.*, 870 N.W.2d 849, 857 (Iowa 2015) ("[W]hen a threat to a prosecutor does not form the basis for a separate criminal prosecution, and when the prosecutor is not the victim, the prosecutor does not have a disqualifying conflict of interest in the underlying prosecution."); *see also* 870 N.W.2d at 853-55 (collecting cases).

Respondent sees evidence of retaliation in the fact that Mr. Fox's initial letter to Respondent contained written questions, which Respondent argues are unlawful, citing *In re Artis*, 883 A.2d 85 (D.C. 2005). Motion at 5; Respondent's Reply at 32. We disagree. These written questions are not improper nor are they evidence of retaliation. They are permitted by Board Rule 2.9, as the Court of Appeals recently

7

recognized in *In re Doman*, 314 A.3d 1219, 1228 (D.C. 2024) ("After our decision in *Artis*, . . . the Board promulgated a rule governing written requests by Disciplinary Counsel for information from respondents and others. Bd. Pro. Resp. R. 2.9.").

Finally, Respondent argues that Mr. Fox's decision to investigate a "patently insufficient" complaint is further evidence of retaliation.  Motion at 4; *see id.* at 5; Respondent's Reply at 4-5.  Disciplinary Counsel asserts that it is investigating whether Respondent's conduct violated his oath of office to support the Constitution, which would be grounds for discipline, if proven.  ODC's Reply at 2-3 (discussing the bases for its investigation); *see* D.C. Bar. R. XI, § 2(b) (a violation of an attorney's oath of office is grounds for discipline); § 6(a)(2) (Disciplinary Counsel has "the power and the duty" to investigate alleged misconduct "where the apparent facts, if true, may warrant discipline").  Given the breadth of Disciplinary Counsel's investigative authority, we cannot conclude that it is investigating a patently insufficient complaint, or that its theory of investigation is clear evidence of retaliation.[2]

---

[2] Respondent's Reply contains discussions of what might be considered defenses if disciplinary charges are filed based on the complaint:  that Disciplinary Counsel cannot question Respondent's public statements interpreting federal law, or his discretion to investigate possible violations of federal law; that Disciplinary Counsel cannot interfere with an ongoing federal civil rights investigation or litigate contested civil rights issues pending before Article III courts; and that Disciplinary Counsel's "Oath of Office" theory in unconstitutionally vague.  *See* Respondent's Reply at ii-iii (Table of Contents, sections IV, V(2), V(3), V(4)).  We need not consider those arguments at this point because they are not germane to the question before the Board, which is whether Mr. Fox suffers from a disqualifying conflict of interest.

8

Upon consideration of the foregoing, it is hereby

ORDERED that Disciplinary Counsel's Motion to Compel Response to Written Inquiries is withdrawn as moot; and it is further

ORDERED that Respondent's Motion for Protective Order is denied as moot; and it is further

ORDERED that Respondent's Motion to Disqualify Disciplinary Counsel and the Office of Disciplinary Counsel is denied.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____
　　　Bernadette C. Sargeant
　　　Chair

cc:

E.R.M.
c/o Harry W. MacDougald, Esquire
hmacdougald@ccedlaw.com
Robert A. Destro, Esquire
robert.destro@protonmail.com


Hamilton P. Fox, III, Esquire
foxp@dcodc.org

9