## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

**In the Matter of**

**EDWARD R. MARTIN,**

**Respondent, A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 481866**

**CASE NO.**

**1:26-mc-0042-CRC**

## MOTION TO DISQUALIFY DISCIPLINARY COUNSEL AND EXECUTIVE ATTORNEY

*/s/ Christopher A. Byrne, Esq.*
Christopher A. Byrne, Esq.
DC Bar No. 928424
Byrne Law PLLC
1050-30th St Northwest
Washington, D.C. 20007
(202) 487-6800
cabesq@protonmail.com
*Pro hac vice motions pending*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd. 520
Arlington, VA 22207
202-905-6064
robert.destro@protonmail.com

Attorneys for Edward R. Martin

TABLE OF CONTENTS

Introduction............................................................................................................................1

Statement of Facts.................................................................................................................4

I.      `In February 2025, Respondent Edward R. Martin, acting as U.S. Attorney for
        the District of Columbia, first launched an investigation of Disciplinary Counsel,
        Hamilton "Phil" Fox, III, and his supervision of the Office of Disciplinary
        Counsel prior to Fox's investigation and filing of the charges now before this
        court............................................................................................................................ 4

II.     ODC's Retaliatory Investigations of Respondent ........................................... 9

Argument ..........................................................................................................................10

I.      Any lawyer who serves as the "quasi-independent prosecutorial arm" of the
        District of Columbia Court of Appeals must recuse or be disqualified whenever
        his impartiality "can reasonably be questioned" or his "professional judgment on
        behalf of the [public interest] will be or reasonably may be adversely affected by
        the lawyer's own financial, business, property, or personal interests."........................ 10

        A.   The BPR performs judicial functions only by delegation from the DCCA. ................ 13

        B.   The Code of Judicial Conduct applicable to the D.C. courts governs all
             operations of the BPR – including the behavior of its Hearing Committees,
             Disciplinary Counsel, and the Executive Attorney. ...................................... 15

        C.   These Bar proceedings implicate the sovereign interests of the United States, the
             powers of the executive branch, and the constitutional rights of Mr. Martin. ............. 19

II.     Mr. Fox, Mr. Phalen, and the staff attorneys have irreconcilable, and imputable
        conflicts of interest. ................................................................................... 21

III.    Prosecutors appointed by courts to assist in the exercise of their disciplinary
        powers may not appear in cases in cases in which they have a personal interest. ....... 24

IV.     The BPR's denial of Mr. Martin's motion to disqualify is not binding on this
        court and should be reconsidered. ................................................................ 30

        A.   The BPR Chair's decision that Disciplinary Counsel should not be recused is an
             error of law tainted by conflict of interest.................................................... 30

        B.   The BPR is not a Disinterested "Adjunct Fact Finder"................................. 33

Conclusion .........................................................................................................................35

## INTRODUCTION

Comes now, Edward R. Martin, Respondent in this matter, and moves this Honorable Court for an order disqualifying the following two attorneys involved in this matter for conflict of interest:

| Attorney | Position | Grounds for Disqualification |
|---|---|---|
| Hamilton P. Fox, III | Disciplinary Counsel, Board on Professional Responsibility | Conflict of Interest |
| James T. Phalen | Executive Attorney, Board on Professional Responsibility | Conflict of Interest |

Respondent also moves this Honorable Court for an order disqualifying all of the attorneys who work for the Office of Disciplinary Counsel [ODC] and the Office of the Executive Attorney [OEA] in favor of independent, non-conflicted counsel representing the interests of the District of Columbia Court of Appeals [DCCA] and its Board on Professional Responsibility [BPR] in this matter.

Disciplinary Counsel, Hamilton P. Fox, III, must be disqualified because he opened his own investigation and filed formal disciplinary charges against Respondent Edward R. Martin *after* acknowledging, in writing, that Mr. Martin had previously opened and was conducting an ongoing federal investigation into Mr. Fox's own behavior. This acknowledgment reflected a known, irreconcilable conflict of interest between Mr. Fox's personal interests as the subject of an ongoing federal investigation and his professional obligations as Disciplinary Counsel and as a member of the D.C. Bar. Mr. Fox's disqualification is also imputed to the staff attorneys he supervises in his office because, at a minimum, DCCA Rule XI §4(e) provides that "the term 'Disciplinary Counsel' shall refer collectively to Disciplinary Counsel, any Special Disciplinary Counsel, and all assistant disciplinary counsel unless the context requires otherwise." Further, Mr. Fox is the sole delegate of the DCCA's authority to serve as the Court's special prosecutor.

Assistant Disciplinary Counsel derive whatever authority and discretion they have from him in any given case.

Mr. Phalen, the BPR Executive Attorney, and the staff attorneys he supervises in his office must also be disqualified for four (4) reasons. First, the attorneys in the Office of the Executive Attorney were at all relevant times serving as legal advisors to the BPR and were in a position to advise the "Contact Member" who approved Mr. Fox's decision to file formal charges against Respondent. Mr. Phalen would have been responsible for the charging process and thus it was part of his job as legal advisor to the BPR to have known about the correspondence between Mr. Martin, the BPR, the Chief Judge, and the Judges of the DCCA that reveals Disciplinary Counsel's conflict.[1] Second, Mr. Phalen is responsible for Hearing Committee assignments, and would have decided which of the Hearing Committees appointed by the BPR would conduct the adversarial evidentiary hearing on Mr. Fox's charges.[2] Third, Mr. Phalen plays an essential role in both the BPR and Hearing Committee's own determinations concerning conflicts of interest.[3] When recusal

---

[1] The Executive Attorney advises the BPR, and selects, on a rotating basis, an attorney member of a Hearing Committee to serve as "Contact Member." A Contact Member, who is a volunteer, oversees disciplinary proposals made by Disciplinary Counsel, and must approve the initiation of all formal charges. The Executive Attorney then decides which Hearing Committee will conduct the evidentiary hearing on the charges. Rule XI §7 a (2, 3).

[2] Rule XI §4e (6); §5b; §5(c)(1). Under current BPR procedure, Mr. Phalen and members of his staff also provide legal advice to the Hearing Committees. The Executive Attorney concurrently provides advice to the BPR, which supervises and oversees both the Executive Attorney and reviews the findings of fact and recommendations proposed by Hearing Committees. Mr. Phalen, in addition to his general obligations as BPR's legal advisor, thus provides advice at all levels of a disciplinary proceeding: 1) selection of the "Contact Member"; 2) approval of charges; 3) assignment of cases to Hearing Committees; 4) advice to the Hearing Committee regarding the conduct of the Hearing; and 5) advice to the BPR. *See also* Rule XI §4(e)(4); §7(b).

[3] *See* BPR "Recusal Policy for Board and Hearing Committee Members" (Approved May 17, 2018, but only recently published in November, 2025 on the District of Columbia Bar website) at https://www.dcbar.org/getmedia/997b261d-4bcd-4eda-aabe-ea8b66aac04b/Recusal-Policy-for-Board-and-Hearing-Committee-Members (accessed June 19, 2026). The District of Columbia Rules of Professional Responsibility concurrently apply to Mr. Phelan as well.

2

questions arise for Hearing Committee members, that member "should consult with the Executive Attorney to decide whether recusal is appropriate."[4] When a respondent seeks recusal of a Hearing Committee member, the issue is resolved by the BPR Chair, whom Mr. Phalen advises in his capacity as the BPR's legal advisor. Fourth, in his role as legal advisor to the BPR and Court of Appeals, he and his staff would necessarily have been consulted, and should have been consulted by Mr. Fox, the BPR, and the Court of Appeals concerning the substance and ethical implications of their respective responses to Mr. Martin's federal investigation of Mr. Fox's behavior.

In sum, Mr. Fox, Mr. Phalen, and their respective staff lawyers were "personally and substantially" involved in the investigation, review, and filing of the specific disciplinary charges at issue here, as well as the responses made by the BPR and Mr. Fox to Mr. Martin's investigative inquiries.

When Mr. Fox implicitly directed Respondent to submit his complaint about Mr. Fox to the Chief Judge and the Chief Judge then referred the complaint to the BPR, Mr. Phalen, as counsel to the BPR, would also have reviewed (if not crafted) the Board Chair's official response to Mr. Martin's complaints and inquiries to the Court of Appeals concerning Mr. Fox's behavior. Both Mr. Fox and Mr. Phalen and their respective offices would (at the very least) have been consulted prior to the BPR Chair's denial of Mr. Martin's motion to disqualify Mr. Fox at the Hearing Committee level and thus were well aware of the conflict-of- interest allegations and resulting responsibilities at issue here. *See* Board on Professional Responsibility, Order of July 31, 2025, *In the Matter of Confidential* (E.R.M.)*,* Board Docket No. 25-PD-011, Disciplinary Docket No. 2025-D047) [APPENDIX B]. As a result, and as shown in depth below, Mr. Fox, Mr. Phalen, and their

---

[4] *Id.*, BPR Recusal Policy supra note 3, at p. 3.

**3**

offices are inextricably entangled in conflicts of interest in this case that require their disqualification.

STATEMENT OF FACTS

**I.**     `IN FEBRUARY 2025, RESPONDENT EDWARD R. MARTIN, ACTING AS U.S. ATTORNEY FOR THE DISTRICT OF COLUMBIA, FIRST LAUNCHED AN INVESTIGATION OF DISCIPLINARY COUNSEL, HAMILTON "PHIL" FOX, III, AND HIS SUPERVISION OF THE OFFICE OF DISCIPLINARY COUNSEL PRIOR TO FOX'S INVESTIGATION AND FILING OF THE CHARGES NOW BEFORE THIS COURT.**

On February 7, 2025, Respondent, acting in his official capacity as Acting U.S. Attorney for the District of Columbia, wrote to Hamilton P. "Phil" Fox, III, in his official capacity as Disciplinary Counsel informing him that a federal investigation[5] into his conduct as Disciplinary Counsel was underway. That letter began with the following words:

---

[5] As used in this motion, the term "investigation" means "the requiring of information concerning" the business or operations of a business or association of lawyers.

> The Supreme Court has … held … that it is not necessary that a charge of violation of law be pending, or that the inquiry be limited by 'forecasts of the probable results of the investigation.' The official might, the Court held, make 'preliminary investigation of possibly existing violations', so long as the investigation be for a lawfully authorized purpose within the power of Congress to command.

*Barsky v. United States*, 167 F.2d 241, 245 (D.C. Cir. 1948), *citing Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S. Ct. 494, 90 L. Ed. 614 (1946) and *Interstate Com. Comm'n v. Goodrich Transit Co.*, 224 U.S. 194, 211, 32 S. Ct. 436, 440, 56 L. Ed. 729 (1912).

This definition is in accord with Rule 1.2 of the Rules of the Board on Professional Responsibility, which provides:

> **Investigation** means a factual inquiry by the Board pursuant to Section 4(e)(1) of Rule XI with respect to any alleged ground for discipline or alleged incapacity of any attorney, or by Disciplinary Counsel pursuant to Section 6(a)(2) of Rule XI, brought to Disciplinary Counsel's or the Board's attention by complaint or otherwise, with respect to all matters involving alleged misconduct by a member of the District of Columbia Bar or with respect to petitions for formal proceedings or for reinstatement by suspended or disbarred attorneys.

> **Investigator** means a person assisting Disciplinary Counsel in a disciplinary investigation.

4

At this time, I have received a specific request about how the DC bar operates with regard to disciplinary investigation and actions. In particular, I have been asked about how you target individuals based not on personal knowledge for a basis of a complaint but instead based on a policy or political disagreement. Please see the two attached documents that seem to indicate some sort of policy.

However, public reports of your conduct compared with these two documents is inconsistent. For example, in some instances you have clearly not abided by the "personal knowledge" requirement and instead fallen into political motive: see, for example, your use of the Senator Dick Durbin complaint to open complaints against DC Bar members.[6]

Mr. Martin asked "specifically:"

First, whether you [ODC] have written policy that you [Fox] can share which indicates how you are evenhanded in your policies? This would include something that explains how you limit the targeting of individuals [with whom] you may disagree.

Second, will you describe for me exactly how you handle the clearly politically motivated attacks that come from certain "public interest" groups? What has become clear in their own literature and public announcements is that these groups are simply political hit squads looking to damage the Bar. I assume that you have addressed this because it is a serious problem that is damaging our Bar as well as others across the country[.]

(Exhibit 1: Letter 02/17/2025– Martin to Fox).

By letter dated February 25, 2025, Mr. Fox acknowledged the existence of the U.S. Attorney's investigation into his official conduct and that of his subordinates in ODC, but he did not respond to Respondent's two (2) "specific" questions concerning the use of the BPR process to achieve political aims. Rather, Fox hastened to point out that Respondent:

appear[ed] to be under the impression that the Office of Disciplinary Counsel is a part of the D.C. Bar. We are not; *we are an arm of the District of Columbia Court of Appeals and are governed by the rules of that court and the rules of its Board on Professional Responsibility*. [Emphasis added.]

---

[6] One of the issues that Respondent was investigating was the alleged collaboration between ODC and the staff of Senator Richard Durbin of Illinois prior to Mr. Fox's filing of formal charges against former Assistant Attorney General, Jeffrey B. Clark, whose case is mentioned on page 2 of Respondent's letter of February 7, 2025 as well as in the Complaint in *United States v. Fox*, U.S. District Court for the District of Columbia, Case No. 1:26-cv-01658-RJL (filed 05/13/26).

**5**

Exhibit 2: Letter – 02/25/25 Fox to Martin; Exhibit 2.1: Email 03/05/25 linking to Exhibit. 2

In all, Mr. Martin sent six (6) letters or emails complaining about and inquiring into Mr. Fox's conduct *before* Fox opened the Argento investigation into Mr. Martin that led to the charges at issue in this case. The timeline of relevant communications and the exhibit numbers for each appear in the table below. A full, chronological list of correspondence relevant to this motion appears as Appendix A to this motion.

| CONFLICT OF INTEREST TIMELINE<br>Exhibits are numbered in Order as they appear in the Motion | | | | | |
|---|---|---|---|---|---|
| **Date** | **From** | **To** | **Type** | **Description** | **Exh.** |
| 02/07/25 | Martin | Fox | Letter | Asking Fox about policies of investigating attorneys with whom he disagrees based on complaints made without personal knowledge of people, including Jeffrey Clark | 1 |
| 02/25/25 | Fox | Martin | Letter | Responding to Martin's letter of 2/17/25 | 2 |
| 03/5/25 | Fox | Martin | Email | Sending link to Fox's letter of 2/25/25 | 2.1 |
| 03/6/25 | Martin | Fox, Blackburne-Rigsby | Email with letter | Responding to Fox email of 3/5/25 advising that ODC is arm of DCCA | 3 |
| 03/6/25 | Martin | Fox, Blackburne-Rigsby | Email | Regarding *Wash Post* article; Fox working with Sen. Durbin | 4 |
| 03/13/25 | BPR Chair Sargeant | Martin, cc to Fox | Letter | General deflection of Martin's complaints about Fox, noting "we are unaware of anything about ODC's investigation or prosecution of those matters that would be a cause for concern among attorneys at the U.S.A.O. (cc: Blackburne-Rigsby, Fox, and Phalen) | 5 |

6

| CONFLICT OF INTEREST TIMELINE | | | | | |
| --- | --- | --- | --- | --- | --- |
| Exhibits are numbered in Order as they appear in the Motion | | | | | |
| Date | From | To | Type | Description | Exh. |
| 03/19/25 | Martin | Blackburne-Rigsby | Letter | Formal complaint regarding Fox to the DCCA Chief Judge | 6 |
| 03/28/25 | Martin | Blackburne-Rigsby | Letter | Supplementing USAO complaint against Fox for threats against Clark; charging that Fox is provoking a crisis. | 7 |
| 03/28/25 04/15/25 | Fox/Thornton | Martin | Emails with letters | Opening ODC investigation into Argento complaint. | 10 |

On March 5, 2025, Martin forwarded the letter commencing his investigation of the complaints about Fox[7] by email to Mr. Fox and sent a "cc:" to the Chief Judge of the D.C. Court of Appeals, Anna Blackburne-Rigsby.[8] On March 6 Respondent emailed Fox to follow up on his earlier inquiries and said: "You may have seen that Sen. Durbin, encouraged by your effort on his behalf, is now sending letters to the NY Bar disciplinary folks to push his agenda. All of this make [sic] me ask you again to answer my letter and my inquiries."[9]

The Chief Judge did not respond directly to Mr. Martin. Instead, she referred the Acting U.S. Attorney's letter to the BPR, the body established by Court of Appeals XI §4(a) whose lawyer was Mr. Phalen, "[t]o consider and investigate any alleged ground for discipline or alleged incapacity of any attorney called to its attention, or upon its own motion, and to take such action with respect thereto as shall be appropriate to effect the purposes of this rule." DCCA Rule XI §4(e)(1).

---

[7] Exhibit 1: Letter 02/17/2025– Martin to Fox
[8] Exhibit 3; Email 03/06/2025 – Martin to Fox and Blackburn-Rigsby
[9] Exhibit 4: Email 03/06/2025 – Martin to Fox and Blackburne-Rigsby

On March 13, 2025, then-BPR Chair, Ms. Bernadette Sargeant, responded to Mr. Martin's letter of February 7, 2025[10]. After a somewhat lengthy explanation of the rules governing the initiation of ODC investigations, she acknowledged that Respondent had complained about Mr. Fox's behavior.

> Because the Board and the Court can have adjudicative responsibilities with respect to particular matters, the Board *and the Court generally do not exercise administrative oversight over ODC with respect to the handling of particular matters*. The Board and the Court do, where appropriate, exercise more general administrative oversight over ODC. (Exhibit 5: Letter – 03/13/2025 Sargeant to Martin at p. 2) (emphasis added)

The Chair concluded: "We hope that the foregoing addresses any concern that Disciplinary Counsel's decision-making has been influenced by anything other than the evidence presented to it."

Clearly, the BPR's response failed to address Mr. Martin's stated concerns, and he continued to press his investigation. On March 19, 2025, Respondent sent a detailed complaint about Mr. Fox's behavior to Chief Judge Blackburne-Rigsby:

> With this letter, I hereby file a Complaint with you against Mr. Hamilton Fox for his failures in office. I lodge this complaint with you because Mr. Fox says that he works for you and therefore you can review his office and conduct.
>
> We are living in a time when lawfare and the weaponization of legal tools against Americans is rampant. We must take extraordinary steps to protect our legal system and to confront abuses.
>
> Mr. Fox has encouraged the politicization of his position and your court. Specifically, he failed to rein in Senator Durbin over the past few years and now my own office is facing this too. I find it particularly offensive that **I addressed these concerns to Mr. Fox by letter** – naming Senator Durbin as an abuser of our system – and Mr. Fox did not address it. I did the before Senator Durbin's recent actions precisely because I wanted to cut off such misconduct. Mr. Fox slow-walked his response and gave me a non-answer. And thus Senator Durbin struck again. What a shame and failure.
>
> By allowing Senator Durbin to attack me and my office, Mr. Fox is aiding in what I see as retaliation against our work as U.S. Attorney. In addition, Mr. Fox has failed to

---

[10] (Exhibit 1: Letter 02/17/2025– Martin to Fox)

make clear his role and for whom he works. One of our senior leaders in the legal community – a member of the bench no less – recently admitted to me that he did not even "know that Mr. Fox worked directly for the Court of Appeals." The impression is that Mr. Fox prefers to seem independent even though he is not and that he does not seem to want accountability.

I refuse to allow our Bar, our Courts and our profession to be denigrated by anyone – including Mr. Fox and certainly not by allowing his failures to go uncommented on. At this time, while you are investigating this complaint, may I respectfully recommend that you suspend Mr. Fox (with pay if necessary) until a review can be undertaken of his office and his professional conduct?

Thank you for addressing my Complaint against Mr. Fox. I remain, as I offered before now, happy to meet in person to discuss this important matter.

(Exhibit 6: Letter – 03/19/2025 Martin to Blackburne-Rigsby) (emphasis in original).

On March 28, 2025, Mr. Martin later followed up with another letter to the Chief Judge.

Its first two paragraphs restate and amplify his complaint:

I am supplementing my Complaint Against Mr. Hamilton Phil Fox by sending you the attached document. The document came to my attention after some of the recent public coverage.

It appears to me based on this document that Mr. Fox is compromised regarding his investigation of Jeff Clark. I believe this investigation is before you right now. I point you to page 4 and page 52 of the document where Mr. Fox uses mob-like language to threaten that he will "ratchet up" an investigation of the subject invokes certain defenses. This is problematic and I respectfully request that you investigate Mr. Fox.

… To be candid, Judge, you have a crisis on your hands because of him. In a time where we have so much need for collaboration between all parties with regard to the issues facing our community and your court, he is dividing us.

(Exhibit 7: Letter – 03/28/2025 Martin to Blackburne-Rigsby).

## II.    ODC'S RETALIATORY INVESTIGATIONS OF RESPONDENT

During his term as Acting U.S. Attorney, Respondent had opened three (3) official federal investigations that are relevant to this motion.

- The first, opened on February 7, 2025, was aimed at Fox and ODC and concerned allegations that Mr. Fox and ODC had abused the powers of the office. (Exhibits 1-7).

- The second, opened on February 17, 2025, concerned possible violations of the civil rights laws and compliance with conditions of federal assistance by Georgetown University Law School. [Exhibit 8: Letter – 02/17/2025 Martin to GULC Dean Treanor].

- The third was an inquiry into the behavior of a former FBI agent, dubbed the "Horgan" matter after the name of the complaining party. [Exhibit 9: Letter – Fox to Martin opening Horgan investigation with demand for DOJ documents.]

On March 28, 2025, seven weeks *after* Mr. Martin's investigations, Fox responded by opening the first of his own three (3) official BPR investigations into Respondent's official actions and eventually filed formal charges against Respondent based on two of them: 1) the Georgetown investigation and Martin's investigation into Fox's putative "abuse of power and office"[11], and 2) the Horgan matter.[12] A motion to enforce a subpoena in the Horgan matter remains pending before the DCCA.

### ARGUMENT

**I.     ANY LAWYER WHO SERVES AS THE "QUASI-INDEPENDENT PROSECUTORIAL ARM" OF THE DISTRICT OF COLUMBIA COURT OF APPEALS MUST RECUSE OR BE DISQUALIFIED WHENEVER HIS IMPARTIALITY "CAN REASONABLY BE QUESTIONED" OR HER "PROFESSIONAL JUDGMENT ON BEHALF OF THE [PUBLIC INTEREST] WILL BE OR REASONABLY MAY BE ADVERSELY AFFECTED BY THE LAWYER'S OWN FINANCIAL, BUSINESS, PROPERTY, OR PERSONAL INTERESTS."**

The issue presented by this motion is straightforward: The DCCA has conferred on the BPR the "power and duty … (1) To consider and investigate any alleged ground for discipline or alleged incapacity of any attorney called to its attention, or upon its own motion, and to take such action with respect thereto as shall be appropriate to effect the purposes of this rule." DCCA Rule XI §4(e)(1). Disciplinary Counsel is a lawyer-employee of the BPR, which serves as the "quasi-independent prosecutorial arm of the of the [DCCA]" and which is "bound to follow its own rules

---

[11] Exhibit 10: Email 03/28/2025 Thornton to Martin with attached letter from Fox to Martin with copy of Argento complaint and demand for response by April 14, 2025

[12] Exhibit 9: Letter 11/10/2025 Fox to Martin with attached Horgan complaint.

and regulations" in the course of its duties. *In re Kitchings*, 779 A.2d 926, 932 (D.C. 2001) (so describing Disciplinary Counsel). In the case at bar, this Court must determine, for itself, *which* rules and regulations apply to govern disqualification of Disciplinary Counsel. 28 U.S.C. §1450 ("All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.") The "rules and regulations" governing the DCCA and its subordinate organizations, including the BPR, are, of course, the Constitution, the District of Columbia Code, the Federal Rules of Appellate Procedures, and the rules the DCCA has adopted, including the Code of Judicial Conduct [CJC], Rule XI (governing disciplinary proceedings), and the D.C. Rules of Professional Conduct [RPC], among others. *See* 28 USC §455. Given this, the question becomes do the "rules and regulations" governing disqualification in D.C. require that Mr. Fox and Mr. Phalen be disqualified whenever their impartiality "might reasonably be questioned."

Mr. Martin argues here that the investigations conducted by Disciplinary Counsel *on behalf of* the BPR are governed not only by the disqualification rules in the Code of Judicial Conduct, CJC Rule 2.11(A) (governing D.C. judges); but also, by the conflict of interest and imputed conflict rules of the D.C. Rules of Professional Conduct. [*see* RPC 1.7(b) (conflicts of interest); 1.10 (imputed disqualification), and 1.13 (organization as client)]. *Compare* 28 U.S.C. §455 (which governs the recusal obligations of Article III judges). Given this, when fully assessed, the "rules and regulations" governing disqualification in D.C. do require that Mr. Fox and Mr. Phalen be disqualified whenever their impartiality "might reasonably be questioned."

The BPR, by contrast, does not recognize that the law or the rules of the DCCA define what standards govern disqualification of BPR members or Disciplinary Counsel. Instead, BPR takes the position that it can make its own rules and policies – which it has held are

**11**

"discretionary."[13] It also concedes that neither the BPR nor Disciplinary Counsel have (to date) "cite[d] any [D.C.] Court of Appeals decisions that address a prosecutor's conflict of interest." *See* BPR Order of July 31, 2025[14]. *supra*, Nonetheless, the BPR's official position *in this case* is that, in the absence of any such rules or guidance from the Court of Appeals, the Chair of the BPR is not only empowered the discretion to decide disqualification motions involving Disciplinary Counsel, but also to determine – without so much as mentioning the CJC – that the proper standard for disqualification will be whether the facts alleged by the party moving to disqualify "clearly and indisputably" establish "personal bias or prejudice … against the party submitting the affidavit." *Id.* (holding that it is Mr. Martin's burden, not Mr. Fox, to "explain how Mr. Fox's self-interest in defending himself in connection with Respondent's inquiries conflicts with his professional obligation as the Disciplinary Counsel.")[15] The "clearly and *indisputably*" (emphasis added) standard of proof is akin to the criminal standard of proof, beyond a reasonable doubt, and far beyond that required in any other disqualification context known to the law. Apparently in the view of the BPR, not even the retaliatory investigation and institution of charges designed to disbar the federal prosecutor in retaliation for the prosecutor's lawful investigation of Disciplinary Counsel can meet this burden nor does such an action qualify as impeding a federal investigation.

---

[13] The BPR Chair has held that the BPR has adopted its own policy and that "The [BPR] Recusal Policy uses similar standards to recusal rules applicable to judges *only as guidance* when considering non-mandatory recusal." [Emphasis added] *See* BPR Recusal Policy for Board and Hearing Committee Members, Approved May 17, 2018 (published for the first time in November, 2025 on the District of Columbia Bar website); See also, BPR Order, November 10, 2025, p. 4, fn. 3; *In the Matter of Haller* et al., Board Docket No. 24-BD-003; Disciplinary Docket Nos. 2021-D012, 2021-D013, 2021-D014, 2021-D015, 2021-D044, 2021-D045, 2021-D046. The BPR Chair explicitly rejected application of "judicial recusal rules." *Id.* [Appendix D].

[14] APPENDIX B

[15] APPENDIX C. *Accord* Brief of the Board on Professional Conduct, *In the Matter of Brandon C. Johnson*, D.C. App. No. 25-BG-1137 (filed by Executive Counsel, James Phalen, January 12, 2026) (arguing that the standard in the case of a Hearing Committee member is "actual bias or prejudice").

**12**

## A. THE BPR PERFORMS JUDICIAL FUNCTIONS ONLY BY DELEGATION FROM THE DCCA.

Under DCCA Rules I and XI §§4-14, the BPR, its Hearing Committees, Disciplinary Counsel, and the Executive Attorney, constitute a single entity that serves as the "official arm of the Court" that investigates, prosecutes, and resolves most contested disciplinary issues. While not "technically an agency," the BPR, Hearing Committees, and BPR staff, including Disciplinary Counsel and the Executive Attorney, function as one entity that serves as the DCCA's "adjunct factfinder" in Bar discipline cases. *In re Kitchings*, 779 A.2d 926, 932 (D.C. 2001) (describing Disciplinary Counsel as "the quasi-independent prosecutorial arm of the court," but "not technically an 'agency'".)

It is the BPR *as an entity* on which the DCCA has conferred the "power and duty … (1) To consider and investigate any alleged ground for discipline or alleged incapacity of any attorney called to its attention, or upon its own motion, and to take such action with respect thereto as shall be appropriate to effect the purposes of this rule." DCCA Rule XI §4(e)(1).

Hearing Committees appointed by the BPR conduct full-blown evidentiary hearings and resolve disputed questions of fact. *See generally* BPR Rules Chapters 2 through Chapter 20. (August 2020). Hearing Committees rule on the admissibility of evidence and applicability of relevant privileges. When the record closes, Hearing Committees hear arguments, receive briefs, and make what are, as a practical matter, binding recommendations concerning the law of professional responsibility in D.C. and the appropriate measure of discipline to be imposed on the attorney found to have violated them. The BPR's role is to do a limited review of the record, and "may affirm, modify, or expand the findings and recommendation of the Hearing Committee." BPR Rule 13.7.

In sum, the DCCA has vested its "adjunct factfinder" with enormous discretion and confers immunity "from disciplinary complaint under this rule and from civil suit for *any conduct in the course of their official duties*." DCCA Rule XI §19(a) (emphasis added). It has vested so much authority in the BPR that it expressly declines to conduct *de novo* reviews of the BPR's findings in contested cases.

> In determining the appropriate order [of discipline], the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

DCCA Rule XI §9(h).

The DCCA has, therefore, delegated to the BPR much of "its inherent powers over members of the legal profession," *and* a significant portion of its "statutory authority governing admissions to the Bar." DCCA Rule I (Preamble).[16] *Compare and contrast Northern. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 78-79, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982) (discussing constitutional limitations on judicial utilization of "adjunct factfinders") and *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (criteria for approving the use of federal magistrate judges). *See generally*; Wright and Miller, 13 FEDERAL PRACTICE & PROCEDURE §3528 (3d ed.) (distinguishing between the exercise of Article I judicial

---

[16] In full, the Preamble to DCCA Rule I provides:

> The District of Columbia Court of Appeals in the exercise of its inherent powers over members of the legal profession does hereby create, as an official arm of the Court, an association of members of the Bar of the District of Columbia to be known as the District of Columbia Bar, and pursuant to its statutory authority governing admissions to the Bar promulgates the following rules for the government of the Bar and the individual members thereof: …

https://www.dcbar.org/about/who-we-are/rules-and-bylaws/rules-governing-the-district-of-columbia-bar/rule-i-organization-of-the-bar-of-the-district-of- (accessed June 10, 2026)

powers granted to the D.C. courts and those administrative functions that Congress has the power to assign under the Seat of Government Clause).

### B. THE CODE OF JUDICIAL CONDUCT APPLICABLE TO THE D.C. COURTS GOVERNS ALL OPERATIONS OF THE BPR – INCLUDING THE BEHAVIOR OF ITS HEARING COMMITTEES, DISCIPLINARY COUNSEL, AND THE EXECUTIVE ATTORNEY.

The authority on which the BPR and Hearing Committees rely to hear and make recommended findings of fact and law in disputed Bar cases is judicial in character. D.C. Code §11-2503(b) expressly requires adversary court proceedings in contested discipline cases. DCCA Rule XI creates the BPR, and authorizes its Hearing Committees, Disciplinary Counsel, and the Executive Attorney to serve as its "arms" to assist in the DCCA's fact finding process and make recommendations concerning appropriate discipline.

Because the BPR is "an arm of" the DCCA, the BPR itself, its members, Hearing Committees, and employees are bound collectively and individually by the CJC. *In re J.A.*, 601 A.2d 69 (D.C. 1991); *Scott v. United States*, 559 A.2d 745, 749 & n. 6 (D.C. 1989).

### 1. The Code of Conduct for the D.C. Courts Requires Recusal by Members of the BPR, Members of Hearing Committees, Disciplinary Counsel, the Executive Attorney, and All Staff Attorneys whenever their Impartiality "Might Reasonably be Questioned."

Setting aside, for present purposes, the question of whether the DCCA has the authority to appoint the lawyers who carry out the BPR's "adjunct factfinder" function and defer to their findings of fact,[17] all members of the BPR, Hearing Committees, and BPR staff members are

---

[17] *See Northern Pipeline*, *supra*, and *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024). *In re Haar*, 270 A.3d 286, 294 (D.C. 2022) ("We accept the Board's factual findings if they are supported by substantial evidence in the record. D.C. Bar R. XI, § 9(h)(1). Although we defer to the Board's fact finding, the Board in turn must defer to the Hearing Committee's fact finding and "accept [those determinations], including credibility findings, if they are supported by substantial evidence in the record." [citation omitted]. As for "ultimate facts" or legal conclusions, including whether the attorney's

**15**

unquestionably "court officials and others subject to" the DCCA's direction. CJC Rule 2.12(A)

provides:

> (A) A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code.

Thus, to the extent that the DCCA *has* empowered the lawyers who participate in the BPR's fact-

finding function, *all* of the lawyers so engaged are bound *directly* by Rule 2.11(A) of the D.C.

Code of Judicial Conduct. It provides:

> (A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, …

Comment [1] makes it clear that the applicable standard is "*objective*" and recusal is mandatory,

not discretionary:

> Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply. For example, if a judge were in the process of negotiating for employment with a law firm, the judge would be disqualified from any matters in which that law firm appeared, unless the disqualification was waived by the parties after disclosure by the judge.
>
> [2] A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed.

The relevant case law also articulates this standard:

> a judge must recuse from any case in which there is "an *appearance* of bias or prejudice sufficient to permit the average citizen reasonably to question [the] judge's impartiality." *United States v. Heldt,* 215 U.S. App. D.C. 206, 239, 668 F.2d 1238, 1271 (1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982) (footnote and citations omitted). The objective standard is required in the interests of ensuring justice in the individual case and maintaining public confidence in the integrity of the judicial process which "depends on a belief in the impersonality of judicial decision making." *United States v. Nobel,* 696 F.2d 231, 235 (3d Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). *See generally,* Note, *Disqualification of Judges and Justices in the Federal Courts,* 86 Harv.L.Rev. 736, 746 (1973). Neither bias in fact nor

---

conduct was proven by clear and convincing evidence to be negligent, reckless, or more, we review de novo.) [citation omitted].

actual impropriety is required to violate the Canon. *Hall v. Small Business Admin.,* 695 F.2d 175, 178–79 (5th Cir.1983) (federal disqualification statute "focuses on what is revealed to the parties and the public, as opposed to the existence in fact of any bias or prejudice [and] cannot ... extend to ... the judge's actual virtue").

*Scott v. United States,* 559 A.2d 745, 749 (D.C. 1989).

The same rules apply to judicial employees – including Disciplinary Counsel, the Executive Attorney, and their respective attorney staff members. *See* Code of Conduct for the D.C. Courts, Appendix A – Conduct of Law Clerks (Revised February 19, 2025 (referencing; Federal Judicial Center, CODE OF CONDUCT FOR JUDICIAL EMPLOYEES (2024) CANON 2 ("A judicial employee should not engage in any activities that would put into question the propriety of the judicial employee's conduct in carrying out the duties of the office."); Advisory Committee on Judicial Conduct, Memorandum to Judicial law clerks and interns regarding "Public statements, protests, and financial support concerning controversial causes" at https://www.dccourts.gov/sites/default/files/divisionspdfs/Memo-to-Law-Clerks-re-Involvement-in-Controversial-Issues.pdf (accessed June 12, 2026).

### 2. Under the D.C. Rules of Professional Conduct, Disciplinary Counsel and the Executive Attorney serve as Special Counsel to the BPR.

In both form and function, the BPR is the DCCA's "in house" compliance office. Its seven (7) members include five (5) members of the Bar and two (2) individuals who are not lawyers. DCCA Rule XI §4(a). The BPR appoints Hearing Committees, "each consisting of two members of the Bar and one person who is not a lawyer, and such alternate Hearing Committee members as may be required, who shall conduct hearings under this rule and such other hearings as the Court or the Board may direct …." *Id*., §4(e). BPR then reviews the findings and recommendations of the Hearing Committees to which contested disciplinary cases are assigned by the Executive Attorney.

**17**

Mr. Fox and Mr. Phalen thus serve, both legally and functionally, as "inside counsel" for DCCA's compliance office.[18] Both are hired by the BPR, serve at its pleasure, and are paid from funds collected by the D.C. Bar. *See* DCCA Rule I (creating the D.C. Bar); XI §§4(e) (2-3); 19(g). The Executive Attorney is the legal advisor to all of the following: the Board, the Contact Member, the Hearing Committees, and (through the advice given to the Contact Member concerning the disposition of charges) to Disciplinary Counsel and his staff. The Executive Attorney also serves as the BPR's advocate before the Court of Appeals. DCCA Rule XI §§7(a)(7) (7-11). *See* Appendix C [Mr. Phalen's brief in the DCCA arguing against the application of the CJC to Hearing Committee Members]. Disciplinary Counsel is the BPR's in-house investigator, negotiator, compliance officer, and prosecutor. DCCA Rule XI §§6(a) (2-8). Disciplinary Counsel has complete discretion to decide *which* attorneys should be investigated, how and for what, but Mr. Fox does not have the discretionary authority to file formal charges. His service as *prosecutor* is subject to oversight by the BPR-designated Contact Member, whom the Executive Attorney "assign[s] … periodically and on a rotating basis." It is the Contact Member who, advised by the Executive Attorney, has final authority "to review and approve or suggest modifications of recommendations by Disciplinary Counsel for dismissals, informal admonitions, and the institution of formal charges." DCCA Rule XI §4(e)(5).

---

[18] *Compare Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), in which the Supreme Court held that article III courts have the authority to appoint counsel who can both investigate charges and prosecute proceedings to enforce the court's orders. *Id.*, 481 U.S. at 796 n.8, 107 S. Ct. at 2132 n.8 ("The need to vindicate a court's authority is thus satisfied [by hiring counsel to prosecute contempt that occurs outside the presence of the court] by ensuring that an alleged contemner will have to account for his or her behavior in a legal proceeding, regardless of whether the party is ultimately convicted or acquitted."). *But see Id.*, 481 U.S. at 816, 107 S. Ct. at 2142 (Scalia, J., concurring in the judgment) (arguing that the judicial power "does not include the power to seek out law violators in order to punish them—which would be quite incompatible with the task of neutral adjudication.")

**18**

Because both Mr. Fox and Mr. Phalen act on behalf of and serve at the pleasure of, the BPR, they are, as a matter of fact and as a matter of law, "lawyer[s] employed or retained by an organization." RPC 1.13(a). As such, each "represents the organization [here, the BPR] acting through its duly authorized constituents."

As "inside counsel" for the BPR, Mr. Fox, Mr. Phalen, and their respective staff attorneys must comply with all of the ethical constraints imposed on counsel for on organization or agency in general, and beyond judicial interpretation of the law, specifically *two* codes of professional ethics: the Code of Judicial Conduct for the D.C. Courts, which applies to all "judicial employees," and the D.C. Rules of Professional Conduct, which applies to Messrs. Fox and Phalen *as practicing lawyers* whose client is the BPR. *See* RPC 5.1 Comment [1] (duties of partners, managers, and supervisory lawyers in "the law department of an enterprise or government agency"). *Compare* RPC 1.6(k) (for purposes of confidentiality "[t]he client of the government lawyer is the agency that employs the lawyer unless expressly provided to the contrary by appropriate law, regulation, or order.")

### C. THESE BAR PROCEEDINGS IMPLICATE THE SOVEREIGN INTERESTS OF THE UNITED STATES, THE POWERS OF THE EXECUTIVE BRANCH, AND THE CONSTITUTIONAL RIGHTS OF MR. MARTIN.

When Mr. Martin wrote to Mr. Fox and to the Chief Judge with complaints that Mr. Fox was "weaponizing" his quasi-judicial office,[19] he represented the government of the United States, which is sovereign in the District of Columbia. U.S. Const. art. I § 8 cl. 17 (Seat of Government Clause). As U.S. Attorney he had not only the discretionary right of the to raise the issue of Fox's alleged wrongdoing directly with the Court of Appeals, but also a First Amendment right to pursue that complaint without fear of retaliation. When Mr. Martin wrote to the Dean of Georgetown Law

---

[19] Exhibit 12: Letter 05/09/25 – Martin to Blackburne-Rigsby

School to inquire about its DEI programs, he had the discretionary right of the U.S. Attorney to raise the legal compliance issue with the University, and he had a personal right, under Article VI and First Amendment, to complain to the judges of the Court of Appeals that Fox's "investigation" was inappropriate.[20]

These proceedings further pose a threat to Mr. Martin's Fifth Amendment rights, such as fair notice, and involve by necessity all Fifth Amendment principles, such as the right against self-incrimination, which is why the Supreme Court and the DCCA characterize them as "quasi-criminal." *In re Ruffalo*, 390 U.S. 544, 551 (1968) ("These [disciplinary proceedings] are adversary proceedings of a quasi-criminal nature."); *In re Williams*, 464 A.2d 115, 118-19 (1983) (following *In re Ruffalo* as to D.C. lawyer regulation); *In Re: Artis*, 883 A.2d 85, 98-99 (D.C. 2005). The conduct and scope of professional discipline cases also affect important, constitutionally protected interests, including a) fair notice of the applicable rules and b) the attorney's property interest in maintaining his or her license, U.S. Const., amend. V.

In this case, Mr. Martin's role as Acting U.S. Attorney for the District of Columbia also made him the representative of the United States Government in the District. As such, he was obligated by RPC 1.2 to "abide by [the President's] decisions concerning the objectives of representation" and he had every right, as U.S. Attorney, to inquire broadly concerning Mr. Fox's stewardship of the authority and near-absolute discretion the DCCA has granted to him. *See* 28 U.S.C. §§541-546.

The President and the Attorney General, no less than private clients, are entitled to their lawyers' candid advice and their competent and zealous advocacy. U.S. Const. art. II § 2 cl. 2

---

[20]Exhibits 9, 11: Letters – 03/28/25 and 04/15/2025 Fox to Martin (requiring a "substantive, written response to Judge Argento's letter" defending, on religious grounds, Georgetown's DEI programs).

**20**

(Opinion Clause); U.S. Const., amend. VI.; and both the President and the Attorney General benefit from the protection the First Amendment provides to both attorneys and clients, who must be free to covey and receive "candid advice" that is informed "not only [by] law but to other considerations such as moral, economic, social, and political factors, which may be relevant to the client's situation." RPCs 1.2, 1.3, 2.1(a). *Chiles v. Salazar*, 146 S. Ct. 1010, 1021-1023 (2026), citing *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 755, 138 S. Ct. 2361, 2365 (2018).

## II.   MR. FOX, MR. PHALEN, AND THE STAFF ATTORNEYS HAVE IRRECONCILABLE, AND IMPUTABLE CONFLICTS OF INTEREST.

By filing these obviously retaliatory charges against Mr. Martin, Mr. Fox further set up a deliberate confrontation between ODC and BPR on the one hand, and the Department of Justice on the other, involving at least two (2) issues. The first is whether the Executive Branch or a lawyer appointed by the BPR has preemptive, supervisory authority over the conduct of active federal investigations by the U.S. Attorney for the District of Columbia.[21] The second is whether the BPR has the authority to regulate the content or viewpoint of the inquiries made by law enforcement officers or employees of the United States on the President's behalf,[22] or to enquire concerning the content or viewpoint of the advice given to the President by his appointees. *See United States v. Fox*, U.S. District Court for the District of Columbia, Case No. 1:26-cv-01658-RJL (filed 05/13/26).

---

[21] Mr. Fox's actions also call into question whether he has interfered with an active federal criminal investigation by filing retaliatory charges in an effort to blunt a federal investigation into his own personal conduct in the execution of his official responsibilities. *See* 18 USC §1510.

[22] Mr. Martin's complaint to the Chief Judge of the DCCA specifically charged that that Mr. Fox's behavior "is not only a breach of my confidentiality, but an interference in the work of the United States Attorney's Office for the District of Columbia." [Exhibit 12: 05/09/2025 Letter – Martin to Blackburne-Rigsby] *See* 18 U.S.C. §1503 (intentional interference with a federal investigation; obstruction of justice); 18 USC §1505 (obstruction of proceedings); 18 USC §1510 (obstruction of criminal investigations); 18 USC §1519 (retaliation); 19 U.S.C. §1512 (witness tampering).

**21**

Though the Court of Appeals has described Disciplinary Counsel as its "quasi-independent prosecutorial arm,"[23] *In re Kitchings, supra,* Mr. Fox is *not* "independent" any sense of the word. He, Mr. Phalen, and the Contact Attorney appointed by the BPR play essential roles in the investigation, initiation, prosecution, and disposition of the disciplinary cases litigated in the BPR fact-finding process. Mr. Fox and his staff attorneys investigate, prepare, and propose charges at the pleasure of the BPR, but cannot proceed with them without Mr. Phalen's oversight and involvement. Mr. Phalen selects and "assign[s] periodically and on a rotating basis, an attorney member of a Hearing Committee as a Contact Member to review and approve or suggest modifications of recommendations by Disciplinary Counsel for dismissals, informal admonitions, and the institution of formal charges." DCCA Rule XI §7(a)(2).

> In the event of a disagreement between Disciplinary Counsel and the Contact Member regarding the disposition recommended by Disciplinary Counsel, *the matter shall be referred by the Executive Attorney* to the Chairperson of a Hearing Committee other than that of the Contact Member for decision. The decision of the Hearing Committee Chairperson to whom the matter is referred shall be final.

DCCA Rule XI §5(d) (emphasis added). Mr. Phalen not only selects *which* Hearing Committees will hear and decide contested cases, DCCA Rule XI §5(c)(1), he selects the Contact Member, *id*. §7(a)(2); and he decides which Hearing Committee Chair will resolve disputes between Disciplinary Counsel and the Contact Member concerning the nature and content of formal charges in a specific case – and is charged with providing legal advice to them all.

---

[23] While the concept of "independence" may admit of shades of grey, the concept of "quasi-independence" makes no sense at all as applied to the BPR and its employees unless the DCCA has "outsourced" its factfinding function in Bar cases to its "adjunct factfinder." *Compare Axon Enter., Inc. v. Fed. Trade Comm'n,* 598 U.S. 175, 196, 143 S. Ct. 890, 906, 215 L. Ed. 2d 151 (2023) (Thomas, J. concurring) ("I write separately, however, because I have grave doubts about the constitutional propriety of Congress vesting administrative agencies with primary authority to adjudicate core private rights with only deferential judicial review on the back end."); *with id*., 598 U.S. at 217, 143 S. Ct. at 918 (Gorsuch, J. concurring in judgment) ("We have no authority to froth plain statutory text with factors of our own design, all with an eye to denying some people the day in court the law promises them.").

Acting together as the "quasi-agency" it is the lawyers who make up the BPR's various constituent entities that shape DCCA disciplinary policy through the exercise of their investigative, prosecutorial, and fact-finding discretion. *see In re Kitchings, supra,* Mr. Phalen advises on the content and continuity of that policy and defends it before the Court of Appeals. He attends Hearing Committee hearings; gives legal advice to Hearing Committees and their members and then gives legal advice to the BPR during its review of Hearing Committee reports and recommendations. He can even serve as "Special Disciplinary Counsel" when appointed by the BPR. *Id.,* §7(a)(8). Together with Mr. Fox, Mr. Phalen is "inside counsel" for the BPR. *See* RPC 1.13 (organization as client).

When Mr. Fox sought clearance from the Contact Attorney to file charges against Mr. Martin for exercising his investigatory discretion as U.S. Attorney, the Contact Attorney, Mr. Phalen, and BPR Chair Ms. Bernadette Sergeant, were obligated *by their duties as attorneys acting for and on behalf of the BPR* to determine whether there was conflict of interest between Mr. Fox's personal and professional interests under RPCs 1.7(b), 1.10, and 1.13 and the duty he owes to the Court as "inside counsel" for the BPR and the Court of Appeals under Rules 2.11(A) and 2.12 of the CJC.

From the extant correspondence presented in Appendix A [Timeline of Correspondence], it appears that Mr. Fox deliberately provoked a confrontation with the Department of Justice so that he could litigate the scope of ODC's authority over DOJ lawyers in a contested case before the BPR – or "in-house."[24] He selected what he already knew to be a friendly forum with

---

[24] There is no question in this case concerning the power of the District of Columbia courts to control the conduct of DOJ attorneys who appear before them. 28 C.F.R. §77.4(a) provides that "A government attorney shall, in all cases, comply with the rules of ethical conduct of the court before which a particular case is pending."

questionable and flexible adherence to federal ethics standards;[25] the Contact Member selected and advised by Mr. Phalen approved those charges; Mr. Phalen chose the Hearing Committee to which the Martin case would be assigned; and Mr. Phalen has advised both the Chair of the BPR and the Court of Appeals that the BPR is not bound by the Code of Conduct for D.C. Judges. *See* Response of the Board on Professional Responsibility, *Matter of Brandon C.* Johnson, D.C. App. No 25-BG-1137 (Filed January 12, 2026) at pp. 3-5 & fn. 3 (arguing in the DCCA that in a proceeding to recuse a Hearing Committee member, the BPR's own Rule 7.22, which requires "actual bias", controls rather than the CJC or 28 U.S.C. §455). [Appendix C]

These are "classic" conflicts of interest that must be imputed to all BPR staff attorneys. RPC 1.7(a)(4); 1.10(a). *Compare* D.C. Code §1-1162.23)(a) (District employees may not use their official titles in any matter in which they "personally and substantially participate … in a manner that the employee knows is likely to have a direct and predictable effect on the employee's financial interests …."; 18 U.S.C. §208(a) (criminal liability for "personal and substantial" involvement in a "particular matter" in which the federal employee has a personal, financial interest)); 28 U.S.C. §528 (requiring recusal by Department of Justice attorneys in cases where they have a personal interest).

## III.   PROSECUTORS APPOINTED BY COURTS TO ASSIST IN THE EXERCISE OF THEIR DISCIPLINARY POWERS MAY NOT APPEAR IN CASES IN CASES IN WHICH THEY HAVE A PERSONAL INTEREST.

Bar disciplinary proceedings exist to vindicate the court's interest ensuring that counsel conduct their affairs in accord with the law. D.C. Code §§ 11-2501 through 11-2504.[26] In the words of the DCCA itself, Disciplinary Counsel is its "quasi-independent prosecutorial arm". *In re*

---

[25] See Part IV(B) at 33-34 and following.

[26] District of Columbia Court Reform and Criminal Procedure Act of 1970, Public Law 91-358, (the "Reorganization Act"), *codified as revised in* DC Code, Chapter 11, as amended.

*Kitchings, supra.* Under the CJC Rule 2.12(A), Mr. Fox is a quasi-judicial officer who serves for the limited purpose of vindicating the DCCA's regulatory interest in the conduct of Bar members. He and Mr. Phalen play pivotal roles in that enforcement effort.

Because prosecutors are to represent only the public's interest in the administration of justice, it is at least an abuse of discretion and at worst a denial of Due Process for any court to permit an interested or otherwise conflicted lawyer to conduct an investigation or adversary proceeding on its behalf. Read together, CJC 2.11(A), 2.12(A), RPC 1.7(b)(4) and RPC 3.8(a), require the disqualification of a lawyer retained by a court to prosecute on its behalf who has *any* personal, professional, or client-centered interest in the outcome of the case.

> We have held that some errors "are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). We find that the appointment of an interested prosecutor is such an error.
>
> An error is fundamental if it undermines confidence in the integrity of the criminal proceeding. *Rose v. Clark,* 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986); *Van Arsdall, supra,* 475 U.S., at 681–682, 106 S.Ct., at 1436–1437; *Vasquez v. Hillery,* 474 U.S. 254, 263–264, 106 S.Ct. 617, 623–624, 88 L.Ed.2d 598 (1986). The appointment of an interested prosecutor raises such doubts. Prosecution by someone with conflicting loyalties "calls into question the objectivity of those charged with bringing a defendant to judgment." *Vasquez, supra,* at 263, 106 S.Ct., at 623. It is a fundamental premise of our society that the state wields its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters. We have always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty. We have held, for instance, that it cannot be harmless error for racial discrimination to infect the selection of the grand jury, *Vasquez, supra;* for a petit jury to be exposed to publicity unfavorable to the defendant, *Sheppard v. Maxwell,* 384 U.S. 333, 351–352, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); or for adjudication to be performed by a judicial officer faced with a conflict of interest, *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

*Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 809–10, 107 S. Ct. 2124, 2139, 95 L. Ed. 2d 740 (1987).

In his opposition to Mr. Martin's motion to disqualify him at the Hearing Committee and the BPR Chair levels, Mr. Fox implausibly and contrary to the documentary evidence claimed that he did not "know" that his conduct was the focus of the U.S. Attorney's investigation and correspondence with the judges of the Court of Appeals.[27] Apparently. Mr. Fox's reading of Mr. Martin's numerous written communications was insensate. Further, by his assertions, Mr. Fox has put assertions of fact known only to himself – his own knowledge of the federal investigation, his state of mind, and his veracity – into dispute not only with regard to his fitness to prosecute this proceeding, CJC 2.11(A)(1), but also with regard to the retaliation and investigation interference claims.[28] As the Chair of the BPR put it in his order denying Mr. Martin's motion to disqualify:

> In considering Respondent's retaliation claim, we need not determine whether Respondent was investigating Mr. Fox in his official capacity when the complaint was opened, or whether he is investigating Mr. Fox now. Instead, *we must determine whether there is clear evidence that Mr. Fox understood that he was under investigation*, because such an understanding is an essential component of Respondent's retaliation argument.

*See* BPR Order of July 31, 2025, *supra*, at p.5 (emphasis added). [APPENDIX B]. Read together, the correspondence marked as Exhibits 13, 14, 15, 16, 17, and 18 clearly confirm that then-BPR Chair Sargeant and Chief Judge Blackburne-Rigsby formally acknowledged that Mr. Martin was conducting an official investigation of ODC, its policies, and its practices. Wholly apart from the question of how knowledge is imputed among the lawyers who staff BPR's fact-finding functions, those exhibits unquestionably confirm not only that Mr. Fox and Mr. Phalen were aware of the investigation, but that the BPR itself had conducted an internal inquiry and *rejected* Mr. Martin's

---

[27] *See* BPR Order of July 31, 2025, *supra*, at pp. 4-5 ("Disciplinary Counsel asserts that Mr. Fox did not know he was under investigation, and thus, his investigation of Respondent is not retaliatory. [citing ODC's Reply at 12-14]"). APPENDIX B.

[28] *See* Exhibit 11: 04/15/25 Email – Fox to Martin recommending that Martin retain counsel and stating "… nothing in your correspondence [with the Chief Judge] absolves you of your obligations as a member of the Bar, which includes responding to my inquiry."

concerns on the merits.[29]

Given Mr. Fox's admitted status as a quasi-judicial officer [Exhibit 2, Letter – 03/28/25 Fox to Martin]**,** and the clear paper trail in which the Board Chair and the Chief Judge of the Court of Appeals acknowledge that Mr. Fox was, in fact, under investigation by Mr. Martin [Exhibits 14-18], the conduct of the BPR permitting him to prosecute this this case without disqualifying him "calls into question the objectivity of those charged with bringing a defendant to judgment." *Vuitton Fils, S.A.*, 481 U.S. at 810, 107 S. Ct. 2139.

> It is true that we have indicated that the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers. [citation omitted] This difference in treatment is relevant to *whether* a conflict is found, however, not to its gravity once identified. We may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists. Once we have drawn that conclusion, however, we have deemed the prosecutor subject to influences that undermine confidence that a prosecution can be conducted in disinterested fashion. If this is the case, we cannot have confidence in a proceeding in which this officer plays the critical role of preparing and presenting the case for the defendant's guilt.
>
> ***
>
> Appointment of an interested prosecutor is also an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining the effect of this appointment thus would be extremely difficult. A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are *part* of the record.

*Id.*, at 810–13, 107 S. Ct. at 2139-2140 (emphasis in original); *United States v. Armstrong*, 517 U.S. 456, 464 (1996).[30]

---

[29] *See* Exhibit 14, 04/01/25 Letter – BPR Chair Sergeant to Martin (acknowledging that Martin was conducting a USAO investigation of ODC while justifying and defending Fox's behavior with cc: to Fox, Phalen, and Blackburne-Rigsby); Exhibit 16, 05/20/25 Letter – BPR Chair Sergeant to Martin (rejecting the merits of Fox's complaints about Fox and ODC).

[30] *See also Registe v. State*, 287 Ga. 542 (2010) ("[C]ourts have an independent interest in ensuring that criminal trials are conducted *within the ethical standards of the profession* and that legal proceedings appear fair to all who observe them.") *citing Wheat v. United States*, 486 U.S. 153, 160 (1988).

In both *Vuitton et Fils, S.A.* and *Brotherhood of Locomotive Firemen & Engineers,* the District Courts appointed counsel who had personal or client interests in the outcome to argue the case for contempt. In *Vuitton et Fils, S.A.*, the court appointed the attorneys for Vuitton to prosecute the alleged infringers. In *Brotherhood of Locomotive Firemen & Engineers,* the court appointed the attorneys for the Carriers who opposed the union. And in this case, the Chair of the BPR has ruled – arguably without authority, *see* Part IV (A) at page 30 below – that Mr. Fox can continue to prosecute the former Acting U.S. Attorney for the District of Columbia who opened a federal investigation into his behavior.

Here, the timeline leaves no doubt: Fox's own conduct was the subject of an investigation by the U.S. Department of Justice when Fox received a complaint about Respondent's letter to Georgetown Law School.[31] After 18 days and three additional letters from Mr. Martin inquiring into his behavior, Fox then opened an investigation. After multiple *additional* letters from Mr. Martin, Mr. Fox received permission from the Contact Member and Executive Attorney to file formal charges. Mr. Phalen assigned those charges to a specific Hearing Committee knowing that Respondent had filed a formal complaint about Fox with the Chief Judge and the Associate Judges of the D.C. Court of Appeals.

Facially, the correspondence from Respondent to the DCCA judges shows that Mr. Fox was aware of not only the charges Respondent made against him, but also that he had access to copies of that correspondence from various sources, including Respondent, BPR Chair Sargeant or from the DCCA itself. Thus, Mr. Fox charged Mr. Martin with making an *ex parte* communication all the time knowing that a communication with a court is not legally or factually

---

[31] Mr. Argento's complaint letter, while seemingly sincere, is, in fact, an extended editorial and religious comment by a self-admitted Georgetown Law alumnus who offers no personal knowledge of the facts that would shed light on how Georgetown Law actually interprets and implements its DEI policies.

*ex-parte* when the opposing party is copied on that communication.[32] Moreover, there was no "proceeding" before the DCCA or the BPR in which an *ex parte* communication could have been made. There was only, by the BPR Chair's own admission, an internal administrative discussion about how (and who) should manage the U.S. Attorney's inquiries about Mr. Fox's behavior. [Exhibit 5, Letter 03/13/25 BPR Chair Sergeant to Martin; Exhibit 14, 04/01/25 Letter from BPR Chair Sargent to Martin]. Martin's complaints about Fox were not contested cases before the BPR or in any other sense a "proceeding;" they were official U.S. Government inquiries into the conduct of the ODC and BPR.

Unlike Mr. Martin, who exercised his right and duty as U.S. Attorney to question the DCCA concerning the ethics and legality of Mr. Fox's official conduct, it is Mr. Fox who has – just as Respondent alleged – used his Office of Disciplinary Counsel to advance his own personal and political agendas. He operates unsupervised by *anyone,* because Mr. Phalen, who has his own ethical responsibility to the BPR to identify and report questionable conduct, has not done so, nor has any member of the BPR, including the current BPR Chair, who is presumed to know of his predecessor's correspondence concerning Fox. *See* RPC 1.10 (imputation of knowledge within a firm); 1.13 (organization as client); 2.1 (independent professional judgment); 8.3 (reporting misconduct). Both Mr. Phalen and the former Chair of the BPR, Ms. Sargeant, not only knew about

---

[32] Mr. Fox's allegation before the BPR that he did not know that Mr. Martin had opened a federal investigation into his conduct is also cast into doubt by the Specification of Charges Fox filed against Mr. Martin. Paragraph 15 of those charges refers specifically to Mr. Martin's March 31, 2025, letter to the Court of Appeals, recites its content, and asserts that is the basis for the charge that Mr. Martin was engaged in *ex parte* communications with the DCCA. *Compare* Exhibit 21: 03/06/26 Specification of Charges signed by Hamilton P. Fox III *with* Exhibit B (crediting Fox's assertion that he did not know he was being investigated) *and* Exhibit 18: Letter 01/07/2026 Fox to MacDougald (requesting comment on Martin's March 31, 2025 letter to the DCCA [Exhibit 13 Letter-03/31/25 – Martin to Blackburne-Rigsby & Judges of the DCCA].

Mr. Martin's complaints about Fox's behavior and defended it, but they also allowed Fox to bury the fact of Acting U.S. Attorney Martin's investigation of Fox's conduct by filing these charges.

Mr. Fox and the attorney staff of the Office of Disciplinary Counsel, and Mr. Phalen, and the attorney staff of the Office of the Executive Attorney should be disqualified.

## IV.    THE BPR'S DENIAL OF MR. MARTIN'S MOTION TO DISQUALIFY IS NOT BINDING ON THIS COURT AND SHOULD BE RECONSIDERED.

By statute, this Court is not bound by the decisions of the forum from which this case was removed especially when, as here, the forum has inherent conflicts. 28 U.S.C. § 1450 provides in pertinent part that "All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."

This case is a good example of the wisdom inherent in the §1450 requirements. Indeed, the whole point of the federal officer removal statute is to provide a federal forum for the adjudication of the Respondent's federal defenses. Decisions adverse to the federal officer in the local forum are therefore inherently subject to review by the Article III court.  It is fair to recognize that the District of Columbia, and in particular  lawyers who staff its Bar disciplinary process, exhibit hostility to lawyers appointed by the Trump Administration.  Thus, for these structural reasons, the recognized climate of hostility and the conflicts that have already tainted the BPR proceedings, this Court should give a disqualification a fresh look.

### A. THE BPR CHAIR'S DECISION THAT DISCIPLINARY COUNSEL SHOULD NOT BE RECUSED IS AN ERROR OF LAW TAINTED BY CONFLICT OF INTEREST

If, as the DCCA held in *Kitchings*, supra, the BPR is "bound to follow its own rules and regulations" in the course of its operations, there is also a Due Process "notice" problem with the BPR's approach in this case. Both DCCA Rule XI and the BPR Rules are silent concerning the general standard to be applied when a Respondent seeks disqualification of a BPR member,

30

Disciplinary Counsel, the Executive Attorney, or an attorney member of the BPR staff.[33] *Compare* BPR Rule 7.22 (providing a procedure for disqualification of a Hearing Committee member). Nor do either DCCA Rule XI or the BPR Rules specify a process for deciding recusal motions that go to the heart of the fact-finding process.[34] The rules (as opposed to "policy") are simply silent on the question of whether disqualification motions should be decided, in the first instance, by the Court of Appeals or the BPR. The result, however, is clear: If the DCCA chooses to decide, a Respondent could be spared the ordeal of a proceeding involving an interested factfinder.[35] If the BPR decides, the conflict taints the entire proceeding. Even Chief Justice Blackburne-Rigsby's implausible and legally erroneous suggestion that the U.S. Attorney's Office may investigate ODC but only within and subject to the rules of the BPR disciplinary process before the court will even consider them, is untethered both to DCCA's own the rules and to federal law governing the powers of U.S. Attorneys. It also ignores the structural supremacy of the federal government over the District of Columbia. *See* Exhibit 15, 04/08/25 Letter – Judge Blackburne-Rigsby to Martin (suggesting that the U.S. Attorney must submit to the jurisdiction of the BPR and DCCA in order to investigate claims against ODC and the BPR); Exhibit 19, 05/14/25 Letter – Blackburne-Rigsby to Martin (same).[36]

---

[33] The BPR did adopt a "Recusal Policy for Board and Hearing Committee Members" in May 2018. *See* citation link at note 3, *supra.* Whatever the BPR "Recusal Policy" purports to be, it is not, as a matter of law a "rule" binding on anyone, including, it appears, the BPR itself. See citations at to BPR proceedings at note 13, *supra* (holding the policy applies "***only as guidance***."

[34] The BPR "Recusal Policy" does articulate a process for limited functions.

[35] The DCCA defers such decisions regarding conflict issues in disciplinary proceedings beyond the point when it is recognized, forcing a Respondent to run an entire gauntlet of tainted proceedings.  See, January 28, 2026 Order, IN RE BRANDON C. JOHNSON, No. 25-BG-1137 (DCCA) stating" We observe that the Board on Professional Responsibility provides only a recommendation to this court and that, to the extent Johnson takes issue with the final recommendation, he can present his arguments during this court's review of the recommendation."

[36] A close reading of Rule XI §19(a) shows that the DCCA purports to confer immunity on all who are associated in an official capacity with disciplinary process, and Rule XI §19(b) expressly permits *only*

In the present case, in which Mr. Martin sought to disqualify Mr. Fox before the Hearing Committee and at the BPR level, the "gaps" in the rules raise questions that go to the heart of Due Process. Read together CJC 2.11(A), comment [2], and 2.12(A) expressly provide that judicial personnel must recuse even in the absence of a motion to disqualify whenever there is "personal bias or prejudice concerning a party or a party's lawyer, **or** personal knowledge* of facts that are in dispute in the proceeding."

The BPR's official position  is that 1) a motion to disqualify is required; 2) the affidavit submitted by the complaining party must "clearly and indisputably" show that there is "personal bias or prejudice … against the party submitting the affidavit"; 3) that the burden is, here, on Mr. Martin to "explain how Mr. Fox's self-interest in defending himself in connection with Respondent's inquiries conflicts with his professional obligation as the Disciplinary Counsel"; and 4) that the Chair of the BPR has authority to make such rulings. *See* BPR Order of July 31, 2025, *supra* [APPENDIX B] *Accord* Brief of the Board on Professional Conduct, *In the Matter of Brandon C. Johnson*, D.C. App. No. 25-BG-1137 (filed by Executive Counsel, James Phalen, January 12, 2026) (arguing that the standard is "actual bias or prejudice.") [APPENDIX C].

As the Supreme Court held in *Vuitton Fils, S.A.*:

A concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system. "[J]ustice must satisfy the appearance of justice," *Offutt, supra,* 348 U.S., at 14, 75 S.Ct., at 13, and a prosecutor with conflicting loyalties presents the appearance of precisely the opposite. Society's interest in disinterested prosecution therefore would not be

---

"Complaints against members of the disciplinary system" in cases "involving activities *other than* those performed within the scope of their duties." (emphasis added). Rule XI and the BPR rules are silent on the standards governing conflict of interest and recusal of anyone except for Hearing Committee members. *See* BPR Rule 7.22. The plain meaning of the Seat of Government Clause negates the proposition that any arm of the D.C. government can immunize itself from federal law and from investigations or oversight by the federal government.

adequately protected by harmless-error analysis, for such analysis would not be sensitive to the fundamental nature of the error committed. [footnote omitted]

Appointment of an interested prosecutor is also an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining the effect of this appointment thus would be extremely difficult. A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are *part* of the record.

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. at 812–13, 107 S. Ct. at 2140, 95 L. Ed. 2d 740 (1987) (emphasis in the original).

In sum, Due Process not only "requires a disinterested prosecutor with the unique responsibility to serve the public …and to seek justice that is unfettered", *Vuitton et Fils S.A.*, supra, 481 U.S. at 815, 107 S. Ct. at 2141 (Blackmun, J., concurring), it also forbids *ad hoc* rule and "policy" making by the BPR in an effort to fill identified gaps in its own rules.

The personnel who staff the functions of the BPR are not real judges and not in all cases even lawyers. They are, in fact, a mix of volunteer lawyers and laypersons who are appointed by the Court of Appeals as "adjunct fact finders" to assist the court in the exercise of its statutory oversight of the behavior of members of the D.C. Bar. In this position of judicial appointees, they must recuse themselves if any of the conflict scenarios listed in CJC 2.11[A] *or* in RPC 1.7(a) or (b) are present. Such conflicts cannot be waived, and are imputable to the BPR and, as here, to judges of the DCCA itself.

## B. The BPR is not a Disinterested "Adjunct Fact Finder"

As explained in Part I(B)(2) at page 17 above, Disciplinary Counsel and the Executive Attorney serve as Special Counsel to the DCCA. Their *sole* duty *to the court* and to the BPR which is the court's "arm" *and their client* is to protect the interests of the DCCA in its process and decisions policing the behavior of attorneys admitted to its bar. It is, at the very least, incongruous that Ms. Sargeant's successor as Chair of the BPR, as advised by Mr. Phalen, rejects the proposition

that the law on ethical standards governing recusal of judges does not apply to Hearing Committee members.[37] Nor is it plausible that anyone in the leadership of the BPR could have been unaware of the correspondence among Mr. Martin, BPR Chair Sargeant, and Chief Judge Blackburne-Rigsby. *See* Exhibit 11, 04/15/25 Email chain – Fox to Martin & Martin reply to Fox, Thornton, and Blackburne-Rigsby); Exhibit 15, 04/01/25 Letter – BPR Chair Sargeant to Martin (with copies to Blackburne-Rigsby, Fox, and Phalen); Exhibit 16, 05/20/25 Letter – BPR Chair Sargeant to Martin (indicating that the BPR's review of the facts found no wrongdoing on Fox's part).

Respondent submits that, in the present case, the BPR's present recusal practice is fatal to the entire BPR process in which Mr. Martin is ensnared. Both the BPR Chair and the Judges of the D.C. Court of Appeals were acutely aware that Mr. Martin had alleged that Mr. Fox had committed serious misconduct. [Exhibits 1-7, 11-13, 16, 18] That conduct is ongoing.  They did nothing to address the misconduct charged, or the conflicts of interest those charges created for Mr. Fox and to whom the DCCA has delegated the responsibility to supervise his behavior. As Mr. Martin warned the DCCA, "To be candid, Judge, you have a crisis on your hands because of him." That crisis has now metastasized into *U.S. v. Fox*.

The BPR's nonexistent supervision of Disciplinary Counsel is at least "at odds" with its continuing duty to ensure that the attorneys it employs and supervises comply with the legal and ethical requirements that Disciplinary Counsel so zealously (if selectively) enforces on other members of the D.C. Bar. Under Rule XI §4(e)(2), the BPR appoints Disciplinary Counsel, and the incumbent serves at the pleasure of the Board "subject to the DCCA's oversight authority over all disciplinary matters." Since under Rule XI §8(a) all investigations, whether upon complaint or

---

[37] This assertion was also articulated by the BPR in its order dated November 10, 2025, *In re Haller, Johnson and Joseph*, Board Docket No. 24-BD-003 [Appendix D].

otherwise are conducted by Disciplinary Counsel, the question arises: To whom does Disciplinary Counsel Fox answer? Respondent submits that then-BPR Chair Sargeant's letter to Mr. Martin on behalf of the BPR dated March 13, 2025, provides the answer: Nobody.

### CONCLUSION

Mr. Martin opened an investigation for the better part of two months *before* Mr. Fox opened his retaliatory investigation of Mr. Martin. An attorney who intentionally participates in a disciplinary proceeding as a representative of the DCCA where there is a *prima facie* case that he or she has a personal or client-centered conflicted interest in the outcome perverts the fair administration of justice and harms not only the judicial system as a whole, but also the individual whose right to equal *protection* and due process of the law is swallowed by the conflict.

In this case, ODC and the BPR have targeted Mr. Martin and other Department of Justice attorneys in a politically inspired effort to impede the fair administration of justice. The BPR and ODC attorneys necessarily had (and have) conflicting personal and institutional interests that were known to them when the Argento investigation was opened and when ODC filed its BPR-approved charges against Mr. Martin.

This case is tainted by conflict of interest, *ab initio*. Due Process does not permit Mr. Fox, Mr. Phalen, or any attorney employed by the BPR to prosecute the charges against Respondent. Mr. Fox and Mr. Phalen and their staff attorneys must be disqualified.

Respectfully submitted this 26th day of June 2026.

> */s/ Christopher A. Byrne, Esq.*
> Christopher A. Byrne, Esq.
> DC Bar No. 928424
> Byrne Law PLLC
> 1050-30th St Northwest
> Washington, DC 20007
> (202) 487-6800
> cabesq@protonmail.com

*Pro hac vice motions pending*

| | |
|---|---|
| Harry W. MacDougald* | Robert A. Destro* |
| Georgia Bar No. 453076 | Ohio Bar #0024315 |
| Caldwell, Carlson, Elliott & DeLoach, LLP | 4532 Langston Blvd. 520 |
| 6 Concourse Parkway, Suite 2400 | Arlington, VA 22207 |
| Atlanta, Georgia 30328 | 202-905-6064 |
| (404) 843-1956 | robert.destro@protonmail.com |
| hmacdougald@ccedlaw.com | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June 2026 I served counsel for the opposing parties

with a copy of this ***Motion to Disqualify*** by email addressed to:

Hamilton P. Fox
 D.C. Bar Office of Disciplinary Counsel
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

James Phalen, Esq.
Executive Attorney
D.C. Bar Office of the Executive Attorney
Building A
515 5th Street NW
Washington DC 20001
Phalenj@dcoea.org

/s/ *Christopher A. Byrne*

Christopher A. Byrne, Esq.
DC Bar No. 928424

Byrne Law PLLC
1050-30th St Northwest
Washington, DC 20007
(202) 487-6800
cabesq@protonmail.com

**36**